NO. __16-CI-00067__                                         OLDHAM CIRCUIT COURT
                                                            DIVISION _____
                                                            JUDGE _____


ADRIANNE POPECK                                                              PLAINTIFF

v.

RAWLINGS COMPANY LLC
    Serve: Patricia G. Tobin
          Rawlings Company LLC
          One Eden Parkway
          LaGrange, Kentucky 40031

and

DEBRA FORD                                                                   DEFENDANTS
    Serve: Debra Ford
          9309 Norton Commons Boulevard
          Prospect, Kentucky 40059

## VERIFIED COMPLAINT

Plaintiff Adrianne Popeck, for her Verified Complaint against Defendants Rawlings Company LLC and Debra Ford, states as follows:

1. Plaintiff Adrianne Popeck is a resident of Louisville, Jefferson County, Kentucky, residing at 11026 Indian Legends Drive, No. 301, Louisville, Kentucky 40241.

2. Defendant Rawlings Company is a for-profit Kentucky limited liability company with a principal place of business in LaGrange, Oldham County, Kentucky, where it employs more than fifty people. Its registered address and address for service of process is The Rawlings Company LLC, c/o Patricia G. Tobin, One Eden Parkway, LaGrange, Kentucky 40031.

3. Defendant Debra Ford is a resident of Prospect, Jefferson County, Kentucky, with



EXHIBIT A

FILED
FEB 03 2016
OLDHAM CIRC/DIST. COURT
BY _____ D.C.

a residential address of 9309 Norton Commons Boulevard, Prospect, Kentucky 40059.

4. Jurisdiction and venue are proper in this Court under KRS § 344.450 and 29 U.S.C.A. § 2617(a)(2).

5. Until December of 2015, Plaintiff worked at the Rawlings Company in LaGrange for over six years, having been hired on March 30, 2009. Plaintiff worked as a salaried employee, with additional commissions paid to her based on performance.

6. In her time as a Rawlings employee, Plaintiff served as an Auditor and Audit Manager in the company's Medicare group, auditing claims for payment by health care providers that had previously billed Rawlings's clients for services rendered to patients.

## PLAINTIFF'S MEDICAL DIAGNOSIS AND MEDICAL LEAVE

7. In September of 2012, Plaintiff was promoted to the position of Audit Manager, which she held for approximately two years.

8. In or about the summer of 2013, Plaintiff was diagnosed by a medical doctor as suffering from irritable bowel syndrome ("IBS"), a medical condition that causes those afflicted to experience digestive trouble.

9. Plaintiff undertook to treat her IBS, under the care and direction of medical specialists, immediately upon receiving her diagnosis.

10. IBS is a chronic condition, without a known cure, but it can be managed with a combination of therapies, including medication.

11. IBS is known to afflict sufferers with chronic bouts of waste elimination difficulties, including episodes of diarrhea and extraordinary abdominal pain.

12. IBS further afflicts sufferers with sleep difficulties, depression, and general feelings of being unwell.

13. Plaintiff has experienced these symptoms of IBS since around late 2011, and her diagnosis was the first critical step to beginning to manage the disability.

14. In or about December of 2013, Plaintiff completed paperwork to justify intermittent leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C.A. §§ 2601, *et seq.* and transmitted the paperwork to her employer.

15. Plaintiff's FMLA paperwork advised that she would need to use intermittent leave to miss small portions of work when her IBS symptoms interfered with her ability to function.

16. Specifically, Plaintiff's medical team advised that she was most likely to experience symptoms early in the morning and late in the afternoon, requiring her to occasionally arrive late or leave early.

17. Attendant to the paperwork process, Defendant Rawlings tendered a copy of an "At-Will Job Description" for the position to the medical team.

18. In the Description, Defendant Rawlings identified only the following time-related job requirements: 1) "Answers all phone calls in a timely fashion"; 2) "Possesses time management skills"; 3) "Frequently remains in sitting position for long periods of time to perform duties"; and 4) "Frequently concentrates for long periods of time, paying close attention to detail."

19. In practice, Defendant Rawlings frequently varies from its "ordinary" work schedule. Employees are permitted to arrive to work late, or stay late, to avoid traffic congestion caused by bridge construction. There are also alternative shifts available to people who work on files for which they need to communicate with people in western time zones. The absence of a stated hours requirement on the Description was consistent with

the established expectation that employees could vary from the ordinary business hours in order to complete work while navigating external factors.

20. In response to Defendant Rawlings's itemized Description, Plaintiff's medical doctors advised that Plaintiff would require the intermittent accommodation of coming in late, and sometimes leaving early, on the occasions that her symptoms were particularly severe and required care at home.

21. In the weeks and months following Plaintiff's submission of the FMLA paperwork, unpaid leave was given to her so that she could attend to her medical needs as necessary, all the while working with her medical team to identify the best combination of therapies for her disability.

22. During that time, Plaintiff experienced disparate treatment from the Audit Department's Director, Kelly Young, including selective enforcement of company rules that resulted in singling her out for unique discipline.

## PLAINTIFF'S DEMOTION

23. After Plaintiff began to take this unpaid, intermittent leave, she was called into a meeting held by Defendant Ford in August of 2014, and at which Director Young was also present. In that meeting, Defendant Ford advised Plaintiff that she was being demoted from her managerial job, and that she would resume the duties of a subordinate Auditor.

24. Plaintiff was upset at the news, and she went to the office of the company's owner, George Rawlings, to discuss her demotion.

25. Plaintiff told Rawlings that she had been demoted, after years of high performance and success, and so soon after she had asked for FMLA leave.

26. Rawlings told Plaintiff that he would look into it.

27. Plaintiff advised Rawlings that she believed that Director Young had singled her out because of her FMLA leave, and Rawlings told Plaintiff to leave his office.

28. Plaintiff was not at that time reinstated as Audit Manager, and she served the rest of her employment term at the company as an Auditor.

### THE MAKE-UP WORK PRACTICE

29. Although Plaintiff had qualified for leave under the FMLA, her superiors still expected her to make the time up by staying late, coming in early, and working through lunchtime on days when she was well enough to do so.

30. Plaintiff and her supervisor, Audit Manager Diana Chapman, developed the routine of keeping track of Plaintiff's missed time, measured in minutes, and identifying equalization time when Plaintiff would "repay" the missed hours by working outside the ordinary work schedule.

31. In March of 2015, during the FMLA leave period, Chapman wrote to Plaintiff, "I am going to have to have a daily message from you on time because it's hard to keep up with it at the end of the week when you aren't here. Just send me an email daily if you worked extra time to make up for something."

32. Plaintiff agreed, and for months, she frequently updated Chapman about her use of the intermittent leave time, as well as her use of after-hours time and lunch breaks to make up for the missed time.

### EXPIRATION OF FMLA LEAVE/SUBSEQUENT DISABILITY ACCOMMODATION

33. From 2013 through the present, Plaintiff continued to work with her medical team to discover which medications, and in what dosages, would best treat her body's particular chemistry and, thus, her experience of IBS symptoms.

34. In 2014, when Plaintiff's FMLA time for that year was expiring, she completed and submitted paperwork to Defendants requesting a disability accommodation attendant to her IBS.

35. At that time, Plaintiff discussed the expiration of her FMLA leave time and ongoing medical needs with Defendant Ford.

36. Defendant Ford acknowledged at that time that Plaintiff's disability was "covered" by prevailing disability accommodation law in the Commonwealth, and that the company would have to accommodate Plaintiff's needs.

37. At that time, there was no dispute that Plaintiff's disability caused her to struggle with waste elimination and severe abdominal cramping that made her unable to sit comfortably.

38. The disability accommodation was to serve as a gap-filler between the expiration of the 2014 leave and the eligibility window for FMLA renewal later that year. In 2014, it functioned as such.

39. Plaintiff renewed her FMLA intermittent leave in late 2014, which would extend into 2015.

40. After the exhaustion of the FMLA leave in the summer of 2015, Plaintiff resumed the "gap-filler" disability accommodation that had been established in 2014.

41. In August of 2015, Plaintiff caused her doctor to update the medical file for the disability accommodation, and that information was transmitted to Defendants.

42. Plaintiff and her supervisor continued the practice of communicating about missed time and make-up time, so that Plaintiff's time "debt" to the company was frequently resolved by Plaintiff working through lunch, coming in early, or staying late to make up

6

missed time.

43. On October 8, 2015, Chapman informed Plaintiff that she no longer needed to send notifications about working through lunch or staying late for non-disability related time off, as "I'm not tracking it."

44. On the same day, Chapman clarified that "I am tracking your FMLA/ADA time only."

## REVOCATION OF ACCOMMODATION

45. In October of 2015, Defendant Ford surprised Plaintiff with a written reprimand for missing days due to her disability.

46. In a meeting that included Chapman, Defendant Ford delivered the disciplinary paperwork to Plaintiff and articulated that she did not believe that the medical paperwork justified Plaintiff missing days due to her disability.

47. At this point, Plaintiff's needs had been accommodated through a combination of FMLA leave and disability accommodation for about two years – including the need to miss days due to pronounced episodes of IBS.

48. Surprised, Plaintiff offered to have her medical doctor clarify any questions that Defendant Ford had been harboring, but had not yet articulated.

49. Plaintiff contacted her doctor and conveyed Defendant Ford's questions, as she understood them.

50. Plaintiff's medical team supplemented the paperwork with additional information designed to clarify the nature of Plaintiff's disability for Defendant Ford's better understanding.

51. In response, Defendant Ford stated that she perceived additional deficiencies.

52. When Plaintiff asked what additional information the company needed in order to resume the accommodation, Defendant Ford vaguely responded that "We have specific questions that we are going to be asking."

53. On October 14, 2015, Defendant Ford transmitted a letter to Dr. Sheila Rhoads, Plaintiff's gastrointestinal specialist, asking the doctor, "are you able to provide a definite time frame or date that Adrianne's medication should be regulated and full day absences would no longer be expected as frequently as she has experienced in the last three months? ... If so, what is that time frame or date?"

54. Defendant Ford further asked, "When you say come in late or leave early, can you provide us with a typical time frame including how frequently (daily, weekly, monthly)?"

55. Further, Defendant Ford inquired as to the precise time that an IBS sufferer could expect to experience the symptoms: "Could we expect a late arrival in the range of 9:30 or 10:00 a.m. and an early departure of 3:30 to 4:30 p.m.?"

56. Defendant Ford noted in the letter that she had been made aware of recent medication changes in Plaintiff's treatment regimen.

57. Plaintiff's doctor advised, consistent with the previous documentation, that medication was meant to alleviate the symptoms, but that it was not possible to give a deadline for bringing the symptoms under control: "Unfortunately, IBS symptoms affect everyone differently so there really isn't a range of expected absenteeism. . . . Typically with IBS, symptoms most commonly occur either early morning or late afternoon, which is reasonable cause for her to possibly be late for work or have to leave work early. . . . At this time we are unable to give you a time frame or date that Adrianne's medication should start working."

58. Plaintiff was alerted to the discussion, and she expressed to Defendant Ford that she did not understand the perceived lack of documentation sufficiency, many months into a workable accommodation.

59. Having received no cured-by deadline, Defendant Ford advised Plaintiff in an impromptu meeting on November 10, 2015 that the reason Plaintiff was being disciplined, with a view toward eventual discharge, was that Defendants could "find someone who can be in that chair one-hundred percent of the time."

60. Defendant Ford followed this meeting with an email, in which she advised Plaintiff, "Effective immediately you may not miss any more work until you have a positive accrual balance or once again become eligible and approved for FMLA. . . . As I stated, this means you must be here from 8:00-5:00, Monday through Friday or you will be subject to immediate termination."

61. Plaintiff went to the office of owner George Rawlings, carrying her volume of paperwork, and explained to the owner that she had been threatened with termination if her paperwork was not clarified to Defendant Ford's satisfaction. She further explained to Rawlings that she did not understand what deficiencies remained that could be actually addressed, and she asked the owner to assign a different Human Resources Generalist to review her accommodation file. Rawlings refused the request, telling Plaintiff that he trusted Defendant Ford and would require Plaintiff to find a way to work with her demands.

62. Concerned about the treatment of her disability, Plaintiff filed a complaint with the Kentucky office of the U.S. Equal Employment Opportunity Commission, and Defendants were made aware of her participation in this process.[1]

---

[1] Plaintiff's charge in the EEOC is currently under investigation. Once that administrative

9

63. Later in the month of November, Defendant Ford stated that she did not believe that Plaintiff even had a disability, as she did not believe any major life activities were implicated by IBS. This was the first time, after years of paperwork and accommodation, that anyone at the company had challenged Plaintiff's medical diagnosis for its validity.

64. On information and belief, Defendant Ford had no competing medical qualifications or data to challenge Plaintiff's doctors' diagnosis.

65. On information and belief, throughout the following weeks, Defendant Ford dispatched Plaintiff's co-workers to watch her, report on any periods of time that she was not at her desk, and report back to Defendant Ford in to-the-minute detail with their findings.

66. Despite Chapman's statement to Plaintiff that she was only tracking the FMLA/ADA time, Chapman participated in extensive note-taking about Plaintiff's movements, noting whenever Plaintiff left her desk and guessing as to the purpose of Plaintiff's movements.

67. Throughout November/early December of 2015, Defendants acknowledged Plaintiff's success as a high performer, listing her regularly as a top performer for all crucial assessment categories, including "most new audits touched," "highest completed," "hit rate," and "highest $$."

68. Under Rawlings's performance assessment standards, "most new audits touched" meant that when it came to newly received audit files, Plaintiff had a superior record of commencing work on those files during the assessment period. Scoring high in "highest

---

remedy is exhausted, Plaintiff anticipates amending this Verified Complaint to include the ripened claim under the Americans With Disabilities Act, 42 U.S.C.A. §§ 12101, *et. seq.*

10

completed" meant that Plaintiff had completed work on a high number of audit files during the same period. As a recognized achiever for "hit rate," Plaintiff had demonstrated success in identifying clients' payment opportunities and authorizing invoices for her completed audit files. Scoring well in "highest $$" meant that among her peers, Plaintiff maintained a particularly high level, measured in dollars, of invoicing sums to health providers. All of those markers measured Plaintiff's success in identifying medical providers' insurance billing errors, pinpointing the nature of their mistakes, and beginning the process of recovering the erroneously billed-and-paid sums for Defendant Rawlings's insurance company clients.

69. Despite her status as an exceptionally strong performer, Defendants continued to single Plaintiff out due to her disability.

70. During that time, Plaintiff attempted to overcome her physical needs, aware that succombing to her disability would result in the loss of her job.

71. The stress and anxiety over the prospect of unemployment worsened Plaintiff's condition, yet she strove to meet the demands conveyed to her.

72. Plaintiff endured great physical discomfort and indignities as a result of the revocation of her accommodation.

73. On December 8, 2015, Plaintiff found that she was too ill in the morning, due to her disability's aggravated symptoms, to leave her home in time to arrive at work by 8:00. In keeping with the original, years-old accommodation, she sent a text message to Chapman alerting her to the health need.

74. Upon arriving at work, Plaintiff resumed her duties and worked for several hours.

75. Late in the afternoon, Defendants convened a meeting with Plaintiff in which they

informed her that she was being discharged from the company due to her illness-related tardiness.

## UNEMPLOYMENT PROCEEDINGS

76. On December 9, 2015, Plaintiff filed a claim for unemployment benefits with the Commonwealth of Kentucky, Education and Workforce Development Cabinet, Division of Unemployment Insurance (the "Division").

77. On or about December 23, 2015, Defendant Ford transmitted a written statement to the Division with the intent that the statement would cause Plaintiff's disqualification from receiving benefits.

78. Defendant Ford's statement claimed, "Contrary to [Plaintiff's] statement[,] she has not submitted paperwork establishing a disability."

79. At the time this statement was transmitted, Defendant Ford knew it to be false, as she had personally administered Plaintiff's disability file and had known of the company's previous verification of Plaintiff's disability due to medical paperwork.

80. Defendant Ford made the false allegations to the Division in order to cause Plaintiff's disqualification from her unemployment benefits.

81. On information and belief, other employees discharged under the absenteeism pretext were not singled out and forced to fight for their unemployment benefits by these Defendants.

82. Defendant Ford's actions caused the initial disqualification of Plaintiff for her benefits, requiring her to file an appeal with the Division and receive an administrative hearing.

83. Defendant Ford did not show up to the hearing to stand behind her false statement

– nor did any other fact witness from Rawlings.

84. Defendants' conduct was malicious, oppressive, and without regard to the rights of others.

85. The delay caused by Defendants' treachery caused Plaintiff economic injury, as well as physical, mental, and emotional distress.

86. As of the date of this Verified Complaint, Plaintiff has suffered lost wages, loss of benefits, loss of commissions, delay in payment of her rightful unemployment benefits, consequential damages, and the physical, mental, and emotional distress caused by Defendants' conduct.

## COUNT ONE – DEFENDANTS' VIOLATION OF THE KENTUCKY CIVIL RIGHTS ACT

87. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

88. Defendant Rawlings is an employer as that term is defined by the Kentucky Civil Rights Act, KRS Chapter 344 ("KCRA").

89. Under KRS § 344.040, it is unlawful for an employer:

To . . . discharge any individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of that individual's race, color, religion, national origin, sex, age forty (40) and over, because the person is a qualified individual with a disability. . . .

90. It is also unlawful for an employer to retaliate against a person who has asserted her rights under the KCRA, including her rights to accommodation and to enjoy freedom from discrimination for a qualified disability. *See* KRS § 344.280.

91. Plaintiff is a qualified individual with a disability as that term is defined in the KCRA.

92. The modified work schedule described by Plaintiff's medical team is the sort of

reasonable accommodation contemplated under KRS § 344.030(6).

93. Plaintiff requested a reasonable accommodation from Defendants to allow her to perform her job duties.

94. Plaintiff was afforded the accommodation for a period of time, after which Defendants revoked it without cause or reasoned explanation.

95. Defendant's revocation of Plaintiff's accommodation was not supported by a showing of undue hardship or expense.

96. A continued accommodation would have caused no undue hardship or expense to Defendants.

97. Defendants' conduct violated the KCRA's requirement that employers provide reasonable accommodations to their disabled employees.

98. Defendants announced their desire to discriminate against Plaintiff in favor of a non-disabled replacement, in violation of the KCRA's prohibition on disability discrimination.

99. Defendants discriminated against Plaintiff on the basis of her disability, in violation of the KCRA.

100. Under the KCRA, Plaintiff is entitled to recover compensatory damages, including lost wages and benefits, damages for physical, mental, and emotional distress, damages for embarrassment and humiliation, and her attorneys' fees.

### COUNT TWO – FMLA VIOLATIONS AND RETALIATION

101. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

102. Defendant Rawlings is an employer required to follow the mandates of the Family Medical Leave Act, as codified at 29 U.S.C.A. §§ 2601, *et seq.*

103. The FMLA prohibits qualifying employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided under th[e] [FMLA]." 29 U.S.C. § 2615(a)(1).

104. Under 29 C.F.R. § 825.220(c), employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions, or disciplinary actions.

105. Defendants did not consider Plaintiff a key employee, as set forth in 29 CFR § 825.219, when she served as Audit Manager.

106. At no time did any Defendant convey to Plaintiff, in writing, that she was considered a key employee such that job restoration would be denied to her.

107. Nonetheless, Defendants refused to restore Plaintiff to her prior employment after she took her FMLA leave.

108. Defendants demoted Plaintiff concurrent with her use of FMLA leave, without demonstrating a substantial and grievous economic injury.

109. Defendants further interfered with Plaintiff's ability to take her FMLA leave, in violation of the federal law.

110. Defendants continued to retaliate against Plaintiff after the cessation of her FMLA leave time, including written discipline and, ultimately, termination.

111. Defendants counted Plaintiff's FMLA leave time as documented absenteeism, relying upon it to terminate Plaintiff with "absenteeism" as the stated grounds.

112. Defendants' actions to demote, discipline, and then terminate Plaintiff were performed in retaliation against Plaintiff for exercising her rights under the FMLA.

113. Plaintiff suffered loss of compensation and benefits, including the opportunities to

advance within the company, as a result of her demotion and termination.

114. Pursuant to 29 U.S.C.A. § 2617(a)(1), Plaintiff is entitled to recover compensatory damages, liquidated damages, and any such equitable relief, including reinstatement, promotion, and injunctive relief, as the Court deems appropriate.

### COUNT THREE – DEFENDANTS' VIOLATION OF KRS § 341.990

115. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

116. KRS § 341.990(6)(a) states as follows:

> Any person who knowingly makes a false statement or representation, or who knowingly fails to disclose a material fact to prevent or reduce the payment of benefits to any worker entitled thereto, or to avoid becoming or remaining subject to this chapter, or to avoid or reduce any payment required of an employing unit under this chapter shall be guilty of a Class A misdemeanor unless the liability avoided or attempted to be avoided is one hundred dollars ($100) or more, in which case he shall be guilty of a Class D felony.

117. Plaintiff's unemployment benefits exceeded $100, rendering a violation of the statute a Class D felony.

118. In violation of KRS § 341.990(6)(a), Defendants, jointly and in concert, made knowingly false statements to the Division to prevent, delay, or reduce the payment of benefits to Plaintiff.

119. KRS § 446.070 permits the Plaintiff, who has been injured by the Defendants' violation of KRS § 341.990(6)(a), to recover from the Defendants such damages as she sustained by reason of the violation.

120. Plaintiff is among the class of persons intended to be protected by KRS § 341.990(6)(a).

121. Plaintiff was injured by the Defendants' violation of KRS § 341.990(6)(a).

## PUNITIVE DAMAGES

122. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

123. Defendants have engaged in a pattern of conduct in the Commonwealth of Kentucky that regularly oppresses the Commonwealth's disabled employees.

124. Defendants have cavalierly announced that they will discharge disabled Kentucky workers in order to "find someone who can be in that chair one-hundred percent of the time."

125. Plaintiff is aware of at least one other disabled worker who experienced retaliation and disability discrimination by these Defendants after requiring medical leave.

126. Absent the deterrent effect of punitive damages, Defendants will continue to subject Kentucky workers to illegal retaliation and discrimination.

127. Defendants' actions were intentional, willful, and malicious. These actions were carried out with flagrant indifference to Plaintiff's rights, were effected with an awareness that the conduct would result in physical and emotional injury, and were specifically intended to subject Plaintiff to cruel and unjust hardship.

128. Defendant Rawlings authorized or ratified the fraudulent, oppressive, and malicious conduct of Defendant Ford, or it should have anticipated her fraudulent, oppressive, and malicious conduct.

129. As a result, Defendants' conduct justifies a judgment of punitive damages, as permitted by applicable law and due process, in an amount to be determined by a jury.

Wherefore, Plaintiff respectfully demands:

1. Judgment against Defendants;
2. Compensatory and liquidated damages as authorized by 29 U.S.C.A. § 2617, and the

Kentucky Civil Rights Act, KRS Chapter 344;

3. Equitable relief to which she appears entitled, including reinstatement, promotion, and any appropriate injunctive relief;

4. Punitive damages;

5. Trial by jury;

6. Interest on her judgment as recoverable under the law;

7. Her costs and attorneys' fees as recoverable under the law;

8. Leave to amend this Verified Complaint as the law and orders of the Court permit; and

9. Any and all other relief to which she may appear entitled.

Respectfully submitted,

/s/ Robyn Smith
Robyn Smith
Abney & McCarty, PLLC
2950 Breckenridge Lane
Suite 13
Louisville, Kentucky 40220
Telephone: (502) 459-4108
Facsimile: (502) 459-4277
Email: robyn@amkylaw.com
*Counsel for Plaintiff*

## VERIFICATION

I have read the foregoing statements and they are true and accurate to the best of my knowledge and belief.

_____
ADRIANNE POPECK

COMMONWEALTH OF KENTUCKY )
)ss
COUNTY OF JEFFERSON )

Subscribed and sworn to before me by Adrianne Popeck this 3rd day of February, 2016.

_____
Kelly A. Machen
Notary Public
State at Large, Kentucky
My commission expires: 12/19/2018