UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

**ADRIANNE POPECK,**

      **Plaintiff**

v.

**RAWLINGS COMPANY LLC**

and

**DEBRA FORD,**

      **Defendants.**

**CIVIL ACTION NO. 3:16-cv-138-GNS**

*FILED ELECTRONICALLY*

**DEFENDANT RAWLINGS COMPANY LLC'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Rawlings Company LLC ("Rawlings") hereby submits this memorandum of law in support of its motion for summary judgment.

**TABLE OF CONTENTS**

SUMMARY OF THE ARGUMENT ........................................................................... 4

FACTUAL BACKGROUND ..................................................................................... 5

1.    RAWLINGS AND ITS POLICIES. ................................................................ 5

2.    PLAINTIFF'S INITIAL EMPLOYMENT WITH RAWLINGS. ............................... 7

3.    PLAINTIFF'S DEMOTION TO AUDITOR. ..................................................... 9

4.    PLAINTIFF'S FAMILY MEDICAL ACT LEAVE AND AMERICANS WITH DISABILITIES ACT TIME OFF. ..................................................... 12

5.    PLAINTIFF'S FLAGRANT AND FREQUENT VIOLATIONS OF THE RAWLINGS' ATTENDANCE AND BREAK POLICIES. ...................................... 13

6.    PLAINTIFF'S TERMINATION. .................................................................. 19

PROCEDURAL BACKGROUND ............................................................................ 21

SUMMARY JUDGMENT STANDARD ...................................................................... 22

LEGAL ANALYSIS ............................................................................................. 23

I.   PLAINTIFF'S ADA/KCRA DISABILITY DISCRIMINATION CLAIMS FAIL AS A MATTER OF LAW FOR A MULTITUDE OF REASONS.................. 23

   1.   Legal Standards........................................................................... 23

      a.   Disparate Treatment........................................................... 24

      b.   Failure to Accommodate...................................................... 24

   2.   Plaintiff cannot survive summary judgment on her ADA or KCRA claims......................................................................... 25

      a.   Plaintiff is not "disabled" under the ADA. ........................................ 25

      b.   Plaintiff was not qualified to perform an essential function of her job as an Auditor, regular and predictable attendance. ........... 27

         (1)   Sixth Circuit precedent establishes that regular and predictable attendance is an essential function. ................. 28

         (2)   Plaintiff's frequent absenteeism and excessive breaks make her unqualified to perform the essential function of regular and predictable attendance. ................. 30

      c.   The disparate treatment allegations should also be dismissed since there is no proof that Rawlings treated a similarly situated employee more favorably..................................................... 32

      d.   The reasonable accommodation portion of Count I fails, as well, since Plaintiff never requested a reasonable accommodation. .................................................................. 35

      e.   Plaintiff was not qualified for the Auditor position, therefore her allegation that Rawlings failed to engage in the interactive process fails, as well............................................. 37

      f.   Count I and Count IV should also be dismissed since Rawlings had a legitimate, non-discriminatory reason for Plaintiff's discharge and she has no proof of pre-text. .................. 38

         (1)   Rawlings has articulated legitimate, non-retaliatory reasons for its actions. ............................................. 38

         (2)   No genuine issue of fact exists as to pretext. ........................ 39

II.  PLAINTIFF'S FMLA INTERFERENCE AND RETALIATION CLAIMS CANNOT SURVIVE SUMMARY JUDGMENT. ............................................. 42

   1.   Legal Standards........................................................................... 42

      a.   FMLA interference.............................................................. 42

      b.   FMLA retaliation................................................................ 43

2. The Court should dismiss Plaintiff's FMLA interference and retaliation claims. ........................................................... 44

    a. Plaintiff's FMLA interference allegations fail. ................................ 44

        (1) Rawlings properly designated Plaintiff's time away from work as FMLA time. ......................................... 44

        (2) Rawlings was entitled to demote Plaintiff during her FMLA leave based on her leadership failures. ..................... 46

    b. The FMLA retaliation claim fails as a matter of law, as well. ......... 48

        (1) Plaintiff cannot prove a FMLA retaliation claim based on her demotion. ....................................................... 49

        (2) Nor can she prove a causal connection between her FMLA leave and her termination, six months later. ............ 49

    c. Rawlings had legitimate, non-retaliatory reasons for its actions, and Plaintiff cannot demonstrate pretext in relation to her demotion or her termination. ................................................... 50

        (1) Rawlings has articulated legitimate, non-retaliatory reasons for its actions. .............................................. 50

        (2) No genuine issue of fact exists as to pretext. ........................ 51

III. PLAINTIFF'S RETALIATION CLAIMS UNDER THE ADA, KENTUCKY CIVIL RIGHTS ACT ("KCRA") AND THE KENTUCKY WAGE AND HOUR ACT ("KWHA") SHOULD BE DISMISSED. ................................. 52

    1. Legal Standard .......................................................................... 52

    2. None of Plaintiff's retaliation claims are viable ............................................ 54

    a. Plaintiff did not protest any discriminatory action based on her disability. ....................................................................... 54

    b. Plaintiff's request for an advance on commissions does not qualify as "protected activity," therefore the KWHA retaliation claim should be dismissed. ................................................. 54

    c. No causal connection exists between Plaintiff's threat of filing an EEOC charge related to her disability and her termination, therefore the ADA/KCRA retaliation claims fail as a matter of law. .................................................................... 56

    d. Even if Plaintiff can somehow establish a prima facie case of ADA/KCRA or KWHA retaliation, Rawlings has a legitimate, non-discriminatory reason for her discharge and Plaintiff cannot establish pre-text. ........................................... 59

3

IV.   PLAINTIFF'S WAGE DEDUCTION CLAIM UNDER THE FLSA AND
      K.R.S. 337.385 SHOULD BE DISMISSED SINCE THE DEDUCTIONS
      WERE NOT IMPROPER AND, IN THE ALTERNATIVE, THE COMPANY
      COMPLIED WITH THE APPLICABLE SAFE HARBOR DEFENSE. ................... 59

      1.   Legal Standard................................................................. 60

      2.   Rawlings bears no liability for liquidated damages under the FLSA. ...... 60

           a.   Rawlings payroll department made ADA partial day
                deductions in good faith. ................................................. 60

           b.   In the alternative, Rawlings complied with the
                FLSA/KWHA Safe Harbor. ............................................... 63

V.    PLAINTIFF LACKS STANDING TO REQUEST THAT THE COURT
      ADJUDICATE THE RIGHTS OF NON-PARTIES THROUGH A
      DECLARATORY JUDGMENT ACTION. ................................................ 65

      1.   Legal Standard................................................................. 65

      2.   The Court should decline Plaintiff's request to force non-parties to
           join her wage and hour crusade................................................ 66

VI.   RAWLINGS DID NOT VIOLATE KRS § 341.990 SINCE ALL
      STATEMENTS MADE TO THE UNEMPLOYMENT DIVISION BY FORD
      WERE TRUTHFUL. .......................................................................... 67

VII.  PLAINTIFF IS JUDICIALLY ESTOPPED FROM BRINGING ANY CLAIM
      THAT EXISTED PRIOR TO HER FILING FOR BANKRUPTCY ON JULY
      31, 2015........................................................................................... 67

      1.   Legal Standard................................................................. 67

      2.   Plaintiff cannot assert claims that accrued before July 31, 2015................ 68

CONCLUSION...................................................................................... 71

## SUMMARY OF THE ARGUMENT

Through this lawsuit, Plaintiff asserts nothing more than her disagreement with
Rawlings' business decision to demote and ultimately terminate her based on her unparalleled
levels of absenteeism, tardiness and excessive breaks.  Her repeated and flagrant violations of
Rawlings' company policies – not her medical condition – caused the company to take action.

Plaintiff overreaches and strains to cobble together a legal basis for many of her arguments to no avail.  Summary judgment should be granted based on the undisputed material facts and little to no authority to support Plaintiff's legal arguments.  Plaintiff cannot meet her burden of proof on any of her claims.  There is no evidence that Rawlings treated Plaintiff in an unlawful, discriminatory manner at any time during her employment.  For example, with respect to her disability claims, Plaintiff cannot even prove she was disabled within the meaning of the ADA, or that she was qualified for her position.  Moreover, Rawlings has an iron-clad legitimate non-discriminatory reason for each of its actions – her unmatched absenteeism, tardiness and excessive breaks, which she made no attempt to curb despite multiple warnings.  Plaintiff also has no evidence of pretext.

In addition, Plaintiff's FMLA claims also have no factual or legal basis, as she was provided all the statutory leave she was entitled to receive for her medical condition.  In fact, Rawlings provided Plaintiff additional leave far in excess of the 12 weeks allowable by statute.

Finally, Plaintiff's zealous quest for justice continues with her declaratory judgment action on her alleged wage and hour claims.  However, these claims are likewise not supported by the applicable law and undisputed facts of this case.

With the absence of any genuine issues of material fact to present to a jury at trial, summary judgment for Rawlings is appropriate.  Pursuant to FRCP 56, Plaintiff's entire Second Amended Complaint (DN 48) should be dismissed in its entirety with prejudice.

## FACTUAL BACKGROUND

### 1.      Rawlings and its Policies.

Rawlings is a limited liability company located in LaGrange, Kentucky that provides sophisticated data mining and recovery services to health insurance carriers.  The company

employs approximately 1400 individuals in several divisions, including Subrogation, Workers'

Compensation, Audit, and Support.  (Ms. Barrens Aff., ¶ 3, **Exh. 1**).

  Rawlings maintains an Employee Handbook ("Handbook"), which is given to every

employee at the time of hire.  During Plaintiff's employment with Rawlings, the Handbook

contained an Equal Employment Opportunity ("EEO") policy, as well as provisions relating to

the ADA and the FMLA. (Handbook, pg. 17, 19, **Exh. 2**)**.** The Handbook prohibits

discrimination and harassment because of physical or mental disability (and any other class

protected by law).  *Id.*  Plaintiff received copies of the Handbook both when she was hired in

2009, and when the Handbook was updated in 2012 and 2015.  (Plf. Handbook

Acknowledgement Forms, **Exh. 3**).

  Importantly, the Handbook makes it clear that employment with Rawlings is at-will, and

that either the employee or Rawlings may terminate the employment relationship at any time,

with or without cause or notice.  *See* Handbook, pg. 20, **Exh. 2.**

  The Handbook also includes the following policies, in relevant part:

- **"Hours of Work" policy**:  Our normal work week consists of 40 hours per week. Our standard office hours are 8:00 a.m. to 5:00 p.m., Monday through Friday.  *Id.* at pg. 22.

- **"Punctuality and Attendance" policy**:  Part of performing your job well means being where you are supposed to be when you are supposed to be there.  Your punctual arrival and reliable presence are key factors in providing the excellent service our clients expect.  Unwarranted tardiness and absences are an imposition on your fellow employees and our clients.  We recognize that we all encounter situations in our personal life that can cause us to be late or absent, but we expect you to keep these occurrences to a minimum.  If tardiness and/or absenteeism become excessive, you will be subject to disciplinary action, up to and including termination.  *Id.*

- **"Lunch and Breaks" policy**:  … Employees typically receive one hour for lunch – between the hours of 11:00 a.m. and 2:00 p.m. – unless other arrangements have been made and approved by the employee's supervisor… Lunch periods are to be scheduled around the needs of your department and the Company in order to ensure proper coverage...  Additionally, a 10-minute break is provided for every

6

four hours of work.  Therefore, if you are a full time employee you are provided one 10-minute break to be taken before your meal period and one 10-minute break to be taken after your meal period.  These breaks are in addition to the regularly scheduled meal period.  *Id.* at pg. 23.

- **"Unpaid Leave" policy**:  The Company offers unpaid leave in the form of FMLA, Workers' Compensation Disability and Military Leave…  Employees on leaves of absence or other periods of unpaid service for more than 6 weeks do not accrue sick or vacation time while on leave.  No bonuses or other forms of incentive compensation will be paid to an employee who is in active unpaid leave status except at the discretion of the President…  *Id.* at pg. 33.

- **"Bonuses" policy**:  Compensation and bonuses are subject to change at any time, including the elimination of bonus plans, at the discretion of the Company's President.  Unless expressly authorized in writing by the Company's President, bonus compensation is forfeited unless you are in an Active employment classification on the scheduled bonus payment date…  *Id.* at pg. 27.

### 2.    Plaintiff's Initial Employment with Rawlings.

In 2009, Rawlings hired Plaintiff as an Auditor.  (Plf. Depo., p. 71, 89, **Exh. 4**).  In that role, Plaintiff reviewed health insurance claims for Rawlings' clients, which are typically health insurance companies.  Auditors, like Plaintiff, identify inaccurate claims and re-bill the right insurance company.  *See id.* at p. 80;  *see also* Job Description, **Exh. 5**.  Rawlings paid Plaintiff a base salary plus commissions.  (Plf. Depo., p. 80, **Exh. 4**).  The commissions were based on the amount of recoveries attributable to the Plaintiff and were paid semi-monthly.  *Id.* at p. 81.

Rawlings promoted Plaintiff to an Assistant Team Manager position in January 2012.  *Id.* at p. 85.  In that role, Plaintiff had her own goals, but she also bore responsibility for working with her Team Manager and assisting other team members.  *Id.* at p. 98.

In September 2012, Plaintiff sought and received a promotion to an Audit Team Manager ("ATM") position.  (Mr. Young Depo., p. 189-190, **Exh. 6**).  As an ATM, Plaintiff was placed in charge of a team of Auditors.  As Plaintiff testified, the transition from Auditor to ATM "is a big change.  You're going from taking care of yourself to 10 to 14 people, plus yourself."  (Plf. Depo., 105:11-106:3, **Exh. 4**).  ATMs are required to keep up with their own production goals,

including their own audits, invoicing and recoveries.  *Id.*.  In addition, they manage the employees on their team, including administering discipline.  *See id.* at p. 98, 105.  ATMs get paid an increased base salary.  *Id.* at 103-104.  ATM's also receive a quarterly a bonus based on the performance of their team, in addition to the bonuses received as an Auditor.  *Id.*

Rawlings expects its ATMs to be true leaders.  Plaintiff acknowledges that she was the "first pass" for any questions from her team members, therefore it was important for her to be present.  (Plf. Depo., 98:25-99:7, **Exh. 4**;  Mr. Young Depo., 230:6-21, **Exh. 6**).  In addition, she was tasked with improving performance on her team.  Plaintiff was required to conduct commentary audits with her Auditors to ensure compliance with the Rawlings Way.  *Id.*

Plaintiff admits that during her initial employment at Rawlings, and for the remainder of her time with the company, she "[s]tructured her day the same way."  (Plf. Depo., 26:24-27:17, **Exh. 4**).  She "would come in in the mornings" and "make a sticky note" of tasks for the day.  *Id.* After she completed each task, she would "… get up and go take a break, and then come back and complete that next task."  *Id.* at 27:10-17, 29:3-14.  Other than using the restroom, Plaintiff spent her break time smoking.  *See id.* These smoking breaks varied in length depending on "her stress level" or whether she was "in a conversation with somebody outside."  *Id.* at 29:15-21. Plaintiff took her breaks in one of two places, either the front of Rawlings or on the loading dock area.  *Id.* at 30:18-31:3.

As illustrated by the attached security video from the loading dock (the "Loading Dock Video"), Plaintiff took frequent and lengthy breaks throughout her time at Rawlings.  *See* Loading Dock Video, **Exh. 7**.  This videotape was pulled after Plaintiff's termination but it illustrates fully how often during the work day the Plaintiff took breaks for smoking and how long the breaks lasted.  Attached as **Exh. 8** is a picture taken of the Plaintiff from the security

tape and authenticated by the Plaintiff as a picture of her on the smoking dock.  (Plf. Depo., 510:8-11, **Exh. 4**).  In addition, attached as **Exh. 9**, is an affidavit of Matt McFadden, Technical Services Manager at Rawlings, that authenticates the Loading Dock Video.  Any reasonable person would find Plaintiff's break habits to be excessive.

       **3.**       **Plaintiff's Demotion to Auditor.**

      As an ATM, Plaintiff found it "important" that her employees were at their desk by 8:00 a.m. and worked until 5:00 p.m.  (Plf. Depo., 128:4-8, **Exh. 4**).  However, in 2013 and the early part of 2014, Plaintiff's team members regularly violated the company break and attendance policies.  For example, on November 1, 2013, Plaintiff sent an email to her team regarding their "issues with the following:  Being on time, use of cell phones, excessive breaks, excessive talking/loudness."  (Team Member Emails, **Exh. 10**).  The email quoted the company policies regarding breaks, punctuality, attendance and telephone usage and required that each team member acknowledge receiving the message.  *Id.*  According to Plaintiff, she noticed some of her team members having these issues, but not all, and it was Kelly Young, her direct supervisor that was more concerned than her.[1]  *Id.*  In December 2013, and the start of 2014, Plaintiff again sent similar emails to her team members alerting them to the importance of following the company policies.  *Id.*

      In April 2014, Mr. Young contacted Plaintiff stating that the situation with her team productivity was "unacceptable."  (Team Member Emails, **Exh. 10**).  According to the email, which is titled "Productivity," Plaintiff's team members were "constantly late and leaving early." *Id.*  Mr. Young asked Plaintiff about her plan to curb that behavior.  *Id.*  The email included an attachment that detailed the shifts worked by Plaintiff's team.  *Id.*  Halfway through the month,

---

[1] Rawlings notes that Mr. Young's concern about Plaintiff's team members taking breaks, coming late, leaving early, etc. started in November 2013, before Plaintiff's first request for FMLA leave.

the team had worked only 77.5 shifts out of a possible 198 per month.  *Id.*  Plaintiff testified that

she agreed with Mr. Young that her team members' coming late and leaving early "was

becoming an issue…"  (Plf. Depo., 142:25-143:5, **Exh. 4**).

As a response to Mr. Young's email, Plaintiff sent a message of her own to her team

members.  (Team Member Emails, **Exh. 10**).  In her correspondence, she included the following

points:

- Business hours are Monday-Friday 8am-5pm.  You are expected to be here ON TIME at 8am for morning huddles…

- … I have also been very lenient on people leaving early.  I am not going to be able to do this any longer…

- Breaks – you are permitted a one hour lunch break and 2 10-minute breaks.  Again, I have always been lenient on this, but when production isn't there, I am forced to start monitoring this.

- … When I start seeing production at 5.4 completed audits per hour for an entire day, we have a MAJOR problem…  That's the absolute lowest of any team this month and there is no reason for it…

In the summer of 2014, after the productivity of Plaintiff's team had been festering for

months, Plaintiff met with Mr. Young, about her team's performance.  During the meeting, she

mentioned having trouble with some of her Auditors not being "in their seat;" she felt that if she

could keep her team at their desks more frequently, productivity would increase.  (Mr. Young

Depo., 222:1-17, **Exh. 6**).  Hearing that concern elevated Mr. Young's attention to her team.  *Id.*

Together Plaintiff and Mr. Young put together an action plan regarding "people taking breaks,

people coming in late, people leaving early, people underperforming…" (the "Action Plan").

(Plf. Depo., 202:9-19, **Exh. 4**).  In her role as ATM, Plaintiff agreed to implement the Action

Plan.  (Mr. Young Aff., ¶ 3, **Exh. 11**).

Subsequently, as part of his investigation into Plaintiff's team not being "in their seat,"

Mr. Young noticed that Plaintiff herself was frequently absent from her desk.  (Mr. Young

10

Depo., 222:1-17, **Exh. 6**).  As a result, he started tracking her time away to try to figure out where she was spending her time.  *Id.*  He noticed a pattern;  whenever Mr. Young walked by Plaintiff's desk and did not see her, he would look in the aisles of the Audit department to see if she was working with one of her direct reports.  If she was not in the Audit department working, he would look and see her on the loading dock smoking.  *Id.* at 249-250.  Attached as **Exh. 12** are pictures taken with Mr. Young's assistance showing where he stood on the second floor to see Plaintiff on the smoking dock below.[2]  Plaintiff's time on the loading dock was so significant, Mr. Young believed that she was "not exhibiting the behavior of a manager," particularly in light of the fact that the company had been attempting to curb similar behavior in Plaintiff's direct reports since at least November 2013.  *See* Mr. Young Depo.,253:35-254:3, **Exh. 6**.

As a result, Mr. Young spoke with Human Resource Generalist (and individual defendant) Debra Ford about Plaintiff's excessive breaks, which in his business judgment, exhibited an inexcusable lack of leadership.  The decision was made to demote Plaintiff back to the Auditor position in August 2014.  *Id.* at p. 264.  Mr. Young and Ms. Ford met with Plaintiff to discuss her demotion (the "Demotion Meeting").  At the Demotion Meeting, Mr. Young reviewed the Action Plan with Plaintiff.  She recalls that Mr. Young talked to her about taking excessive breaks, which the company "did not think… was model leadership behavior because of this [Action Plan]…"  (Plf. Depo., 216:17-217:13, **Exh. 4**).  According to Plaintiff, Mr. Young:

---

[2] These pictures were taken pursuant to DN 67, and produced to the Plaintiff in response to the motion for inspection.  *See* Mr. Young Aff., ¶¶ 4-10, **Exh. 11**.  The photograph bates numbered PR002695 depicts an individual in the exact location where Mr. Young saw Ms. Popeck the majority of the time when he would look out the second floor window. *Id.*

> *kept referring to the plan that I created and stating, you know,*
> *okay, so you have so-and-so over here that you wrote in your plan*
> *comes in late sometimes, how are you going to tell so-and-so that*
> *they shouldn't come in late if you come in late, or you take these*
> *breaks?*

*Id.* at 219:17-24.  Notably, Plaintiff did not deny taking an excessive five or six breaks a day at the time of this demotion meeting.  *Id.* at 225:12-19.

After her demotion, Plaintiff worked as an Auditor for ATM Diana Chapman.  *Id.* at 85:21-22.

**4.    Plaintiff's Family Medical Act Leave and Americans with Disabilities Act Time Off.**

In July 2013, during her stint as an ATM, Plaintiff was diagnosed with irritable bowel syndrome ("IBS").  In November 2013, she contacted Terri Parker, an HR Generalist responsible for administering FMLA regarding her eligibility. (Plf. Depo., 179:2-6, **Exh. 4**).  Plaintiff met with Ms. Parker shortly after contacting her.  Plaintiff testified that, at their meeting, "Terri was great to me, Terri sat and spoke with me, asked me a lot of questions, got me the paperwork that I needed."  *Id.* at 179:7-15.  Plaintiff requested and was approved for intermittent FMLA leave in December 2013.  *See* 2013 FMLA Paperwork, **Exh. 13**.  The 2013 FMLA paperwork confirms that Plaintiff's "regular work schedule" was Monday to Friday, "8-5."  *Id.*  Notably, Plaintiff had no issues with Parker throughout the FMLA process.  (Plf. Depo., 179:16-17, **Exh. 6**) (calling Parker "wonderful").

Plaintiff used that leave intermittently until it expired in October 2014.[3]  To help Plaintiff meet the attendance requirements of her job before she became eligible for FMLA leave again in December 2014, Rawlings provided Plaintiff with an ADA Accommodation Form.  *Id.* at 250:22-252:4.  Notably, the ADA form completed by Plaintiff's physician did not identify her

---

[3] Plaintiff was taking intermittent FMLA leave at the time of her demotion.

IBS as a disability that impacted a major life activity.  *Id.* at 254:25-258:16;  *see also* 2014 ADA Paperwork, **Exh. 14**.  In addition, the document stated that Plaintiff's condition would only require her to come in late and leave early.  *Id.*  Although the paperwork did not support the existence of a disability, Rawlings temporarily approved the requested accommodation until Plaintiff was eligible for FMLA again a month later in December 2014.  *Id.* at 260-261;  *see also* 2014 FMLA Paperwork, **Exh. 15**.

In the first half of 2015, Plaintiff continued taking intermittent FMLA leave, and exhausted her full 12 weeks (60 days) of FMLA in July.  Once again, she received the ADA Accommodation Form from Rawlings; in August 2015, her physician filled it out with the same proposed accommodation of coming in late and leaving early.  *See* Plf. Depo., 275:3-276:21, **Exh. 4**;  *see also* 2015 ADA Paperwork, **Exh. 16**.  Again, the 2015 ADA Paperwork did not identify her IBS as a disability that impacted a major life activity.  *Id.*  Dr. Rhoads' and her medical assistant testified that they had access to the prior FMLA and ADA paperwork completed in 2015.  (Ms. Doll Depo., 17:25-18:2, 21:21-22:9, **Exh. 17**).

### 5.   Plaintiff's Flagrant and Frequent Violations of the Rawlings' Attendance and Break Policies.

Plaintiff's issues with tardiness and absenteeism started well before her termination in December 2015.  In fact, on November 12, 2014 – over a year beforehand – Ms. Chapman, with Ms. Ford's assistance, issued Plaintiff a written warning regarding her tardiness and habit of leaving work early.  *See* Written Warning No. 1, **Exh. 18**.  None of the nine tardies or five examples of leaving early contained in the first written warning pertain in any way to Plaintiff's IBS.  *See id.*  The written warning specifically states that, "If these policies or any other company policy is violated again, additional disciplinary action will be taken, up to and including

termination." *Id.* Plaintiff signed the written warning, evidencing her receipt of the document and her understanding about the consequences for future violations of company policy. *Id.*

Despite that, by September 2015, Plaintiff's absenteeism had reached 59% since receiving her ADA accommodation two months earlier in July. (Ms. O'Brien Depo., 185:11-186:9, **Exh. 19**). For example, one week in July, Plaintiff missed a full day of work on Monday, Tuesday and Friday. On Wednesday of that week, Plaintiff arrived at work in the morning, then left for over an hour and a half to "run an errand" returning to Rawlings at 10:55 a.m. *See* July 15th Emails, **Exh. 20.** She left work for the day at 1:23 p.m., allegedly because she did not feel well.[4] *Id.*

After Labor Day 2015, there were 16 available work days in September. Plaintiff missed eight full days, and another three half days of work.[5] *See* Payroll Records, **Exh. 21**. On the five days that she was at work for most of the day, Plaintiff was tardy four times, and spent 158 minutes – nearly two and a half hours – either on the loading dock or at lunch. *See* Sept. Texts, **Exh. 22**; Loading Dock Video, **Exh. 7**. Notably, not all Plaintiff's tardies and absences were related to her medical condition. For example, on September 28th, Plaintiff texted Ms. Chapman at 7:09 a.m. saying she was "running behind this morning." (Sept. Texts, **Exh. 22**). She failed to provide Ms. Chapman with any other information about her absence and never showed up for work that day. *Id.* In addition, none of her four tardies were due to IBS symptoms; one related to a flat tire and the other three involved errands. *Id.*

---

[4] Plaintiff's bank statement from that Wednesday, July 15, 2015 includes a $404.95 withdrawal from an ATM at Belterra Casino. Rawlings' Motion to Serve Revised and Narrowed Subpoenas (DN 75), which the Court granted (DN 94) provides additional information about Plaintiff's gambling activities while on ADA leave.

[5] Although Plaintiff did not attend work at Rawlings, she worked at Kohl's on three of her full days off and two of her half days off in September 2015. *See* Kohl's Records, **Exh. 28**.

During Plaintiff's FMLA leave, and then her ADA leave, Rawlings made deductions from her paychecks for her time off.  The Employee Handbook provides, in part, that deductions shall be made for the following reasons:

- Full-day absences for personal reasons, including vacation;

- Full-day absences for sickness or disability;

- Family Medical Leave absences whether in full or partial day absences.

Employee Handbook, pg. 26, **Exh. 2**.

In accordance with that policy, Rawlings deducted Plaintiff's FMLA time off from her paychecks.  Rawlings' payroll department then continued those deductions for her ADA full and partial days off.  Plaintiff never complained to anyone at Rawlings about the legality of the deductions from her paychecks.  (Plf. Depo., 464:21-465:8, **Exh. 4**).

The normal practice for payroll is that any unpaid time be deducted from the pay period when the absences occurred.  (Ms. Ford Depo., 147:3-8, **Exh. 23**).  From the start of her FMLA leave in 2014, Plaintiff asked Rawlings' payroll department to spread her prior unpaid time out over future pay periods.  (Plf. Depo., 387:18-388:8, **Exh. 4**).  She continued that practice in 2015 during her ADA time.  *Id.* at 390:3-14.  In addition, Plaintiff took a loan against her 401K two times during her employment with Rawlings.  *Id.* at 388:12-15.  To pay back those loans, Fidelity, the 401K provider, took deductions from Plaintiff's paychecks according to the payment plan that she selected.  *Id.* at 388:19-389:8.

In late September, Plaintiff met with Mr. Rawlings because she "… was curious if [she] could take an advance against my own commissions, because [she] needed some extra money towards rent or bills, because [she] had been out on… FMLA and had so much missed time taken out of [her] paycheck." (Plf. Depo., 297:1-17, **Exh. 4**).  Plaintiff testified that, in response, Mr. Rawlings said that "he would check with finance and let me know.  And then later that next

afternoon, he stopped by my desk," and said that it was not possible. *Id.* at 295:25-296:21, 297:1-17. Mr. Rawlings recalls that during their conversation, Plaintiff also mentioned that, although she was missing work at Rawlings, she got a second job, which struck him as odd. *See* Mr. Rawlings Depo., 136:5-15, **Exh. 24**.

According to Joan O'Brien, Vice President of Human Resources, after Plaintiff's conversation with Mr. Rawlings, he called Ms. O'Brien and asked her why Plaintiff was not working and why she needed a loan. (Ms. O'Brien Depo., 232:10-18, **Exh. 19**). Ms. O'Brien told him she thought Plaintiff was on FMLA and pulled the Plaintiff's FMLA/ADA paperwork to confirm this information. *Id.* 157:8-159:6. Ms. O'Brien asked Ms. Ford, the HR Generalist that supported the Audit Department and Ms. Chapman's team, to review Plaintiff's ADA Paperwork with her. *See id.*

When Ford reviewed the paperwork, she immediately noticed that the 2015 Form did not identify Plaintiff as having a disability under the ADA. (Ms. O'Brien Depo., 185:13-186:6, **Exh. 19**). Nor did it indicate that Plaintiff's IBS would require full day absences. *Id.* Instead, the Form stated that the medical condition may cause Plaintiff to "leave work early or be late." (2015 ADA Paperwork, **Exh. 16**).

Since Plaintiff did not have paperwork justifying her frequent absenteeism and tardiness, Ms. Ford, in her capacity as an HR Generalist, issued Plaintiff a written warning for her attendance during a meeting on September 30, 2015 (the "September Meeting"). (Written Warning No. 2, **Exh. 25**). At that meeting, Ms. Ford and Ms. Chapman informed Plaintiff that her ADA paperwork did not support her missing full days of work. (Ms. Ford Depo., 161:25-164:21, **Exh. 23**). Therefore, Plaintiff could not miss a complete day, unless she used vacation or sick time, until she became eligible for FMLA time again. (Plf. Depo., 281:12-15, **Exh. 4**).

At that point, Plaintiff was in the negative for both sick and vacation time off.[6]  During the September Meeting, Plaintiff indicated that she could get additional information from her doctor regarding her medical condition.  *See id.* at p. 291-292.  Ms. Ford told the Plaintiff she would review any additional information her doctor could provide.  *See* Ms. Ford. Depo., 183:4-10, **Exh. 23**.

On October 6, 2015, Ms. Ford emailed Plaintiff stating that Rawlings needed to evaluate whether the company could continue to accommodate her.  (Requests to Dr. Rhoads, **Exh. 26**).  In that email, Ms. Ford specifically stated that Rawlings was not revoking her ADA accommodation at that time, but that the company needed additional information from Plaintiff's physician by October 14th in order to make a determination about the continuation of any accommodation.  *Id.*  Rawlings' requested that Plaintiff have her physician affirm that the 59% absenteeism rate from the previous months was "within the range of what they would have expected" and whether "it will be necessary for [Plaintiff] to continue to be absent at this rate."  *Id.*  Rawlings faxed the information request to Dr. Rhoads and copied the Plaintiff.  (Plf. Depo., pg. 306, **Exh. 4**).

In response, Dr. Rhoads stated that she had treated Plaintiff's IBS since July 2013.  (Dr. Rhoads' Letters, **Exh. 27**).  According to Dr. Rhoads, "IBS symptoms affect everyone differently so there really isn't a range of expected absenteeism… Typically with IBS, symptoms most commonly occur either early morning or late afternoon, which is reasonable cause for her to be possibly be late for work or have to leave early."  *Id.*  Dr. Rhoads mentioned that she had recently prescribed a new medication on August 20th.  *Id.*  The letter states that once Plaintiff's medications were regulated, Dr. Rhoads expected a significant decrease in absenteeism.  *Id.*

---

[6] Plaintiff's available sick time off was -8 hours and vacation time off was -27.33 hours.

On October 14th, Ms. Ford sent Dr. Rhoads a follow-up letter asking (1) for a definite timeframe when Plaintiff's medication would be regulated so that full day absences would be less frequent and (2) for clarification on what Dr. Rhoads meant by coming late and leaving early.  (Requests to Dr. Rhoads, **Exh. 26**).  However, Dr. Rhoads never provided any information answering Ms. Ford's questions.  (Ms. Ford Depo., 182:25-184:19, **Exh. 23**).  In fact, Dr. Rhoads' assistant testified that Dr. Rhoads would not approve full day absences.  (Ms. Doll Depo., 29:13-23; 31:5-12; 32:12-22, **Exh. 17**).

After the September Meeting, Plaintiff started taking half days off, instead of full days.  In October alone, Plaintiff missed 13 half days of work (out of 22 total work days).  *See* Payroll Records, **Exh. 21**.  Throughout that month, while Rawlings communicated with her physician, Plaintiff averaged 120 minutes of break and lunch time per day (on the nine days of the month she attended work for the majority of the day).  *See* Loading Dock Video, **Exh. 7**.  Plaintiff agrees that she always took more than one break in the morning and one in the afternoon, in violation of Rawlings' policy on point.  (Plf. Depo., 344:3-6, **Exh. 4**).[7]

On November 6, 2015, Plaintiff suddenly informed Rawlings that Dr. Rhoads told her that she needed a second set of "paperwork" on file from Dr. Sparks, who treated her for depression, anxiety and sleeplessness related to her IBS.  (Plf. Depo., 334:1-17, **Exh. 4**).

---

[7] Besides Plaintiff's excessive absenteeism and lengthy breaks, her performance also significantly slipped in 2015 as her invoicing and recovery numbers fell well below her targets.  Plaintiff's yearly goals were $1,500,000 in invoicing and $1,000,000 in recoveries.  *See* Performance Chart, attached as **Exh. 30**.  In the first quarter of 2015, she only met 69% of her invoicing goal and 65% of her recovery goal.  Her numbers did not improve as the year continued.  For example, in May 2015, Plaintiff met only 10% of her recovery goal.  In June, her invoicing rate was 22.5% of her target.  Plaintiff had a single large recovery in July 2015;  without that single hit, her numbers would have been abysmal.

In fact, Plaintiff's 2015 yearly numbers were so low that she was consistently the poorest performer on Diana Chapman's team.  *See id.*  By the fourth quarter of 2015, Plaintiff's numbers floundered;  she hit only 26% of her invoicing goal for that time period (the lowest on her team) and 84% of her recoveries goal for the year  (again the lowest).

Rawlings supplied Plaintiff with the applicable FMLA paperwork on November 9th.  *See Additional FMLA Paperwork*, **Exh. 29**.  Plaintiff never returned paperwork from Dr. Sparks to Rawlings.  *See* Plf. Depo., 175:8-11, **Exh. 4**.

Because Dr. Rhoads could not, or would not, answer Rawlings' questions about the duration and timing of Plaintiff's illness, the company revoked her temporary accommodation during a meeting on November 10, 2015 (the "November Meeting").  (Ms. Ford Depo., 181:1-18, **Exh. 23**).  At the November Meeting, Ms. Ford informed Plaintiff that Rawlings could not continue to accommodate her absences without a timeframe for improvement.  (Plf. Depo., 341:9-13, **Exh. 4**).  She also told Plaintiff that being present at work from 8:00 a.m. to 5:00 p.m., Monday through Friday, was an essential function of the Auditor position.  *Id.* at 341:14-21. Plaintiff recalls Ms. Ford telling her that if she missed more work before she accrued additional time off or qualified for FMLA leave, she was subject to termination.  *Id.* at 342:2-9, 342:25-343:3.

As a follow-up to the November Meeting, Plaintiff's ATM, Ms. Chapman, emailed her the next day on November 11th with a "reminder" about break times.  (November 11th Email, **Exh. 31**).  According to Ms. Chapman's email, Plaintiff's break times had been increasing.  *Id.* For example, Ms. Chapman noted that the previous afternoon, Plaintiff took a forty minute break.  *Id.*

### 6.      Plaintiff's Termination.

Despite the November Meeting, the excessive break reminder, and the first and second written warnings, Plaintiff's frequent violations of the attendance and break policies continued. The following chart, which includes the eight days after the November Meeting, proves how egregious Plaintiff's conduct actually was and outlines her blatant disregard for Rawlings' policies.

| Date | Length of Time at Work | Time Spent on the Loading Dock or at Lunch |
|------|------------------------|--------------------------------------------|
| 11-11-15 | Full day | 40 minutes (plus 75 minute lunch) |
| 11-12-15 | Full day | 57 minutes (plus 81 minute lunch) |
| 11-13-15 | Full day | 1 hour, 11 minutes (plus 88 minute lunch) |
| 11-16-15 | 6 hours | 1 hour, 32 minutes |
| 11-17-15 | Full day | 2 hours, 33 minutes |
| 11-18-15 | 7 hours, 15 minutes | 2 hours, 3 minutes |
| 11-19-15 | 8.5 hours | 1 hour, 53 minutes |

*See* Loading Dock Video, **Exh. 7**.

On November 19th, Ms. Ford sent Plaintiff an email stating that on "several occasions" since the November Meeting and the second written warning, Plaintiff had taken "lunches that have lasted close to an hour and 1/2 and several breaks close to 30 minutes instead of 10." (Final Warning Email, **Exh. 32**). In addition, Plaintiff reported late to work on November 18th. *Id.* As a result, Ms. Ford issued Plaintiff a final written warning on November 19th reiterating that Plaintiff "must be at work and working during normal business hours..." (the "Final Warning"). *Id.*

After the Final Warning, Plaintiff failed to change her behavior; her excessive breaks and long lunches continued unabated. In addition, she arrived late three times, including her arrival three hours late on December 8th. As a result, Rawlings terminated Plaintiff's employment that day based on her excessive absences, tardies and breaks. (Ms. Ford Depo., 181:21-182:1, **Exh. 23**; Plf. Depo., 347-350, **Exh. 4**). The following chart illustrates Plaintiff's excessive absenteeism and breaks leading up to her termination.

| Date | Length of Time at Work | Time Spent on the Loading Dock or at Lunch |
|------|------------------------|--------------------------------------------|
| 11-20-15 | Full day | 1 hour, 17 minutes (plus 70 minute lunch) |
| 11-23-15 | Full day | 2 hours, 8 minutes |
| 11-24-15 | Full day | 1 hour, 52 minutes |
| 11-25-15 | Full day | 2 hours, 1 minute |
| 11-30-15 | 4 hours | 39 minutes |
| 12-1-15 | Full day | 1 hour, 48 minutes |

| 12-2-15 | 4.5 hours | 41 minutes |
|---------|-----------|------------|
| 12-3-15 | Full day | 2 hours, 11 minutes |
| 12-4-15 | Full day | 1 hour, 24 minutes (plus 111 minute lunch) |
| 12-5-15 | Full day | 1 hour, 29 minutes (plus 87 minute lunch) |
| 12-8-15 | Arrived 3 hours late | Plaintiff Terminated |

*See* Loading Dock Video, **Exh. 7**.

After Plaintiff's termination, she applied to the Kentucky Division of Unemployment Insurance for unemployment benefits.  Her application stated in part that she was "denied ADA accommodation by Employer for disability, even with appropriate paperwork required completed by physician." (Unemployment Paperwork, **Exh. 33**).   In response to her application, Rawlings HR department, through Ms. Ford, with assistance from counsel, accurately asserted that Plaintiff never submitted paperwork establishing the existence of a "disability," as defined by the ADA.  *See* Rawlings' Unemployment Response, **Exh. 34**.  Rawlings submitted this response not as a challenge to Plaintiff's right to receive unemployment.  *See* Ms. Ford Depo., 239:2-240:17, **Exh. 23**.  Instead, Rawlings submitted the response to place on the record its version of events, knowing that litigation was likely.  *See id.* at 239:2-240:17.  In fact, Ms. Ford, testified she thought it was likely Plaintiff would be awarded benefits.  *See id.* at 245:24-246:2.

## PROCEDURAL BACKGROUND

Plaintiff filed suit against the Defendants in February 2016 alleging a violation of the Kentucky Civil Rights Act ("KCRA"), FMLA interference and retaliation and a violation of K.R.S. § 341.990.  *See* Complaint, DN 1-1.  The Defendants subsequently removed the case to federal court.  *See* Notice of Removal, DN 1.   Since then, Plaintiff has amended her complaint two times.  The most recent iteration, the Second Amended Complaint, also includes claims for violations of the Americans with Disabilities Act (the "ADA"); violations of the Fair Labor Standards Act (the "FLSA"); retaliation under the ADA, KCRA, and the Kentucky Wage and Hour Act (the "KWHA"); and a declaratory judgment action that requests that the Court declare

that all of Rawlings' Auditors, like Plaintiff, are non-exempt under the FLSA.  *See* Second

Amended Complaint, DN 48.  All of Plaintiff's claims should be dismissed as a matter of law.


## SUMMARY JUDGMENT STANDARD

Federal Rule 56(a) provides that within the context of a motion for summary judgment,

"[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  If the pleadings, depositions, answers to interrogatories, and admissions on file, together

with affidavits, if any, show that there is no genuine dispute as to any material fact, the moving

party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The U.S. Supreme Court

has emphasized that the summary judgment procedure is favored as it promotes the expeditious

disposition of cases and avoids unnecessary trials.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 327

(1986); *First Nat'l Bank of Ariz. v. Cities Svc. Co.*, 391 U.S. 253, 288-90 (1968).

When a motion for summary judgment is made and supported under Fed. R. Civ. P. 56,

an adverse party may not rest upon the mere allegations or denials of her pleading.  Plaintiff's

response **must** set forth specific facts showing that there is a genuine dispute for trial.  *Cities

Service Co.,* 391 U.S. at 288.  Further, the alleged issues or facts raised by the adverse party must

be material.  No material issues exist unless there is sufficient evidence to return a verdict for the

adverse party.  If the evidence adduced by the adverse party is merely colorable or is not

significantly probative, summary judgment is proper.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249-50 (1986);  *Celotex*, 477 U.S. at 323.  Therefore, the nonmoving party is required to go

beyond the pleadings and to designate specific facts in affidavits, depositions, answers to

interrogatories or admissions which show a genuine dispute for trial.  Plaintiff cannot meet this

affirmative duty, and her claims fail as a matter of law.

## LEGAL ANALYSIS

**I.**    **PLAINTIFF'S ADA/KCRA DISABILITY DISCRIMINATION CLAIMS[8] FAIL AS A MATTER OF LAW FOR A MULTITUDE OF REASONS.[9]**

Plaintiff's disability discrimination allegations, including her reasonable accommodation

claim and disparate treatment claim, arise under the ADA and KCRA.  The KCRA "was

modeled after federal law, and [Kentucky] courts have interpreted the Kentucky Act consistently

therewith."  *Howard Baer, Inc. v. Schave,* 127 S.W. 3d 589, 592 (Ky. 2003); *see also Henderson*

*v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001) ("We interpret Kentucky protections for the

disabled consonant with the federal Americans with Disabilities Act").  Therefore, the same

standards apply to both the ADA and KCRA allegations.

**1.**    **Legal Standards.**

"Disability discrimination claimants can proceed under the separate legal theories of

disparate treatment and failure to accommodate."  *Webb v. Humana Inc.*, 819 F. Supp. 2d 641,

645 (W.D. Ky. 2011).  Plaintiff asserts both theories in the Second Amended Complaint.  First,

with respect to disparate treatment, Plaintiff claims that Rawlings discriminated against her

based on her alleged disability by making deductions from her wages that were not taken from

non-disabled employees.  *See* DN 48, Count I (¶¶ 173-176) and Count IV (¶¶ 206-213).  Second,

Plaintiff asserts that Rawlings failed to provide a reasonable accommodation.  *See id.* at Count I

(¶¶ 164-172).

---

[8] Plaintiff's ADA and KCRA disability discrimination claims are labeled as Count I and Count IV in the Second Amended Complaint.

[9] Plaintiff's demotion from ATM to Auditor occurred in August 2014, four months before her physician submitted her first set of ADA paperwork.  Therefore, the ADA allegations in the Second Amended Complaint (DN 48) pertain only to Plaintiff's termination in December 2015, not her demotion.

Plaintiff is neither "disabled" nor "qualified" for her position, as defined by the ADA, so both her disparate treatment claim and her failure-to-accommodate claim in Counts I and IV should be dismissed.  Because she cannot prove she was disabled or qualified under the ADA, all of Plaintiff's disability related allegations are subject to dismissal as a matter of law.

### a.      Disparate Treatment.

To survive summary judgment on her disparate treatment claims, Plaintiff bears the burden of establishing a *prima facie* case by providing proof that: (1)  she is disabled; (2)  she is otherwise qualified for the position; (3)  she suffered from an adverse employment decision; (4) the employer knew or had reason to know of her disability; and that (5) she was replaced or her position remained open.  *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017) (citing *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)).  The final element "may also be satisfied by showing that similarly situated non-protected employees were treated more favorably." *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (citations omitted).  If the plaintiff makes out a *prima facie* case, the burden then shifts to the employer to demonstrate that there was a legitimate, nondiscriminatory reason for the adverse employment action. *Williams*, 847 F.3d at 395.  The plaintiff must then show that the reason given by the employer was actually a pretext designed to mask unlawful discrimination.  *Id.*

### b.      Failure to Accommodate.

To survive summary judgment on her failure to accommodate claim, Plaintiff must present the following:

> (1) she is disabled within the meaning of the [ADA]; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.  To satisfy the fourth element, the plaintiff must have initially proposed an accommodation that is objectively reasonable.

*Parks v. UPS Supply Chain Solutions, Inc.*, 2014 U.S. Dist. LEXIS 13538, *36 (E.D. Ky. 2014).

**2.      Plaintiff cannot survive summary judgment on her ADA or KCRA claims**.

**a.      Plaintiff is not "disabled" under the ADA.**

Count I and Count IV must be dismissed, in their entirety, as a matter of law because Plaintiff cannot prove that she was disabled, as defined by the ADA/KCRA.[10]  The statutes define "disability" in three ways: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.  42 U.S.C. § 12102(1)(A-C);  K.R.S. 344.010(4)(a-c).  Plaintiff cannot establish a disability under either 42 U.S.C. § 12102(1)(A) or 42 U.S.C. § 12102(1)(B).[11]  In addition, Plaintiff has not asserted in DN 48 or anywhere else in the record that Rawlings regarded her as disabled.[12]

Although IBS can be considered a "disability," that designation depends on the symptoms of the individual employee.  Here, the analysis of whether Plaintiff's IBS meets the ADA's definition of "disability" can start and end with her physician's assessment of her condition.  Notably, on both of the 2014 and 2015 ADA forms, Plaintiff's physician did not identify her IBS as a disability that substantially limits one or more major life activities.  2014

---

[10] Rawlings originally accommodated Plaintiff's ADA request for partial or full days off in cautious recognition of the fact that IBS can be classified as a "disability," depending on an individual patient's symptoms.  When Plaintiff's physician was unable to justify her full day absences or provide more information about Plaintiff's alleged "disability," Rawlings was not required to continue to accommodate Plaintiff's IBS.  *See e.g.*, *Kleiber v. Honda of Am. Mfg.*, 420 F. Supp. 2d 809, 822 (S.D. Ohio 2012) ("Good deeds ought not be punished, and an employer who goes beyond the demands of the law to help a disabled employee incurs no legal obligation to continue doing so.") (citations omitted).

[11] These sections of the ADA correspond with K.R.S. 344.010(4)(a) and (b).

[12] Should Plaintiff attempt to assert a "regarded as" claim for the first time in her Response, her reasonable accommodation claim should still fail since the "law of the [Sixth] [C]ircuit" is that "a finding of 'regarded-as' disability would obviate an employer's responsibility to offer reasonable accommodation to an employee."  *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 776 (6th Cir. 2011) (citations omitted).

ADA Paperwork, **Exh. 14**; 2015 ADA Paperwork, **Exh. 16**. In fact, Dr. Rhoads' answers on both ADA Forms establish the following:

> (1) In 2014 and 2015, Plaintiff was currently able to perform all of the physical/mental functions of her position.
>
> (2) Plaintiff's mental or physical impairment is controllable with medication so as to enable her to perform the functions of her job. Dr. Rhoads noted that Plaintiff "is prescribed medication that has improved her symptoms."
>
> (3) Plaintiff's mental or physical health impairment(s) ***do not limit*** her ability to perform any major life activities.
>
> (4) There are no steps that Rawlings could take that would enable Plaintiff to perform the essential functions of her job.

*Id*.; *see also* Dr. Rhoads' Depo., 44:16-49:12; 53:21-54:20, **Exh. 35**. Although in 2015 Rawlings approached Dr. Rhoads several times asking for additional information about Plaintiff's condition, Dr. Rhoads never changed her initial evaluation during her correspondence with Rawlings concerning Plaintiff's IBS. In fact, she simply continued to reiterate that plaintiff's condition may cause her to only come in late or leave early.

Other courts have similarly ruled that a physician's assessment of an employee's condition can be conclusive evidence as to whether that employee is "disabled" under 42 U.S.C. § 12102(1)(A). For example, in *Sanders v. Bemis Co.*, 2017 U.S. Dist. LEXIS 12304 (E.D. Ky. 2017), the court evaluated the medical evidence presented by the plaintiff's physician. Like Dr. Rhoads, the *Sanders* physician stated that none of the plaintiff's major life activities were substantially limited as a result of his diabetes. The *Sanders* court found the physician's assertion o be convincing evidence that the plaintiff was not "disabled" under the ADA. Like in *Sanders*, Plaintiff's 2014 and 2015 ADA Forms unequivocally prove that she did not suffer from a "disability" as defined by the ADA/KCRA.

It therefore follows that Plaintiff cannot show a "record of such impairment."  42 U.S.C.
§ 12102(1)(B).  To qualify as a "disability," the "record of an impairment" must substantially
limit one or more major life activities.  *See e.g.*, *Edwards v. Ford Motor Co.*, 218 F. Supp. 2d
846, 851 (W.D. Ky. 2002) ("[C]laims under § 12102(2)(B) (based upon a record of impairment)
would appear to succeed or fail for many of the same reasons as claims under § 12102(2)(A)
(based upon an actual impairment), because both require a predicate showing of a mental or
physical impairment that substantially limits one or more major life activities.").

Since Dr. Rhoads maintains that Plaintiff's IBS does not limit her in that manner, she
cannot show a "record of impairment."  For example, in *Calvert v. AmeriCold Logistics, LLC*,
2012 U.S. Dist. LEXIS 135617, *15-16 (W.D. Tenn. 2012) (reversed on other grounds), the
plaintiff alleged that she met the disability definition because the company had a record of her
disability, a letter from her doctor describing her condition, interstitial cystitis.  That letter led the
company to provide an accommodation that permitted plaintiff to use the restroom whenever she
needed.  The court concluded that, although the employer was aware of the medical condition,
and even took steps to accommodate it, the condition did not qualify as a disability because there
was no "record" that the condition substantially limited one or more major life activities.

Like in *Sanders*, *Calvert*, and *Edwards*, *supra*, Dr. Rhoads never identified Plaintiff as
having a disability, as defined by the ADA/KCRA.  Since Plaintiff is not "disabled," Count I and
Count IV should be dismissed.

> **b.      Plaintiff was not qualified to perform an essential function of her job
>           as an Auditor, regular and predictable attendance.**

Plaintiff was not qualified to perform the essential functions of her job as an Auditor
because of her inability to regularly and predictably attend work.  Therefore, Count I and Count
IV fail.

**(1)      Sixth Circuit precedent establishes that regular and predictable attendance is an essential function.**

Regular and predictable on-site job attendance is an essential function of Plaintiff's position as an Auditor, therefore Plaintiff was not qualified to perform her job.  An employee is deemed "qualified" only if she can perform all of the essential functions of her job, whether accommodated or not. 42 U.S.C. § 12111(8).  "Essential functions" are those that in the employer's judgment, as evidenced by its words, policies and practices, and a written job description deem essential.  *See id.*  Notably, a "reasonable accommodation" does "not include removing an 'essential function' from the position, for that is *per se* unreasonable."  *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (citations omitted).

Sixth Circuit precedent clearly establishes that attendance is an essential function of most jobs – including Plaintiff's.  For example, in *Ford Motor Co.*, the plaintiff also suffered from IBS.  *Id.*  Her disability caused her to have "uncontrollable diarrhea and fecal incontinence, sometimes so bad that "it" could "start[] pouring out of [her]" at work."  *Id.* at 758.  She requested that Ford accommodate her disability by permitting her to telecommute from home four days a week.[13]  *Id.* at 759.  Ford evaluated that accommodation and concluded that it would not work based on the requirements of the plaintiff's position.  *Id.* at 759-760.

In affirming Ford's position, the Sixth Circuit relied on the "commonsense notion"  that "[r]egular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones.  That's the same rule that case law from around the country, the statute's language, its regulations, and the EEOC's guidance all point toward."  *Id.* at 762-63 (stating that as "a general rule," "an employee who does not come to work cannot perform any of his job functions, essential or otherwise").  "An employee who

---

[13] Plaintiff never requested that Rawlings accommodate her by allowing her to telecommute or work from home.

cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA." *Id.* (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998)).

The Sixth Circuit re-affirmed that attendance is an essential function of most positions earlier this year in *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384 (6th Cir. 2017), holding that "AT&T's judgment and much of the evidence in the record support the conclusion that regular attendance is an essential function of the CSR position." *Id.* at 392 (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 420 (6th Cir. 2004) (concluding that regular attendance was an essential function based on a supervisor's affidavit). Thus, *Williams* confirms what *Ford Motor Co.* clearly established; attendance is an essential function of most, if not all, jobs. *See also Gamble v. JP Morgan Chase & Co.*, 2017 U.S. App. LEXIS 8376, *12 (6th Cir. 2017) (Regular attendance was an essential function of the plaintiff's position at JP Morgan, therefore he was not a qualified individual under the ADA); *Hostettler v. College of Wooster*, 2017 U.S. Dist. LEXIS 46742, *16 (N.D. Ohio 2017) (finding that the plaintiff "was not qualified for the position because she could not complete the essential function of working full-time, with or without a reasonable accommodation").

Notably, the Sixth Circuit – even before *Ford*, *Williams*, *Gamble*, etc. – consistently "… held that plaintiffs with excessive absences were not qualified individuals when they failed to perform the essential function of regularly attending their jobs." *Williams*, 847 F.3d at 392 (citing *Brenneman*, 366 F.3d at 420 (concluding that an employee who was terminated because of excessive absences that were unrelated to diabetes was not qualified, and would not be qualified due to these absences even if her accommodation request for medical leave were granted); *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (concluding

that an employee was not qualified because she had been on a year-long medical leave of absence, and her physician had not released her for work or specified a date on which she would be able to return)).

> **(2)     Plaintiff's frequent absenteeism and excessive breaks make her unqualified to perform the essential function of regular and predictable attendance.**

Plaintiff's position at Rawlings required regular and predictable attendance.  Since regular attendance was an essential function of the Auditor job, Plaintiff is not a qualified individual under the ADA/KCRA.

Regular, predictable attendance for on-site work is a necessary part of the Auditor role at Rawlings.  To start, with a few rare exceptions, generally involving the IT department, Rawlings' Auditors are required to work at the facility.  (Ms. Barrens Aff., ¶ 4, **Exh. 1**).  Auditors only have computer access at their desk and there are no Auditors with remote access to Rawlings' system. *Id.*  The company requires work on-site since the employees handle a large volume of confidential and HIPAA protected personal information for Rawlings' clients.  *Id.*  As explained by Kathy Barrens, Rawlings' Senior Vice President and CFO, an Auditor's work involves "… accessing our client systems or accessing our company systems to complete investigations, invoicing and recovery processes.  If you're not at your desk, you cannot be fulfilling that essential responsibility."  (Ms. Barrens Depo., 237:1-16, Vol. I, **Exh. 36**).

Rawlings' employees know that their on-site work must be performed in accordance with the company's punctuality and attendance requirements.  The Employee Handbook, which Plaintiff acknowledged receiving in 2012 and 2015, includes the "Hours of Work" policy that states that "Our normal work week consists of 40 hours per week.  Our standard office hours are 8:00 a.m. to 5:00 p.m., Monday through Friday."  (Employee Handbook, pg. 22, **Exh. 2**).

Other sections of the Employee Handbook confirm the importance of regular attendance. The "Punctuality and Attendance" policy begins by stating that "[p]art of performing your job well means being where you are supposed to be when you are supposed to be there.  Your punctual arrival and reliable presence are key factors in providing the excellent service our clients expect."  *Id.*  It then states that "[i]f tardiness and/or absenteeism become excessive, you will be subject to disciplinary action, up to and including termination."  *Id.*  Ms. Barrens confirmed the importance of the "punctuality and attendance section" of the Handbook, stating that the policy "… makes it really clear that part of performing your job, well, means being where you're supposed to be when you're supposed to be there."  (Ms. Barrens Depo., Vol. I, 254:13-21, **Exh. 36**).

Importantly, the collaborative elements of the Auditor job require punctual and regular attendance, as described in the Handbook.  At Rawlings, "effective collaboration is typically person to person contact."  *Id.* at 248:8-9.   Many of the ways that the company makes its "… investigation in recovery processes better or improve[s] our systems is through collaboration and communication.  Auditors identifying a best practice, a new way to do something, and then sharing it with others…  That is part of the… foundation of making our company better."  *Id.* at 243:1-7.  Therefore, regular attendance is essential based on "the benefit of collaboration and sharing of information between members of both individual teams and across the company."  *Id.* at 240:1-14.

Rawlings also views regular attendance as necessary so that an Auditor can be responsive to clients and their constituents.  Having employees working on a "regular and predictable schedule as defined by the company is what is important for managers to be able to manage their people effectively, for clients to have their… expectation met for responsiveness."  (Ms. Barrens

Depo., 241:1-9, Vol. I, **Exh. 36**).   According to Rawlings,  an Auditor's "… punctual arrival and reliable presence are key factors in providing… [the] excellent service our clients expect." *Id.* at 254:21-25.

It is uncontroverted that Rawlings' views regular, predictable attendance from 8:00 a.m. to 5:00 p.m. as an essential function of the Auditor position.  In fact, Plaintiff agreed in her emails to her team during her time as an ATM.  *See* Team Member Emails, **Exh. 10**.  As described, *supra*, Plaintiff's track record of unpredictable attendance, frequent tardies, and excessively long breaks (whether related to her IBS or not) obviates the fact that she cannot perform that essential function.  Accordingly, Plaintiff is not a qualified individual under the ADA/KCRA and FRCP 56 requires the dismissal of Counts I and IV.

> **c.     The disparate treatment allegations should also be dismissed since there is no proof that Rawlings treated a similarly situated employee more favorably.**

Plaintiff's disparate treatment claims[14] fail for an additional reason;  there is no proof whatsoever that Rawlings treated similarly-situated non-protected employees more favorably. *Jones*, 488 F.3d at 404.  Sixth Circuit precedent establishes that "[i]n the disciplinary context, employees are 'similarly situated' only if they have 'engaged in acts of comparable seriousness.'" *Waggoner v. Carlex Glass Am., LLC*, 682 Fed. Appx. 412, 415 (6th Cir. 2017) (citing *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 710 (6th Cir. 2006)).  It follows that "… the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones*, 488 F.3d at 405.

---

[14] *See* DN 48, Count I (¶¶ 173-176) and Count IV (¶¶ 206-213).

The Second Amended Complaint alleges disparate treatment based on salary deductions allegedly incurred by disabled employees, but not non-disabled employees, for doctor's visits, etc.  *See* DN 48, ¶¶ 206-213.  For Plaintiff to survive summary judgment, she must, therefore, provide evidence of a non-disabled employee, with the same supervisor, whose salary was not deducted, and who was terminated for comparable issues with tardiness, absenteeism and excessively long breaks.

Notably, Rawlings' supervisors have discretion to enforce the company's break policy, therefore Plaintiff must identify a comparator who also worked under Diane Chapman for that individual to be "similarly situated."  Plaintiff acknowledged the extensive discretion exercised by Rawlings' managers over breaks in her own testimony[15] – and in practice, emailing her team that she had always "been lenient" on their breaks, "but when production isn't there, I am forced to start monitoring this."  *See* Team Member Emails, **Exh. 10**.  Plaintiff's witness Ona Hull confirmed Plaintiff's belief about supervisor discretion and specifically the Audit Divison.

> Q.   Okay.  And then were there other managers, in your observation, that were stricter about enforcing break times, enforcing lunch times?
>
> A.   My observation was that every manager treats their team differently.  There's no consistency.
>
> Q.   Okay.  Was there much of a change in your management style relating to enforcing those policies, or did you continue on as long as they are doing their work?
>
> A.   … when I moved from the audit floor to production, it was a completely different atmosphere.  That entire department was much more relaxed.
>
> Q.   The audit department was or the research one?
>
> A.   The research.

---

[15] Plf. Depo., 58:22, 73:3-74:12, **Exh. 4**.

Q.     Okay.  And describe that for me, it was much more relaxed?

A.     On the audit floor, the expectation of a manager is --- was that you should be checking the timer and making sure they're not gone more than ten minutes, and that they didn't go more than once.  It was very rigid.  And there was none of that when I moved to production.

(Ms. Hull Depo., Vol. I, 35:24-36:8, 39:24-40:18, **Exh. 37**).

Plaintiff spent countless hours during discovery attempting to uncover a similarly-situated employee; those attempts failed.  As shown in the following chart, which includes individuals listed as comparators in Plaintiff's Rule 26 disclosures, Plaintiff cannot identify a single potential comparator.

| Name | Same department? | Same duties? | Same supervisor? | Terminated for the same absenteeism, tardiness and break issues? |
|---|---|---|---|---|
| Brett McKinney[16] | No | No | No | No |
| Elena Melone[17] | Yes | No | No | No[18] |
| Jennifer Roby[19] | Yes | Yes | No[20] | No[21] |
| Mark Ingram*[22] | Yes | No | No | No |
| Kristina Harrod[23] | Yes | Yes | No[24] | No[25] |
| Kevin Ford[26] | Yes | Yes | Yes | No |

---

[16] Plf. Depo., 477:22-479:24, **Exh. 4**.
[17] *Id.* at 479:25-484:6.
[18] *See* Ms. Melone Depo., 38:10-21, **Exh. 38**.
[19] Plf. Depo.,487:5-489:1, **Exh. 4**.
[20] Barrens Aff., ¶ 5, **Exh. 1**.
[21] *Id.*
[22] Plf. Depo., 487:5-489:1, **Exh. 4**.
[23] *Id.* at 489:1-491:11.
[24] Harrod Depo., 22:1-12, **Exh. 39**.
[25] Barrens Depo., Vol. III, 168:9-170:11, **Exh. 36** (testifying that Kristina Harrod was warned for attendance on October 20, 2015, months before her FMLA leave started and nearly a year before her termination on September 15, 2016).
[26] Plf. Depo., 491:13-492:22, **Exh. 4**.

| Matt Monyhan[27] | No | No | No | No |
|---|---|---|---|---|
| Gloria Marshall | No[28] | No[29] | No[30] | No |

Accordingly, there is no proof establishing the final element of the disparate treatment claim, and Counts I and IV should be dismissed for this additional reason.

### d. The reasonable accommodation portion of Count I fails, as well, since Plaintiff never requested a reasonable accommodation.

Plaintiff's proposed accommodations, coming in late, leaving early and taking full days off, are *per se* unreasonable in light of an Auditor's essential functions, including regular and predictable attendance.  The ADA Paperwork submitted by Dr. Rhoads proposed only one accommodation, coming late and leaving early.[31]  Despite that, Plaintiff also took full days off. Thus, Plaintiff's proposed accommodation (whether missing partial or full days), would require her to be excepted from the attendance requirements of the Auditor position.

It is well-settled that "[t]he employee bears the burden of proposing an accommodation that will permit her to effectively perform the essential functions of her job." *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010).[32]  The Sixth Circuit previously established that "[i]n failure-to-accommodate claims where the employee requests an accommodation that exempts her from an essential function, the essential functions and reasonable accommodation analyses run together." *Ford Motor Co.*, 782 F.3d at 763 (citations omitted).  Therefore, "[o]ne

---

[27] Plf. Depo., 492:18-493:17, **Exh. 4**.
[28] Marshall Depo., 11:23-12:4, **Exh. 40**.
[29] *Id.*
[30] *Id.* at 59:16-19.
[31] Rawlings notes that the 2014 and 2015 ADA Paperwork specifically states that Plaintiff does not need any accommodation to perform the requirements of her job.
[32] Plaintiff did not request any other accommodations during her time at Rawlings.  (Ms. Ford Aff., ¶ 3, **Exh. 41**).

conclusion (the function is essential) leads to the other (the accommodation is not reasonable)." *Id.*

Moreover, Plaintiff cannot meet her burden of showing that her request to take off partial or full days, indefinitely, is a reasonable accommodation. *See Walsh v. UPS*, 201 F.3d 718, 725-726 (6th Cir. 2000). It is well-established that "where an employer has already provided an employee with a lengthy period of medical leave"—such as through leave provided under the FMLA—"an extension to that leave can be a reasonable accommodation only when its duration is definite." *Maat v. Cnty. of Ottawa*, 657 Fed. Appx. 404, 413 (6th Cir. 2016) (finding that the plaintiff was not qualified for her position since her requested leave was not definite in duration, therefore "it could not have been a reasonable accommodation under the law of this circuit").[33]

For example, in *Walsh*, 201 F.3d 718, an airplane pilot asked for an additional year-long extension of his medical leave. When he made the request, the pilot could not demonstrate that he would recover. *Id.* at 727. The court found that when "… an employer has already provided a substantial leave, an additional leave period of a significant duration, with no clear prospects for recovery, is an objectively unreasonable accommodation." *Id.*

Plaintiff's proposed accommodations, of being allowed to unpredictably miss either partial or full days of work, preclude her from performing an essential function of her job, regular and predictable attendance. Moreover, Dr. Rhoads could not identify any timeframe for when Plaintiff's erratic attendance might lessen. Because attending work is an essential function of Plaintiff's position, and because Plaintiff could not identify a definite timeframe for her

---

[33] Rawlings notes that *Maat*, *Walsh*, etc. generally pertain to situations involving concurrent leave, not intermittent leave. However, the same reasoning applies here. Plaintiff's erratic attendance and tardiness – for an indefinite period – is just as manifestly unreasonable as permitting an employee to miss an indefinite period of time taken on consecutive days.

absences to decrease, her proposed accommodations are not reasonable and Count I is subject to dismissal under Fed. R. Civ. P. 56.

> **e.      Plaintiff was not qualified for the Auditor position, therefore her allegation that Rawlings failed to engage in the interactive process fails, as well.**

In the Second Amended Complaint, Plaintiff throws in the blanket assertion that Rawlings failed to engage "in the interactive process to assess the availability of a reasonable accommodation."  DN 48, ¶ 169.  That allegation carries no weight since Plaintiff was not qualified for her position.

In general, "[a]n employer is required to initiate an informal, interactive process when necessary to determine how an employee's disability limits her ability to work and to identify appropriate reasonable accommodations."  *Williams*, 847 F.3d at 395 (citing 29 C.F.R. § 1630.2(o)(3)).  However, "an employer's failure to engage in the interactive process is actionable only if the employee can demonstrate that she was qualified for the position."  *Id.* (citations omitted).  Since Plaintiff has failed to show that a reasonable accommodation would have allowed her to perform the essential functions of her job – including regular and predictable attendance – her interactive process allegations fail.  *Id.*

Moreover, Rawlings did not conduct a formal interactive process analysis only because Dr. Rhoads never identified Plaintiff's IBS as a disability.  However, Rawlings' communications with Dr. Rhoads throughout October 2015 were, in practical effect, an interactive process since the company took steps to clarify (1) whether Plaintiff's medical condition qualified as a "disability" and (2) the appropriate accommodation for the condition (i.e. if the full day absences were warranted).  Dr. Rhoads did not adequately answer Rawlings' questions on point, nor did Plaintiff submit ADA or FMLA paperwork from Dr. Sparks, like Dr. Rhoads suggested to her. Therefore, the company ultimately revoked the previously provided accommodation since there

was no timeframe for Plaintiff's recovery, no information about the appropriate accommodation (i.e. full days or partial days), and no proof that the condition even qualified under the ADA/KCRA, based on Plaintiff's doctor's statements.

    **f.**  **Count I and Count IV should also be dismissed since Rawlings had a legitimate, non-discriminatory reason for Plaintiff's discharge and she has no proof of pre-text.**

   Even assuming Plaintiff could present enough evidence to show a genuine issue of material fact on her *prima facie* case related to Count I or Count IV, which she cannot as detailed *supra*, she is unable to prove pretext. The Sixth Circuit applies the *McDonnell Douglas* burden shifting framework to ADA/KCRA claims that turn on circumstantial evidence. *Smith v. Chrysler Corp*., 155 F.3d 799, 805 (6th Cir. 1998); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Where a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to establish "… a non-discriminatory reason for discharging the employee." *Smith*, 155 F.3d at 805. If the defendant satisfies its burden in establishing a nondiscriminatory reason for its decision, the plaintiff's claim will overcome a summary judgment challenge only if the plaintiff can show that the there is a genuine issue of material fact as to whether defendant's "… proffered reason for discharge was actually a pretext intended to hide unlawful discrimination." *Id.*

      **(1)**  **Rawlings has articulated legitimate, non-retaliatory reasons for its actions.**

   Rawlings has demonstrated legitimate, non-retaliatory reasons for its decision to terminate Plaintiff's employment, specifically Plaintiff's flagrant and habitual violations of Rawlings' attendance and break policies. To start, Plaintiff was absent 59% of the time between July 2015 and September 2015. (Ms. O'Brien Depo., 185:11-186:9, **Exh. 19**). Rawlings' representatives met with Plaintiff to discuss her absences – which were unsupported by her ADA

Paperwork – multiple times in the fall of 2015.  *See* Factual Background, *supra*, pgs. 5-21.

Despite Rawlings' warnings about her absences and breaks at the September and November

Meetings, Plaintiff failed to change her behavior.  As detailed, *supra*, she ignored Rawlings'

warnings, missing 13 half days (out of 22 days total) in October and spending nearly two and a

half hours per day, on average, (on the 13 full days she worked, out of 22 days) on the loading

dock or at lunch in November and December.  This blatant disregard for Rawlings' policies – a

legitimate, non-discriminatory reason for the company to take action – warranted her ultimate

dismissal on December 8th.

**(2)      No genuine issue of fact exists as to pretext.**

In addition, Plaintiff cannot show a genuine issue of material fact as to the existence of

pretext—that is, that Rawlings' reasons were false and that the real reason for her termination

was her disability.  To establish pre-text, Plaintiff must show:  "(1) that the employer's proffered

reasons for the adverse employment action had no basis in fact, (2) that the proffered reasons did

not actually motivate the employer's action, or (3) that they were insufficient to motivate the

employer's action." *Parkhurst v. Am. Healthways Servs., LLC*, 2017 U.S. App. LEXIS 11623, *8

(6th Cir. 2017).  "In challenging an employer's action, an employee must demonstrate that the

employer's reasons (each of them, if the reasons independently caused the employer to take the

action it did) are not true." *Smith*, 155 F.3d at 806 (citations omitted).

The Sixth Circuit applies the "honest belief rule with regard to pretext." *Ferrari v. Ford

Motor Co.*, 826 F.3d 885, 895 (6th Cir. 2016).  Therefore, "as long as the employer honestly

believed the reason it gave for its employment action, an employee is not able to establish pretext

even if the employer's reason is ultimately found to be mistaken." *Id.*  Notably, courts "… do

not require that the decisional process used by the employer be optimal or that it left no stone

unturned.  Rather, the key inquiry is whether the employer made a reasonably informed and

39

considered decision before taking an adverse employment action." *Smith*, 155 F.3d at 807 (citations omitted).  In the event that "… an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009) (citations omitted).

With regard to Plaintiff's allegations of disparate impact (Count IV) based on salary deductions for disabled employees, Rawlings held the honest belief at the time of those deductions that they were proper, as described *infra*, pgs. 60-62.  Accordingly, Plaintiff cannot establish the pre-text necessary to succeed on Count IV, even if she could prove a *prima facie* case.

Looking at Plaintiff's termination, Mr. Rawlings, the President and sole owner of Rawlings, made the decision, in consultation with Ms. O'Brien and Ms. Ford, to terminate Plaintiff on December 8, 2015, based solely on her frequent and repeated unprotected violations of the company attendance and break policies.  *See* Mr. Rawlings Depo., 172:25-173:4, **Exh. 24**; Ms. Ford Depo., 181:1-182:13, **Exh. 23**.  The incontrovertible Loading Dock Video proves the extent of Plaintiff's disregard for Rawlings policy limiting its employees' breaks.  *See* Loading Dock Video, **Exh. 7**.  Instead of taking one 10-minute break in the morning and one in the afternoon, in compliance with the company standard, Plaintiff admits to taking five or six breaks a day.  *See* Plf. Depo., 225:12-19, **Exh. 4**.  Those breaks did not involve the restroom or her disability in any way.  Rather, she simply stood on the loading dock smoking and/or socializing instead of working.  Plaintiff cannot contradict this proof.

Nor can Plaintiff cast doubt on the sheer number of her absences or tardiness.  From July through September 2015, Plaintiff missed more work days than she attended, as proven by

Rawlings' payroll system and her text messages to Diana Chapman. *See* Payroll Records, **Exh. 21**; Texts with Chapman, **Exh. 42**. In October, even after Rawlings warned Plaintiff that her ADA Paperwork did not support those absences, she missed 13 half days (out of 23 working days). *See id.*

Plaintiff also cannot dispute Rawlings' honest belief that those absences – both the full and half days – were contrary to her ADA Paperwork, which clearly asserts, both in 2014 and 2015, that Plaintiff's medical condition did not limit her ability to perform any major life activities. (2014 ADA Paperwork, **Exh. 14**; 2015 ADA Paperwork, **Exh. 16**). Accordingly, the company reasonably believed, upon reviewing the ADA Paperwork, that she was not disabled under the applicable statute. Rawlings provided Plaintiff with an opportunity to provide additional information from her doctor supporting the existence of a disability and the reasonableness of her frequent absences. Plaintiff's physician essentially refused to provide support for full days as an accommodation, and never changed her opinion on the ADA Paperwork that Plaintiff's medical condition did not qualify as a disability. *See* Dr. Rhoads' Letters, **Exh. 27**.

On this record, no reasonable jury could find that it was more likely than not that Rawlings' conduct in terminating Plaintiff's employment was a pretext for an illegal motive. Because there is no genuine issue of material fact, pursuant to Fed. R. Civ. P. 56, Rawlings is entitled to summary judgment on Count I and Count IV.

## II. PLAINTIFF'S FMLA INTERFERENCE AND RETALIATION CLAIMS CANNOT SURVIVE SUMMARY JUDGMENT.[34]

There are two theories of recovery under the FMLA—an interference (or entitlement) theory, and a retaliation (or discrimination) theory. *Hunter v. Valley View Local Sch.*, 579 F.3d 688, 691 (6th Cir. 2009). Plaintiff brings her FMLA claim under both theories; Rawlings is entitled to summary judgment on both.

### 1. Legal Standards.

#### a. FMLA interference.

Plaintiff cannot prove Rawlings interfered with her rights under the FMLA. An FMLA interference claim stems from 29 U.S.C. § 2615(a)(1), which provides that an employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]." *Id.*; *see also Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007). The intent of the employer is irrelevant to whether an FMLA violation has occurred under the interference theory, because a violation occurs only when the employee does not receive the rights that are due to her under the statute. *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). Accordingly, to prevail on an interference claim, Plaintiff must show that she was entitled to benefits under the FMLA, notified Rawlings of her intent to exercise her FMLA rights, and was denied the FMLA benefits to which she was entitled. *See Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507-08 (6th Cir. 2006).

---

[34] Plaintiff's FMLA interference claim is described in Count II of DN 48. The FMLA retaliation claim is part of Count II and Count VI.

b.      **FMLA retaliation.**

An FMLA retaliation theory arises from the FMLA's prohibition on employer

discrimination or retaliation against employees who take family and medical leave.  29 U.S.C. §

2615(a)(2).  Unlike an interference claim, a FMLA retaliation claim prohibits employers from

discriminating  against anyone "for opposing any practice made unlawful by [the

FMLA]."  *Id*.; *see Grace v. USCAR*, 521 F.3d 655, 669 (6th Cir. 2008).  Courts have routinely

construed this language as barring retaliation against anyone who has exercised his rights under

the FMLA.  *See e.g., Bryant v. Dollar Gen. Corp*., 538 F.3d 394, 400-01 (6th Cir. 2008).  Unlike

an FMLA interference claim, an employer's motive is relevant to an FMLA retaliation claim

"because retaliation claims impose liability on employers that act against employees

specifically *because* those employees invoked their FMLA rights."  *Edgar*, 443 F.3d at 508.

Therefore, to establish a *prima facie* FMLA retaliation claim, Plaintiff must show that:

(1) she engaged in protected activity under the FMLA;  (2) Rawlings knew about the protected

activity; (3) she suffered an adverse employment action; and (4) there was a causal connection

between the two.  *Id*.; *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

To establish a causal connection, Plaintiff must offer evidence sufficient to raise an

inference that the protected activity was the likely reason for the adverse employment action.

*Chavez v. Dakkota Integrated Sys., LLC,* 832 F. Supp. 2d 786, 799 (W.D. Ky. 2011).  In

determining whether there is a causal relationship between a plaintiff's protected activity and an

allegedly retaliatory act, one element courts may consider is whether there is a temporal

connection between the protected activity and the retaliatory action.  *Barrett v. Whirlpool Corp.*,

556 F.3d 502, 516-17 (6th Cir. 2009).  When analyzing temporal proximity, the Sixth Circuit

looks to the date on which the employee requests leave.  *See Hall v. Ohio Bell Tel. Co.*, 529 Fed.

43

Appx. 434, 441 (6th Cir. 2013) (stating that "the better measurement of temporal proximity is…the time between the [employee's] first FMLA request and her termination...")

The temporal proximity/causal connection element is typically satisfied only where the adverse employment action occurred within a matter of months or less of the protected activity. *Dixon v. Gonzales*, 481 F.3d 324, 334 (6th Cir. 2007).  Even four or five months of separation between the notification of intent to take FMLA leave and the adverse employment action is insufficient by itself to demonstrate a causal connection.  *See Blosser v. AK Steel Corp.*, 520 F. App'x. 359, 363-64 (6th Cir. 2013);  *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999).

**2.      The Court should dismiss Plaintiff's FMLA interference and retaliation claims.**

**a.      Plaintiff's FMLA interference allegations fail.**

The Second Amended Complaint alleges that Rawlings interfered with Plaintiff's rights under the FMLA in two ways (1) by "… requiring Plaintiff to apply her FMLA time, as soon as it was available, to the intermittent leave…", which did not allow her to "preserve[] her FMLA entitlements for any other purpose for which it could have been used;"[35] and (2) that "Defendants refused to restore Plaintiff to her prior employment after she took FMLA leave."[36]  Rawlings will evaluate each accusation in turn.

**(1)      Rawlings properly designated Plaintiff's time away from work as FMLA time.**

Plaintiff's allegation that Rawlings was somehow legally obligated to designate her time off as something other than FMLA time fails as a matter of law.  As the Sixth Circuit has explained, an "involuntary FMLA leave" claim is viable "only *when and if* the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully

---

[35] DN 48, ¶¶ 191-92
[36] *Id.* at ¶¶ 186-188.

forced to use FMLA leave in the past." *See Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007) (emphasis added) (citing 29 USC § 2615(a)(1)).  Plaintiff never asked to use her FMLA allotment for any other purpose (such as, for example, to care for a sick family member).  Therefore, under *Wysong*, Plaintiff cannot bring an interference claim for the hypothetical loss of her ability to use her FMLA time for a purpose other than her IBS.

In addition, Plaintiff has no basis for the inaccurate allegation that the law obligated Rawlings "to treat all of Plaintiff's intermittent leave as disability-related accommodation, and to have preserved her FMLA entitlements for other purpose[s]…"  (DN. 48, ¶¶ 191).  The FMLA regulations explain that Congress did not intend for the FMLA to modify obligations under the ADA or other anti-discrimination laws.  29 C.F.R. § 825.702(a) (stating that "the leave provisions of the [FMLA] are wholly distinct from the reasonable accommodation obligations of employers covered under the [ADA]…")

Therefore, if an employee is covered by both the ADA and the FMLA, the employer must make a reasonable accommodation under the ADA, and also afford the employee his or her FMLA leave rights.  29 C.F.R. § 825.702(a); *see also* 29 C.F.R. 825.702(c)(2) (providing an example explaining the dual coverage and the interaction between the ADA and the FMLA).  Like "other types of available leave, such as short-term disability and workers' compensation leave," ADA leave can be charged against an employee's FMLA entitlement. *Murray v. AT&T Mobility LLC*, 374 Fed. App'x. 667, 671 (7th Cir. Ill. 2010).

Here, Plaintiff argues that Rawlings was somehow obligated to designate her intermittent leave _only_ as ADA leave, not as FMLA leave.  That interpretation of the law flies in the face of the plain text of the ADA, the FMLA and the relevant regulations.  Rawlings was required to comply with the requirements of both statutes – not to pick which one to apply at the exclusion

of the other.  Since Plaintiff initially applied for FMLA leave (*see* **Exh. 13**), and appeared to qualify under that statute, Rawlings appropriately granted and designated her leave as FMLA. *See also* 29 C.F.R. 825.702(c)(2).  Thus, Plaintiff's argument that the FMLA designation was somehow improper carries no weight.

**(2)     Rawlings was entitled to demote Plaintiff during her FMLA leave based on her leadership failures.**

Plaintiff would have been demoted, regardless of her FMLA leave, based on her leadership inabilities, i.e. her excessive breaks, therefore her interference claim based on Rawlings' failure to reinstate her to the same position should be dismissed.  (DN 48,  ¶¶ 186-188).  While it is true that an employee who has taken (or is on) FMLA leave has the right "to be restored by the employer to the position of employment held by the employee when the leave commenced,"[37] – which she retained for the first eight months of her FMLA leave  – that right "is not absolute."  *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003).  Thus, it follows that "whether an employer violates the FMLA turns on why the employee was not reinstated."  *Id.* (citations omitted).  The employee must be able to show that she suffered an adverse employment action "… because [s]he took leave - or at least that [her] taking of leave was a 'negative factor' in the employer's decision…" *Id.*  Without such affirmative evidence, which Plaintiff lacks, she "… cannot show a violation of the FMLA." *Id.*

Plaintiff cannot present any evidence that her FMLA leave was "a negative factor" in her demotion from ATM to Auditor in August 2014;  instead her demotion rested solely her based on her frequent, extended breaks, which caused her to be unable to fulfill her leadership duties as a Team Lead.  (Mr. Young Aff., ¶ 11, **Exh. 11**).  In the summer of 2014, Mr. Young met with Plaintiff to come up with a plan to raise her team's performance.  Plaintiff mentioned the issue of

---

[37] 29 U.S.C. §§ 2612(a)(1)(A), 2614(a)(1)(A).

46

her Auditors not being "in their seat" and told him that she believed productivity would increase if her team members spent more time at their desks.  (Mr. Young Depo., 222:1-17, **Exh. 6**). Together Plaintiff and Mr. Young created the Action Plan, which was designed to curb "people taking breaks, people coming in late, people leaving early, people underperforming."  (Plf. Depo., 201:25-202:19, **Exh. 4**).  Instead of leading by example, and encouraging her team members to comply with the Action Plan, Plaintiff herself took repeated, excessive breaks. Since Plaintiff could not realistically curb that behavior when she, herself, was violating the company's policies and the goals of the Action Plan, her failure of leadership required her demotion.  (Mr. Young Aff., ¶ 12, **Exh. 11**).

Plaintiff has no evidence that Mr. Young made any comments to her about her FMLA leave.  Nor did he ever imply that her leave was an issue.  In fact, she can identify only two instances of "different" treatment by Mr. Young.  First, Plaintiff was allegedly disciplined by HR for wearing sandals and a pair of jeans with a hole in them.  *See* Plf. Depo., 188:16-191:17, **Exh. 4**.  Mr. Young walked her down to HR to discuss the dress code violations – but did not say anything about her FMLA leave.  *See id.*  Plaintiff had to go home to change, but otherwise, she incurred no discipline as a result of the violations.  *See id.*

Second, Mr. Young talked to her about her lack of "model leadership behavior" after she took a long lunch with other Rawlings' employees.  *See* Plf. Depo., 191:18-195:25, **Exh. 4**.  At the time, Plaintiff was an ATM.  *See id.*  The two individuals who asked her to lunch were not managers, nor were they on her team.  *See id.*  Some new auditors from other teams attended the lunch, as well.  *See id.*  Plaintiff was the only manager or team member from her group that attended.  *See id.*  When she returned from lunch, Mr. Young told her that taking an extended lunch was "inappropriate."  *See id.*  Mr. Young's  criticism was directed towards her conduct

while at work.  But again, he said nothing about her FMLA leave, nor did he file any type of formal written complaint.  *See id.*

Moreover, it was only *after* her demotion that Plaintiff allegedly made her first (and only) general comment that Mr. Young allegedly treated her "differently" ever since her FMLA leave. (Plf. Depo., 231:4-6, **Exh. 4**).  Even if Plaintiff told Mr. Rawlings that, absent some specific evidence of how or why she was treated differently (which extensive discovery has failed to uncover), this comment by itself is merely an indication of when Plaintiff believes some Mr. Young's behavior changed—not that his behavior changed because she took family and medical leave.  Plaintiff made no complaints to anyone at Rawlings about Mr. Young's behavior towards her between December 2013, when her FMLA leave started, and August 2014, before the demotion.  *See* Plf. Depo., 210:12-24, **Exh. 4**.  Nor can she point to any examples of the alleged "different" treatment, that lead to adverse employment actions.

Rawlings rightfully demoted Plaintiff, albeit during her FMLA intermittent leave, based on her leadership failures, which started in November 2013 (before her FMLA leave) and continued, without any improvement, until the time of her demotion.  Based on these facts, Plaintiff cannot show that her FMLA leave was a "negative factor" in her demotion, and Count II should be dismissed.

>           b.        **The FMLA retaliation claim fails as a matter of law, as well.**

Although there are two adverse employment decisions at issue—Plaintiff's demotion and her termination six months after her last date of FMLA leave (and nearly two years after the initial request)—she cannot prove a *prima facie* case of retaliation related to either action.

48

**(1)    Plaintiff cannot prove a FMLA retaliation claim based on her demotion.**

Plaintiff cannot provide any evidence supplying a causal connection between her FMLA leave and her demotion.  Rawlings received Plaintiff's initial FMLA leave request in December 2013.  *Hall*, 529 Fed. Appx. at 441 ("the better measurement of temporal proximity is…the time between the [employee's] first FMLA request…" and the adverse employment decision).  Nine months later, Rawlings demoted Plaintiff back to an Auditor position.  That nine month period of time is temporally insufficient to establish causation.  *See Blosser*, 520 F. App'x. at 363-64; *Hafford*, 183 F.3d at 515.  Since the timing of the demotion in relation to Plaintiff's FMLA request cannot supply the requisite connection, Plaintiff must provide something else to survive summary judgment.  Extensive discovery has produced no such proof.  Rather, it is undisputed that Mr. Young based his decision to demote Plaintiff on her frequent, extended breaks, which caused her to be unable to fulfill her leadership duties as a Team Lead, as detailed *supra*.  (Mr. Young Aff., ¶¶ 11-12, **Exh. 11**).  No causal connection exists between Plaintiff's FMLA leave and her demotion, therefore the FMLA retaliation claim fails.

**(2)    Nor can she prove a causal connection between her FMLA leave and her termination, six months later.**

Similarly, Plaintiff has no evidence of a causal connection between her termination and her use of FMLA leave.  Her first request for leave – the "measurement of temporal proximity"[38] – arose two years before her termination.  In addition, her final instance of FMLA time occurred six months prior to her dismissal.  Sixth Circuit law makes clear that timeframe cannot be used to meet the causation requirement of Count II.

---

[38] *Hall*, 529 Fed. Appx. at 441.

Like her demotion, Plaintiff has no other evidence linking her FMLA leave to her termination.  Moreover, Rawlings undisputedly did not take Plaintiff's FMLA absences into account in terminating her employment;  the absentee, tardiness and break issues that formed the basis for Plaintiff's termination are documented from July 2015 on, after the expiration of her FMLA leave.  Accordingly, Plaintiff cannot establish her *prima facie* case of FMLA retaliation.

      **c.**    **Rawlings had legitimate, non-retaliatory reasons for its actions, and Plaintiff cannot demonstrate pretext in relation to her demotion or her termination.**

Even assuming Plaintiff could present enough evidence to show a genuine issue of material fact on her *prima facie* case, which she cannot, she is unable to cast doubt on Rawlings' reasons for her demotion or termination, or prove pretext. *Festerman v. Cnty. of Wayne*, 611 Fed. Appx. 310, 319 (6th Cir. 2015) (citations omitted);  *McDonnell Douglas Corp.*, 411 U.S. 792.

      **(1)**    **Rawlings has articulated legitimate, non-retaliatory reasons for its actions.**

As described in detail, *supra*,[39] Rawlings has demonstrated legitimate, non-retaliatory reasons for its decisions to demote and, over a year later, terminate Plaintiff's employment.  In relation to the demotion, Mr. Young took that step after observing Plaintiff's inability to curb her team's absenteeism, tardiness and extensive break issues over the course of several months, starting before she even applied for FMLA leave.  *See* Team Member Emails, **Exh. 10**.  Once Mr. Young realized that it was Plaintiff – not only her team members – breaking Rawlings' policies, he had no choice but to demote her.  Plaintiff admits taking frequent breaks (up to five or six a day),[40] which, in the company's view, made her incapable of effectively leading her team.  Evidence of a violation of employer policies that would have supported dismissal provides

---

[39] Pgs. 38-42.
[40] Plf. Depo., 225:12-19, **Exh. 4**.

a legitimate, non-discriminatory reason for an adverse employment action. *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012); *see also Allen v. Butler Cnty. Comm'rs*, 331 F. App'x 389, 394 (6th Cir. 2009). Accordingly, since Plaintiff does not dispute that she repeatedly violated the Rawlings break policy in the time period leading up to her demotion, Plaintiff's excessive breaks were a legitimate non-discriminatory reason for her that action.

As detailed *supra*,[41] Rawlings also had well grounded, non-discriminatory reasons for Plaintiff's termination based on her excessive absenteeism, tardiness and abuse of the break policy.

### (2) No genuine issue of fact exists as to pretext.

Plaintiff is also unable to show a genuine issue of material fact as to the existence of pretext. With regard to Plaintiff's demotion, Rawlings held the honest belief that she could not perform her Team Lead responsibilities in light of her excessive breaks. As discussed, *supra*, Plaintiff's team had an issue with its Auditors not being "in their seat" and working, an issue that had been percolating for months. When Mr. Young looked into the issue, he discovered that it was Plaintiff – not just her direct reports – that failed to stay at their desk. Since she admits taking five or six breaks a day (not the two specified in the company policies), Plaintiff could not criticize or provide guidance to her team members regarding their break time, therefore her ability to lead was compromised. After conducting an investigation into Plaintiff's breaks, Mr. Young saw that leadership failure as a legitimate reason to demote Plaintiff back to an Auditor position. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) ("'[A]n employer's proffered reason is considered honestly held where the employer can establish it

---

[41] Pgs. 38-42.

reasonably reli[ed] on particularized facts that were before it at the time the decision was

made;") (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x 783, 791 (6th Cir.

2006)).  Although Plaintiff may disagree with Mr. Young's business judgment, there is simply

no evidence that the information upon which Mr. Young relied in deciding to demote Plaintiff

was somehow ill considered.  Moreover, Plaintiff cannot provide any proof that Rawlings' stated

reasons for her termination were a pretext for unlawful discrimination based on her FMLA leave,

as detailed *supra*.[42]

### III.   PLAINTIFF'S RETALIATION CLAIMS UNDER THE ADA, KENTUCKY CIVIL RIGHTS ACT ("KCRA") AND THE KENTUCKY WAGE AND HOUR ACT ("KWHA") SHOULD BE DISMISSED.[43]

Count VI of DN 48 alleges three claims – retaliation under the ADA, KCRA and the

KWHA.[44]  All three causes of action fail and should be dismissed pursuant to Fed. R. Civ. P. 56.

### 1.   Legal Standard.

In order to establish a retaliation under any of the statutes cited in Count VI, Plaintiff

must demonstrate that (1) she engaged in protected activity;  (2) the exercise of her civil rights

was known to Rawlings;  (3) Rawlings thereafter took adverse employment action;  and (4) a

causal connection exists between the protected activity and the adverse employment action.  *See*

*e.g.*, *Hibbler v. Reg'l Med.Ctr. at Memphis*, 12 Fed. Appx. 336, 340 (6th Cir. 2001) (citing

*Walborn v. Erie County Care Facility*, 150 F.3d 584, 588-89 (6th Cir. 1998)).[45]  "If the plaintiff

---

[42] Pgs. 38-42.

[43] The ADA, KCRA and KWHA retaliation claims are asserted in Count VI of DN 48.

[44] Plaintiff lists FMLA retaliation as a portion of Count VI.  FMLA retaliation is addressed *supra* in this brief in relation to Count II.  To the extent that Count VI somehow pleads a different claim, Rawlings incorporates its prior argument regarding FMLA retaliation.

[45] "The Sixth Circuit has adopted the Title VII retaliation claim framework for analyzing ADA retaliation claims." *Webb v. Humana Inc.*, 819 F. Supp. 2d 641, 649 (W.D. Ky 2011).  In addition, courts interpret the Kentucky Civil Rights Act as "consonant" to the ADA, therefore the same standard applies to the KCRA cause of action. *Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001).

establishes a *prima facie* case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff, of course, bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination." *Penny v. UPS*, 128 F.3d 408, 417 (6th Cir. 1997).[46]

With regard to the first prong of Plaintiff's *prima facie* case – a showing of "protected activity" – there are two available types of claims.  First, an opposition claim, where Plaintiff must show that she opposed a practice made unlawful by one of the discrimination statutes. Second, a participation claim, which requires proof that Plaintiff filed a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the applicable statute.  *See* EEOC Enforcement Guidance on Retaliation and Related Issues § II(A).

To engage in "protected activity," an employee must "challenge an employment practice that she reasonably believes is unlawful." *Yazdian v. ConMed Endoscopic Technologies, Inc.*, 793 F.3d 634, 645 (6th Cir. 2015).  "This requirement includes objective and subjective components: the employee must actually believe that the conduct complained of constituted a violation of relevant law, and a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee would believe the conduct complained of was unlawful." *Id.* at 646 (internal quotation marks omitted); *see also Booker*, 879 F.2d at 1313 (explaining that a "person opposing an apparently discriminatory practice" must "have a good faith belief that the practice is unlawful").

---

[46] Kentucky's courts have not acknowledged a retaliation case based on K.R.S. 337.990, the KWHA.  However, a recent federal decision interprets KRS 446.040 to provide a private right of action under KRS 337.990. *Williams v. King Bee Delivery, LLC*, 199 F. Supp. 3d 1175 (E.D. Ky. 2016).  Since no standard is specifically articulated for a retaliation claim based on the KWHA, Rawlings maintains that the standard applicable to Title VII and the FLSA, applies to the KWHA claim, as well.  *See e.g.*, *Mansfield v. City of Murfreesboro*, 2017 U.S. App. LEXIS 14640, *9 (6th Cir. 2017) ("Title VII and FLSA retaliation claims are governed by the same framework…"); *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 Fed. Appx. 524, 529-30 (6th Cir. 2011) ("Claims of FLSA retaliation are subject to the burden-shifting framework of [*McDonnell-Douglas*]").

Here, Plaintiff appears to present three allegations of "protected activity."  First, she alleges that she "protested the discrimination she received as a result of her status as a disabled worker." DN 48, ¶ 223.  Second, she claims that she "further complained to company owner George Rawlings of her severely reduced paychecks, asking him to help her find relief from the financial hardships imposed by them." *Id.* at ¶ 225.  And third, the Second Amended Complaint asserts that Plaintiff "specifically invoked the protections of the federal laws protecting… disabled workers." *Id*. at ¶ 224.  None of these allegedly "protected activities" survive summary judgment.

> **2.** **None of Plaintiff's retaliation claims are viable.**
>
> > **a.** **Plaintiff did not protest any discriminatory action based on her disability.**

Although the Second Amended Complaint vaguely alleges that Plaintiff protested discriminatory actions by Rawlings based on her disability,[47] DN 48 does not contain any detail about that alleged opposition activity.  Moreover, at no point during discovery did Plaintiff claim that she complained to anyone at Rawlings about alleged discrimination resulting from her disability.  As a result, the first of Plaintiff's supposed "protected activities" supporting her ADA/KCRA retaliation claim should be disregarded.

> > **b.** **Plaintiff's request for an advance on commissions does not qualify as "protected activity," therefore the KWHA retaliation claim should be dismissed.**

Next, Plaintiff alleges that she engaged by protected activity by complaining to George Rawlings about her "severely reduced paychecks and the financial hardships imposed by them."

---

[47] After her demotion in August 2014, Plaintiff alleges that she told George Rawlings that "ever since [she] had been out on FMLA, she had been treated differently by Mr. Young."  (Plf. Depo., 231:4-6, **Exh. 4**).  That isolated comment does not concern Plaintiff's disability – but rather her FMLA leave.  Moreover, she made the complaint *after* her demotion, not before, so her demotion necessarily could not be in retaliation for the complaint.  Finally, the comment about Mr. Young is irrelevant to Plaintiff's termination since after her demotion Plaintiff did not work with Mr. Young again.

DN 48, ¶ 225.  The Second Amended Complaint misinterprets the conversation between Plaintiff

and Mr. Rawlings.  During that conversation, which occurred in late 2015, Plaintiff testified that

she stated that she told Mr. Rawlings that she "… was curious if [she] could take an advance

against my own commissions, because [she] needed some extra money towards rent or bills,

because [she] had been out on… FMLA and had so much missed time taken out of [her]

paycheck."  (Plf. Depo., 297:1-17, **Exh. 4**).  Plaintiff testified that, in response, Mr. Rawlings

said that "he did not know if he could do it, he would check with finance and let me know.  And

then later that next afternoon, he stopped by my desk."  *Id.* at 295:25-296:21, 297:1-17.  When

Mr. Rawlings stopped by Plaintiff's desk, "[h]e came by and said that he checked and there just

wasn't a way for them to do that."  *Id.*

That conversation does not qualify as protected activity.  The FLSA, which is similar to

the KWHA, contains an anti-retaliation provision.  Under that provision, an employee's vague

complaints about her pay that do not specifically allege that her employer has violated the law

are not protected activity.  Although an oral complaint can suffice, the oral complaint still must

be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both

content and context, as an assertion of rights protected by the statute and a call for their

protection."  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).  Thus, a

complaint must actually allege a violation of the law; "[m]erely voicing complaints about work

issues, even if those issues relate to work hours, does not itself amount to making a FLSA

complaint."  *French v. Oxygen Plus Corp.*, 2015 U.S. Dist. LEXIS 23395 *13 (M.D. Tenn.

2015); *see also Hagan v. Echostar Satellite, L.L.C.*, 529 F.3d 617, 629 (5th Cir. 2008) (holding

that the FLSA's anti-retaliation provision requires that an informal complaint actually "concern

some violation of law").  For example, in *Riffe v. Wal-Mart Stores, Inc.*, 2012 U.S. Dist. LEXIS

7987 (N.D. Ohio Jan. 24, 2012), a plaintiff's vague statement to her employer that she was "not happy" about taking phone calls when she was at home and off the clock did not amount to protected activity under the FLSA's anti-retaliation provision, because the plaintiff did not make it sufficiently clear that she was alleging that her employer had violated the FLSA by not paying her overtime for the phone calls. *Id.* at *19.

At no point during the conversation with Mr. Rawlings did Plaintiff indicate that she believed the deductions from her paychecks were improper or unlawful.  In fact, she did not even complain about why the deductions were being made (presumably because she knew she was not working full time).  Instead, the point of the conversation was whether Plaintiff could have a loan against her commissions.  Such a conversation does not qualify as protected activity sufficient to sustain Plaintiff's KWHA retaliation claim.

> **c.     No causal connection exists between Plaintiff's threat of filing an EEOC charge related to her disability and her termination, therefore the ADA/KCRA retaliation claims fail as a matter of law.**

Finally, Plaintiff alleges that she "invoked the protections of the federal laws protecting… disabled workers" as the final "protected activity" supporting her ADA/KCRA retaliation claim.  DN 48, ¶ 224.  Presumably, DN 48 is referring to Plaintiff's threat of filing an EEOC charge.  On November 19, 2015, Rawlings received a communication from Plaintiff's current attorney, Robyn Smith, threatening to file an EEOC charge based on Plaintiff's alleged disability.  *See* EEOC Charge Threat, **Exh. 43**.  Although an EEOC Intake Questionnaire was attached to Ms. Smith's letter, that charge was not actually filed until February 2, 2016, nearly two months after Plaintiff's termination.  *See* EEOC Charge, **Exh. 44**.  Rawlings' first notice of Plaintiff's intention to file an EEOC charge was the questionnaire attached to Ms. Smith's November 19 letter.  (Ms. Ford Aff., ¶ 4, **Exh. 41**).  The company received that letter in the afternoon following the Final Warning issued by Ms. Ford that morning.  *Id.*

56

By threatening to file an EEOC charge, Plaintiff engaged in protected activity.  However, "the fact an employee files a complaint or a charge does not create any right on the part of the employee to miss work, fail to perform assigned work, or leave work without notice, unless absence from work is necessitated by proceedings that occur subsequent to the filing of a complaint or charge."  *Booker*, 879 F.2d at 1312.  Thus, "… the employee is generally required to provide notice to his employer that the reason for his absence is a proceeding recognized by the Act."  *Id.*

In addition, "the mere fact that an adverse employment decision occurs after a charge of discrimination is not, standing alone, sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim."  *Id.* at 1314.  For example, "… when the treatment based on plaintiff's disability was the same before and after her EEOC complaint was filed," a court may properly dismiss a retaliation claim.  *Lewis v. Quaker Chem. Corp.*, 2000 U.S. App. LEXIS 22321 (citing *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 470 (6th Cir. 1999)).  Where, like here, "the treatment prior to the protected activity and after the protected activity are essentially the same," the Sixth Circuit requires direct evidence to establish the requisite causal connection.  *Id.*

Thus, "[e]vidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."  *Lattimore v. Wild Flavors, Inc.*, 2012 U.S. Dist. LEXIS 7826, *46 (E.D. Ky. 2012) (citation omitted);  *see also Spencer v. CSL Plasma, Inc.*, 2011 U.S. Dist. LEXIS 102846, *6 (W.D. Ky. 2011) (rejecting plaintiff's assertion that he was under "increased scrutiny" after engaging in protected activity; plaintiff had prior performance problems which were reflected in concerns expressed by management).  Quite simply, anti-retaliation laws "… do not allow employees who are already on thin ice to insulate

themselves against termination or discipline by preemptively making a discrimination complaint." *Alvarez v. Royal Atl. Developers*, 610 F.3d 1253, 1270 (11th Cir. 2010).

Here, Plaintiff received multiple warnings for her attendance and break issues before the company received the EEOC Intake Form on November 19th, therefore she cannot show a causal connection between her termination on December 8th and her EEOC charge.  Rawlings started warning Plaintiff about her absentee and tardiness issues over a year before her termination, on November 12, 2014..  *See* Written Warning No. 1, **Exh. 18**.  The company continued to counsel her about her attendance issues in the fall of 2015, including the second written warning on September 30th.  *See* Written Warning No. 2, **Exh. 25**.  After discussions with Plaintiff's physician, which failed to establish her IBS as a disability or the need for her to miss full days of work, Ms. Ford informed Plaintiff on November 10th that she could not miss any more work until she was once again eligible for FMLA.  Ms. Chapman followed up with Plaintiff, warning her about her excessive breaks on November 11th.  Finally on November 19th, before Ms. Smith sent her letter to Rawlings, Plaintiff received the Final Warning from Ms. Ford that stated Plaintiff "must be at work and working during business hours."  (Final Warning, **Exh. 32**).  After a month and a half of receiving warnings about her attendance, tardiness and excessive breaks, Plaintiff threatened Rawlings with an EEOC charge based on her disability, in the letter sent by her attorney, Ms. Smith.

Under those facts, Plaintiff cannot prove that her termination on December 8th was causally connected to her EEOC threat since Rawlings treated Plaintiff the same before and after November 19th.  *Quaker Chem. Corp.*, 2000 U.S. App. LEXIS 22321 ("… when the treatment based on plaintiff's disability was the same before and after her EEOC complaint was filed," no causation exists).  From September 30th, through Plaintiff's termination on December 8th, the

company insisted that Plaintiff must be at work and working during normal business hours, in accordance with the requirements of the Employee Handbook.  That stance did not change after the EEOC threat on November 19th.  When Plaintiff arrived three hours late on December 8, Rawlings terminated Plaintiff's employment, as it said it would starting on September 30th if her absences, tardies and breaks did not cease.  *See* Written Warning No. 2, **Exh. 25**.  Since Rawlings acted consistently before and after the EEOC threat, Plaintiff cannot prove the necessary causal connection to establish her prima facie case of ADA/KCRA retaliation.  *Lattimore*, 2012 U.S. Dist. LEXIS 7826 at *46 ("[e]vidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation").

> **d.    Even if Plaintiff can somehow establish a *prima facie* case of ADA/KCRA or KWHA retaliation, Rawlings has a legitimate, non-discriminatory reason for her discharge and Plaintiff cannot establish pre-text.**

As described in detail, *supra*,[48] Rawlings had legitimate, non-discriminatory reasons for Plaintiff's demotion and termination.  In addition, Plaintiff cannot prove pre-text based on her issues with absenteeism, tardiness and excessive breaks.

## IV.    PLAINTIFF'S WAGE DEDUCTION CLAIM UNDER THE FLSA AND K.R.S. 337.385 SHOULD BE DISMISSED SINCE THE DEDUCTIONS WERE NOT IMPROPER AND, IN THE ALTERNATIVE, THE COMPANY COMPLIED WITH THE APPLICABLE SAFE HARBOR DEFENSE.

In Count V, Plaintiff alleges that Rawlings failed to pay her for her ADA time off, as required by the statute, and any deductions to her salary while on ADA were done in violation of law.  (DN 48, ¶¶ 215-221).  This is incorrect.  Rawlings made the ADA partial day deductions based on the company's honest belief in their propriety.  In the alternative, if the deductions were

---

[48] Pgs. 38-42.

not proper, Rawlings followed the FLSA and KWHA safe harbor defense as set forth in 29

C.F.R. § 541.603(d) upon receiving notice of Plaintiff's allegations.  Accordingly, Count V is

subject to dismissal as a matter of law.

>    **1.      Legal Standard.**

In the event of a violation of the FLSA, a plaintiff is entitled to recover the amount owed

under the statute, in addition to an "equal amount as liquidated damages."  *See* 29 U.S.C. 216(b).

Notably, however, in an action for liquidated damages, like this one, "if the employer shows to

the satisfaction of the court that the act or omission giving rise to such action was in good faith

and that he had reasonable grounds for believing that his act or omission was not a violation of

the [FLSA] the court may, in its sound discretion, award no liquidated damages…"  (29 U.SC.

260).  The defendant has the burden of establishing that it acted in good faith and upon

reasonable grounds.  *McClanahan v. Mathews*, 440 F2d 320 (6th Cir. 1971).  Since Rawlings can

satisfy that burden under these facts, the Court should dismiss the FLSA/KWHA claim.

>    **2.      Rawlings bears no liability for liquidated damages under the FLSA.**

>    **a.      Rawlings payroll department made ADA partial day deductions in good faith.**

To start, Rawlings payroll department made the ADA partial day deductions based on an

honest belief in their propriety.  During Plaintiff's employment, for both FMLA and ADA

intermittent leave time, her managers tracked her time off until it equaled four hours or a half

day.  Under Rawlings' system, a manager keeps track of each hour missed by an employee until

it reaches four hours.  *See* Ms. Ford Depo., 134:1-14, **Exh. 23**.  Once the time off equals a half

day, the time is entered into ADP and deducted from the employee's pay if they have utilized all

available paid time off.  *See id.*  Since the majority of Plaintiff's time off was typically either a

full day or a half day, no calculating on an hour-to-hour basis was required.

Plaintiff does not appear to dispute the appropriateness of Rawlings' deductions in pay for her FMLA time off.  (*See* DN 48, Count V).  Moreover, even if she did, the FLSA regulations provide that "[a]n employer is not required to pay the full salary for weeks in which an exempt employees takes unpaid leave under the Family and Medical Leave Act," but rather "may pay a proportionate part of the full salary for time actually worked."  29 C.F.R. § 541.602(b)(7); *see also* § 825.206.

With respect to the ADA partial day deductions,  Rawlings did not make those deductions for the purpose of trying to circumvent the salary basis requirement for Plaintiff's exempt status. The deductions were made due to Rawlings' payroll department's belief that ADA absences should be tracked the same as FMLA absences, and that partial day deductions were therefore proper.  (Ms. Barrens Aff., ¶ 6, **Exh. 1**).

The federal Department of Labor ("DOL") addressed a similar situation in a 2004 Administrative Opinion.  *See* WH Admin. Op. FLSA2004-5 (2004).  In that Administrative Opinion, the DOL dealt with several proposed rehabilitation plans for exempt employees with medical conditions who could return to work only partial days or part-time.  The DOL first took the position that an employer can convert recuperating employees to non-exempt status during the disability[49] period *without jeopardizing the exempt status of other salaried employees not on disability.  Id.* at p. 1.  Citing a 1970 opinion letter, the DOL further stated that in such a situation, "…that change does not affect the employee's status during other periods of employment when all the requirements for the exemption are satisfied, absent evidence of an intent to circumvent the salary basis requirement." *Id.*

---

[49] Rawlings is in no way conceding that Plaintiff was disabled.

The DOL went on to state that if the employer prefers to maintain the employee's exempt status during the same time period, the Field Operations Handbook (FOH), states that: "… an employer may make a bona fide reduction in an employee's salary because of a 'reduction in the normal scheduled workweek',  so long as the reduction 'is not designed to  circumvent the salary basis requirement'."  *Id*. at p. 2. The DOL  then confirmed that, "… that reduction in salary due to an employee's reduced workweek while the employee is medically incapacitated from working full-time is directly analogous…" to the situations addressed in the 1970 opinion letter. *Id.*

Thus, Rawlings' payroll department reasonably believed that the deductions were lawful, based on its compliance with corresponding FMLA regulations.  Under the FMLA, an employer may deduct wages for any absences.  *See* 29 C.F.R. § 541.602(b)(7).  An employer can also require exempt employees to use paid time off in full or partial day increments during FMLA leave. *See* Wage and Hour Division, Frequently Asked Questions;[50]  WH Admin. Op. FLSA2005-16 (2005); *see also Fetrow-Fix v. Harrah's Entm't, Inc.*, 2011 WL 5827199, *3 (D. Nev. 2011) (observing that pay deductions for FMLA-related absences are not improper and do not affect salaried status).  Once an employee exhausts their paid time off, deductions can be made from their salary since FMLA leave does not have to be paid.  *Id.*

The 2004 Administrative Opinion, and common sense, supports Rawlings' belief that those deductions would continue to be proper when made for the same medical condition, just using ADA time, rather than FMLA time.  The purpose of the deductions was not to circumvent the salary basis requirement for Plaintiff, rather, it was to adjust her compensation to account for those times she was allegedly unable to work.

---

[50] Available at https://www.dol.gov/whd/fmla/fmla-faqs.htm#5.

       **b.**      **In the alternative, Rawlings complied with the FLSA/KWHA Safe
Harbor.**

In the alternative, if the deductions improper, Rawlings complied with the safe harbor

provisions of the FLSA and KWHA, therefore Defendants are entitled to the safe harbor defense

as set forth in 29 C.F.R. § 541.603(d) (the "Safe Harbor").  The Safe Harbor applies if an

employer's policy includes a complaint procedure about improper deductions/payments,

employees are reimbursed for any improper deductions, and the employer makes a good faith

commitment to comply in the future.  29 C.F.R. § 541.603(d).  According to the regulations,

"[t]he best evidence of a clearly communicated policy is a written policy that was distributed to

employees prior to the improper deductions by, for example, providing a copy of the policy to

employees at the time of hire, publishing the policy in an employee handbook or publishing the

policy on the employer's Intranet."  *Id.*

Rawlings meets all of the requirements of the Safe Harbor.  In compliance with the

requirements of 29 C.F.R. § 541.603(d), Rawlings has a clearly communicated policy prohibiting

improper deductions, like deductions for partial day disability related absences.  That policy is

contained in all of its employee handbooks, including the 2012, 2014 and 2015 versions. *See*

"Payroll Deduction for Exempt Employees," pg. 26-27 (the "Payroll Deduction Policy").  The

Employee Handbook is communicated to employees during orientation and is available to all

employees on the Rawlings' intranet.

The Payroll Deduction Policy clearly sets forth examples of allowable deductions for

exempt employees.  The policy also sets forth prohibited deductions from salary including,

"partial day absences for personal reasons, sickness or disability."  In addition, the Payroll

Deduction Policy includes a complaint mechanism that states that if an employee has any

questions about deductions from their pay to contact the Human Resources Department

immediately or their supervisor. The policy states that "every report will be fully investigated and actions be taken to correct any mistake, including reimbursement for any improper deduction." *Id.* Ms. Barrens is not aware of any Rawlings' employee utilizing the reporting system to complain about any allegedly improper deductions related to the ADA. (Ms. Barrens Aff., ¶ 7, **Exh. 1**). In fact, Rawlings received its first notice of any allegations of improper deductions related to the ADA in the First Amended Complaint filed on June 27, 2016, six months after Plaintiff's termination. *Id.*

After receiving Plaintiff's First Amended Complaint, Rawlings promptly reviewed its payroll to ascertain the validity of Plaintiff's allegation that her pay was improperly withheld for her partial day ADA absences. Without conceding that the deductions were improper, on July 29, 2016, only one month after receiving its first notice of the alleged improper deductions, Rawlings invoked the Safe Harbor defense and reimbursed Plaintiff in full. The company provided Plaintiff with a check for a total of $2,082.04. *See* Deduction Payback Letter and Check, **Exh. 45**. The check included unpaid wages (less all applicable withholdings) for Plaintiff's thirty partial day ADA absences in November 2014, and July through November 2015. In addition, the check included an interest payment of 12% annual interest on the underlying amount of unpaid gross wages.

Since that time, Rawlings has made a good faith effort to make only full day deductions consistent with its policy. (Ms. Barrens Aff., ¶ 8, **Exh. 1**). Rawlings will fully reimburse all employees for any improper partial day deductions from salary. *Id.* In addition, the company has implemented procedural safeguards to prevent partial day deductions for exempt employees related to unpaid leave as an ADA accommodation. *Id.* If this Court rules the partial day deductions were improper, Rawlings will revise its policy accordingly.

Rawlings fully reimbursed Plaintiff for the improper deductions, in addition to paying her 12% interest, thus mooting any claim for back wages under this theory.  Moreover, Plaintiff's request for liquidated damages or attorney's fees should be dismissed based on Rawlings' good faith compliance with the Safe Harbor.   Because Rawlings held the honest belief that the partial day ADA deductions were proper and because the company has complied in full with the Safe Harbor contained in 29 C.F.R. § 541.603(d), Rawlings' Motion regarding Count V should be granted.

## V.   PLAINTIFF LACKS STANDING TO REQUEST THAT THE COURT ADJUDICATE THE RIGHTS OF NON-PARTIES THROUGH A DECLARATORY JUDGMENT ACTION.[51]

Plaintiff lacks standing to request a declaratory judgment regarding other Rawlings' employees, who are not involved in this case in any way, even as witnesses.

### 1.   Legal Standard.

"[F]ederal courts are without power to decide questions that cannot affect the rights of litigants in the case before them."  *N. Carolina v. Rice*, 404 U.S. 244, 246 (1971).  It is axiomatic that a court cannot adjudicate the rights of non-parties.  *See, e.g.*, *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) (holding that a party has standing only to litigate its own rights except in limited circumstances[52]).  Indeed, as the Seventh Circuit posited, if Plaintiff's declaratory judgment action is permitted to forward, "[w]hy . . . bother with class actions?"  *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) (reversing a preliminary injunction that applied to third parties not before the court).

---

[51] Plaintiff asserts a declaratory judgment action in Count VII of DN 48.

[52] The limited circumstances in which a party can obtain an adjudication of the rights of third parties do not exist here.  Those circumstances require a close relationship between the party and the third party (which is not alleged here) and a hindrance to the third party's ability to bring its own suit (which again is not alleged, and plainly does not exist as any other employee could easily pursue a claim if he/she wished).  *See Powers*, 499 U.S. at 411.

Under similar circumstances, courts have refused to adjudicate the rights of individuals not before the court.  For example, the Sixth Circuit applied this principle in refusing to allow a union to seek back pay on behalf of a non-party.  *Int'l Brotherhood of Teamsters, et al. v. Zantrop Air Transp. Corp.*, 394 F.2d 36, 41 (6th Cir. 1968); *see also Tesmer v. Granholm*, 333 F.3d 683, 701 (6th Cir. 2003) (holding that "[d]eclaratory judgment is effective as to only the plaintiffs who obtained it" and that "[w]hen a class has not been certified, the only interests of concern are those of the named plaintiffs") (reversed on other grounds).  District courts likewise routinely refuse to consider claims requiring adjudication of the rights of non-parties.  *See e.g.*, *Braun v. Wal-Mart Stores East, LP*, 2012 U.S. Dist. LEXIS 130673, *3–4 (M.D. Fla. 2012) (holding that the court lacked jurisdiction to adjudicate rights of various non-parties); *Amwest Surety Ins. Co. v. Concord Bank*, 2003 U.S. Dist. LEXIS 10027, *14–15 (E.D. Mo. 2003) (refusing to allow counterclaim involving the contractual rights and obligations of non-parties); *Audlee v. New England Tank Indus. of New Hampshire, Inc., et al.*, 1985 U.S. Dist. LEXIS 12400, at *21 (D. Mass. 1985) ("This Court plainly has no jurisdiction to adjudicate the rights and liabilities of non-parties.").

### 2.     The Court should decline Plaintiff's request to force non-parties to join her wage and hour crusade.

Plaintiff lacks the standing necessary for her to request that the Court adjudicate the rights of unknowing non-parties.  In fact, Plaintiff admits that she has not spoken to any other disabled Rawlings' employees about being their class representative or about filing suit against the company based on allegedly improper deductions.  *See* Plf. Depo., 473:18-474:22, **Exh. 4**.  Despite that, in Count VII, Plaintiff requests that the Court adjudicate the rights of all "disabled Rawlings' employees," without providing any additional information about the identities, disabilities, etc. of those individuals – or giving those individuals the right to opt in or out of

Plaintiff's crusade.  Since Plaintiff lacks standing to bring a declaratory judgment claim on behalf of non-parties related to their exempt status, Fed. R. Civ. P. 56 requires the dismissal of Count VII.

**VI.    RAWLINGS DID NOT VIOLATE KRS § 341.990 SINCE ALL STATEMENTS MADE TO THE UNEMPLOYMENT DIVISION BY FORD WERE TRUTHFUL.[53]**

In response to Count III of the Second Amended Complaint, which asserts that Rawlings violated K.R.S. 341.990 through Ms. Ford's allegedly false statements to the Kentucky Division of Unemployment Insurance, Rawlings incorporates by reference the arguments made in Ms. Ford's memorandum in support of her motion for summary judgment, filed contemporaneously hereto.  In short, Ms. Ford's statements to the Division were true, therefore Count III should be dismissed as a matter of law.

**VII.   PLAINTIFF IS JUDICIALLY ESTOPPED FROM BRINGING ANY CLAIM THAT EXISTED PRIOR TO HER FILING FOR BANKRUPTCY ON JULY 31, 2015.**

Because Plaintiff did not disclose her claims against Rawlings in her bankruptcy proceedings, the company is entitled to summary judgment on all of her causes of action that arose prior to her filing her bankruptcy petition on July 31, 2015.  Due to her failure to disclose these claims in bankruptcy, Plaintiff is judicially estopped from asserting them now.[54]

**1.    Legal Standard.**

Section 521(a)(1) of the Bankruptcy Code requires a debtor to file "a schedule of assets and liabilities." 11 U.S.C. § 521(a)(1).  It is well-settled that, in Chapter 7 bankruptcies, "'all legal or equitable interests of the debtor in property as of the commencement of the case' are

---

[53] Plaintiff alleges violations of K.R.S. 341.990 in Count III of DN 48.

[54] Plaintiff may argue that Defendants waived the defense of judicial estoppel.  They did not.  Defendants included estoppel as an affirmative defense in their Answer to Plaintiff's First Amended Complaint, (*see* DN 26 at 35), and in their Answer to Plaintiff's Second Amended Complaint (*see* DN 50, at 5).

considered property of the bankruptcy estate" and must be scheduled under § 521.  *Tyler v. DH Capital Mgmt.*, 736 F.3d 455, 461 (6th Cir. 2013) (citing 11 U.S.C. § 541(a)(1)).  Further, "pre-petition causes of action" are assets that must be scheduled.  *Id.*  Thus, "all causes of action that hypothetically could have been brought pre-petition" must be scheduled.  *Id.* at 462.  "This is the case even if the debtor[] w[as] unaware of the claim" and "even if further post-petition damages were incurred."  *Id.* (internal quotation marks omitted) (brackets in original).

In the context of a debtor's failure to disclose claims in prior bankruptcy proceedings, the doctrine of judicial estoppel bars her subsequent assertion of those claims when: "(1) the debtor assumed a position contrary to one she asserted under oath while in bankruptcy; (2) the bankruptcy court adopted the contrary position either as a preliminary matter or as part of a final disposition; and (3) the debtor's omission did not result from mistake or inadvertence." *Kimberlin v. Dollar Gen. Corp.*, 520 F. App'x 312, 314 (6th Cir. 2013) (citing *White v. Wyndham Vacation Ownership, Inc.,* 617 F.3d 472, 478 (6th Cir.  2010)).

## 2.    Plaintiff cannot assert claims that accrued before July 31, 2015.

Plaintiff filed for Chapter 7 bankruptcy on July 31, 2015.  (*See* Bankr. Pet., **Exh.  46**). Schedule B of the bankruptcy petition required Plaintiff to list any "[o]ther contingent and unliquidated claims of every nature" and to list "[o]ther personal property of any kind not already listed."  Plaintiff, under penalty of perjury, responded both times: "None."  *Id.* at pgs. 20-23.  However, many of the claims that Plaintiff now brings had already accrued by the time she filed her bankruptcy petition on July 31, 2015.

For example, prior to filing her bankruptcy petition, Plaintiff could have sued the Defendants for FMLA retaliation and interference in relation to her demotion and any alleged

violations of the FLSA or KWHA.[55]  These causes of action, and potentially others, accrued pre-

petition.  *See e.g.*, *Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 905 (6th Cir. 2012) (holding that

a plaintiff should have disclosed her age-discrimination claim on her bankruptcy petition because

"[i]t accrued when the company fired her");  *Hasken v. City of Louisville*, 234 F. Supp. 2d 688,

691 (W.D. Ky. 2002) ("[E]ach violation of the FLSA gives rise to a new cause of action").

Therefore, because Plaintiff's claims regarding alleged wrongdoings that occurred prior to July

31, 2015 equally existed at the time that Plaintiff filed her bankruptcy petition as they did when

Plaintiff filed her complaint in this case, Plaintiff was required to disclose them.

As a result, Plaintiff is judicially estopped from asserting any claim that accrued prior to

July 31, 2015.  As to the first prong of the judicial estoppel test —whether Plaintiff assumed a

"contrary position"—Plaintiff's current pursuit of claims that were not disclosed in her

bankruptcy proceedings establishes that she has taken a position contrary to her sworn testimony

on her bankruptcy petition.  *See Lewis v. Weyerhaeuser Co.*, 141 F.  App'x 420, 425 (6th Cir.

2005) (failure to schedule a cause of action, followed by a pursuit of that cause of action,

constituted taking a "contrary" position).

Additionally, with respect to the second prong—whether the bankruptcy court adopted

Plaintiff's contrary position—the bankruptcy court necessarily adopted her contrary position

when it discharged her debts on November 3, 2015.  *See id.* (quoting *Reynolds v. Comm'r*, 861

F.2d 469, 473 (6th Cir. 1988)) ("[W]hen a bankruptcy court—which must protect the interests of

all creditors—approves a payment from the bankruptcy estate on the basis of a party's assertion

---

[55] This is not meant to be an exhaustive list of all of the claims that are barred by Plaintiff's bankruptcy petition.
Defendants are unclear exactly how Plaintiff will formulate her claims.  To clarify, Plaintiff is judicially estopped
from bringing any claim that is based on any alleged wrongdoing that occurred prior to July 31, 2015.

of a given position, that, in our view, is sufficient 'judicial acceptance' to estop the party from later advancing an inconsistent position.").

Likewise, the third prong—whether Plaintiff's omission was due to mistake or inadvertence—also demonstrates that Plaintiff is judicially estopped.  When analyzing this prong, courts consider if "(1) [the debtor] lacked knowledge of the factual basis of the undisclosed claims; (2) she had a motive for concealment; and (3) the evidence indicates an absence of bad faith." *Kimberlin*, 520 F. App'x at 314 (quoting *White*, 617 F.3d at 478) (brackets in original).  Plaintiff knew all of the factual bases of her undisclosed claims the moment that the allegedly wrongful actions occurred;  this is not a latent injury case where an individual discovers that she has been wronged only years after the allegedly wrongful actions occurred.  In addition, Plaintiff clearly had a motive to conceal her claims, as "[i]t is always in a [debtor's] interest to minimize income and assets." *Lewis*, 141 F. App'x at 426; *see also White*, 617 F.3d at 479 ("[The debtor] had a motive for concealment: if the harassment claim became a part of her bankruptcy estate, then the proceeds from it could go towards paying [the debtor's] creditors, rather than simply to paying [the debtor].").

Further, the evidence does not indicate an absence of bad faith.  This inquiry focuses on "affirmative actions taken by the debtor to notify the trustee or bankruptcy court of an omitted claim," not the subjective intent of the debtor.  *Kimberlin*, 520 F. App'x 312 at 315.  Thus, for example, the Sixth Circuit ruled that a debtor's affidavit stating that "[i]t was never [her] intent to hide anything from the bankruptcy court" was insufficient to prove the absence of bad faith. *Id.*  Instead, a debtor must show "affirmative actions" to avoid a finding of bad faith, such as proof that the debtor informed the trustee or bankruptcy court of the claims even though the debtor neglected to initially disclose them.  *Id.*; *see also Eubanks v. CBSK Fin. Grp., Inc.* 385

F.3d 894, 895-97 (6th Cir. 2004) (finding an absence of bad faith when the debtor made numerous attempts to advise the bankruptcy court and trustee of the undisclosed claims). Similarly, efforts to correct an omission that occur only after a defendant has moved to dismiss based on judicial estoppel are "not consider[ed] favorably" by courts, as to hold otherwise would be to "encourage gamesmanship." *White*, 617 F.3d at 481.

Here, there is no evidence that Plaintiff made any effort whatsoever to inform either the trustee or the bankruptcy court about her potential claims against Rawlings and Ford. Further, as explained by the Sixth Circuit in *White*, any action that Plaintiff might now take to correct the omissions would not alter the conclusion that she is judicially estopped from pursuing those claims. As a result, in addition to the reasons explained above for why Plaintiff's claims fail on the merits, Plaintiff's pre-petition claims also fail for the independent reason that Plaintiff is judicially estopped from asserting them based on her failure to disclose them in bankruptcy.

## CONCLUSION

This lawsuit amounts to nothing more than Plaintiff's disagreement with Rawlings' business judgment about the appropriate actions for her absenteeism, tardiness and overly long breaks. For the foregoing reasons, Plaintiff's Second Amended Complaint should be dismissed, in its entirety, as a matter of law.

Respectfully submitted,

*/s/ Shannon Antle Hamilton*
Shannon Antle Hamilton
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, KY  40202-3352
Telephone: (502) 587-3400
shamilton@stites.com

Ashley O. Hopkins
STITES & HARBISON, PLLC
250 West Main Street, Suite 2300
Lexington, KY  40507-1758
Telephone: (859) 226-2300
ahopkins@stites.com

*COUNSEL FOR DEFENDANTS*

639517:15:LEXINGTON