UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:16-CV-00138-GNS-DW

ADRIANNE POPECK                                                    PLAINTIFF

v.

RAWLINGS COMPANY LLC; and
DEBRA FORD                                                        DEFENDANTS

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on Plaintiff's Objection to Magistrate Judge's Order (DN 97), Plaintiff's Motions for Partial Summary Judgment (DN 110, 111, 112, 113, 117, 118), Defendants' Motions for Summary Judgment (DN 115, 116), Defendants' Motions for Leave to Exceed Page Limitations (DN 114, 124, 138), and Plaintiff's Motion for Leave to Exceed Page Limitations (DN 126). The motions are ripe for adjudication. For the reasons outlined below, Defendants' Motions for Summary Judgment (DN 115, 116) are **GRANTED IN PART** and **DENIED IN PART**, the parties' motions to exceed page limitations are **GRANTED**, Plaintiff's objection is **OVERRULED AS MOOT**, and Plaintiffs' remaining motions are **DENIED AS MOOT**.

I.        <u>STATEMENT OF FACTS AND CLAIMS</u>

This action involves several employment law claims brought by Adrianne Popeck ("Popeck") against her former employer, The Rawlings Company LLC[1] ("Rawlings Co."), and

---

[1] Rawlings Co. is based in LaGrange, Kentucky, and provides data mining and recovery services to health insurance carriers. (Def. Rawling Co.'s Mem. Law Supp. Mot. Summ. J. 5, DN 116-1 [hereinafter Def. Rawlings' Mot. Summ. J.]). As an auditor at Rawlings Co., Popeck identified

one of its human resources generalists, Debra Ford ("Ford") (collectively "Defendants").  Popeck worked for Rawlings Co. in various roles—including auditor and audit team manager ("ATM")—from March 30, 2009, until December 8, 2015.  (Second Am. Compl. ¶ 5, DN 48; Popeck Aff. ¶ 89, DN 127-4; Barrens Dep. 12:12-16, Mar. 22, 2017, DN 109-1; Popeck Dep. 71:14-16).  As an ATM, Popeck audited claims and supervised the performance of ten to fifteen auditors.  (Popeck Dep. 105:11-106:3).  In her supervisory capacity, Popeck utilized Rawlings Co.'s "hands-on" management policy, regularly interacting with her team members and engaging them in one-on-one discussions about their performance.  (Young Dep. 225:17-226:3, Nov. 3, 2016, DN 109-10; Popeck Dep. 105:11-106:3).  Throughout her employment, Rawlings Co. paid Popeck a base salary plus commissions.  (Popeck Dep. 80:12-13).

During her stint as an ATM, Popeck was diagnosed with irritable bowel syndrome ("IBS"), a digestive disease that caused her to experience severe stomach cramping and sudden diarrhea.  (Popeck Aff. ¶¶ 21, 25).  According to Popeck, her "IBS episodes tended to strike . . . in the early mornings and late afternoons."  (Popeck Aff. ¶ 25).  Sometimes she would experience IBS symptoms while at work; on those occasions, she would occupy the nearest bathroom stall, and—"between bouts of diarrhea"—lay "on the floor of the stall with [her] head on [a] sweatshirt, in the fetal position."  (Popeck Aff. ¶ 26).

Rawlings Co. first learned of Popeck's medical condition in late November 2013 when she requested leave under the Family and Medical Leave Act ("FMLA").  Upon her request, one of Rawlings Co.'s human resources generalists, Terri Parker ("Parker"), administered the company's FMLA paperwork to Popeck, who submitted it to her doctor, Shelia Rhoads, M.D. ("Dr. Rhoads").  In completing the paperwork, Dr. Rhoads noted that Popeck's IBS may

---

inaccurate health insurance claims billed to Rawlings Co.'s clients and rebilled the correct insurance provider.  (Popeck Dep. 80:2-9, June 15, 2016, DN 142-1).

interfere with her ability to work and recommended that she work part-time.   (2013 FMLA

Paperwork, DN 116-14).   Thus, in December 2013, Rawlings Co. placed Popeck on intermittent

leave, allowing her to arrive to work late and to leave work early as needed.   (Popeck Aff. ¶ 5,

DN 111-3 [hereinafter Popeck Second Aff.]).

While on intermittent FMLA leave, Popeck failed to meet the expectations that Rawlings

Co. sets for its managers.[2]   Indeed, her team's continual underperformance, tardiness, and taking

of excessive breaks eventually prompted Kelly Young (Young")—Rawlings Co.'s Director of

Operations—to email her the following:   "[t]his [i.e., Popeck's team's misconduct] is

unacceptable.   I see people on your team constantly late and leaving early.   What's the plan to

address?"[3]   (Team Member Emails 7).   Months later, Popeck met with Young and told him that

she believed that her team's productivity suffered because many of her team members were

never at their desks.   (Popeck Dep. 201:7-202:8; Young Dep. 222:4-14).   This comment stood

out to Young, so he asked Popeck to create an action plan designed to remedy her team's

behavior; he also began observing Popeck's team's work area to "see if whoever she identified

[as being absent] was actually there."[4]   (Young Dep. 222:10-11).   In doing so, he discovered that

*Popeck*—rather than her team members—was often smoking cigarettes on the loading dock

rather than working at her desk.   (Young Dep. 222:4-14, 249:24-250:3).

---

[2] Popeck had emailed her team prior to taking leave and admonished them for repeatedly arriving to work late and taking lengthy breaks throughout the day.   (Team Member Emails 1-2, DN 116-11; Popeck Dep. 128:23-130:6).   To support her complaints Popeck quoted portions of Rawlings Co.'s Employee Handbook, reminding them that their "punctual arrival and reliable presence are key factors in providing . . . excellent service . . . ."

[3] In support of his concerns, Young attached a monthly shift tracking report to his email.   (Team Member Emails 7-8).   The report showed that, by mid-April, Popeck's team had only worked 77.5 out of 198 shifts for that month.   (Team Member Emails 7-8).

[4] Popeck testified that she felt "singled out" by Young, as he had never asked other ATMs to create "action plans" to improve their respective teams.   (Popeck Dep. 201:7-24).

Young informed Ford of Popeck's conduct, and in August 2014 Ford and Young met with Popeck and notified her that she was being demoted to the auditor position. (Young Dep. 252:10-20; Ford Dep. 102:3, 103:15-16, 104:3-4, June 16, 2016, DN 109-5). Young told Popeck during the meeting that her excessive break-taking did not exemplify "model leadership"—particularly in light of the action plan she created for her team. (Popeck Dep. 216:24-217:13). Popeck did not deny that she had been taking excessive breaks or suggest that the breaks she took were related to her IBS. (Ford Dep. 105:24-106:8).

Upset by her demotion, Popeck approached the company's owner, George Rawlings ("Mr. Rawlings"), and asked him to reinstate her as an ATM. (Popeck Aff. ¶ 53). Popeck claims she told Mr. Rawlings that Young had been treating her differently since she began taking FMLA leave, but Mr. Rawlings has testified that "[s]he never mentioned that." (*See* Popeck Aff. ¶ 53; Rawlings Dep. 114:9-14, Sept. 14, 2016, DN 109-8). In any event, Mr. Rawlings declined to reverse Popeck's demotion but allowed her to maintain an ATM's base salary. (Rawlings Dep. 115:22-116:2).

In October 2014, Popeck's FMLA leave expired, so Ford provided Popeck with the company's Americans with Disabilities Act ("ADA") paperwork and told her that perhaps she could use ADA leave until her FMLA time replenished. (Popeck Dep. 253:17-21; Parker Dep. 164:8-17, Aug. 24, 2016, DN 109-6). In completing Popeck's ADA paperwork, Dr. Rhoads indicated that Popeck did not have a condition that substantially limited a major life activity but recommended that she be allowed to arrive to work late and leave early, as she did while on FMLA leave. (*See* 2014 ADA Paperwork, DN 116-15). Despite Dr. Rhoads' evaluation, Parker concluded that Popeck was entitled to bridge the gap between her stints of FMLA leave with a

one-month term of ADA leave so that she would be able to keep her job.[5]  (Parker Dep. 164:10-12).  Rawlings Co. re-designated Popeck's leave as FMLA leave in December 2014.  (Ford Dep. 116:4-12).

Around that same time, Popeck was unsuccessfully settling back into her role as an auditor.  On November 12, 2014, Popeck's ATM, Diana Chapman ("Chapman"), served her with a written warning indicating that over the course of approximately one month she had accumulated nine instances of tardiness and had left work early on five different occasions.  (First Written Warning, DN 116-19).  At least five of the instances of Popeck's tardiness—and four of the occasions where she left early—were unrelated to her IBS.  (First Written Warning).

In terms of Popeck's work habits and employment at Rawlings Co., 2015 largely resembled 2014—i.e., it was marked by underperformance and excessive absences.  Her performance dwindled, as evidenced by Rawlings Co.'s 2015 performance chart which shows that Popeck failed to meet her invoicing expectation in every month except March and April.  (*See* 2015 Performance Chart 1, DN 116-31).  In addition, Popeck exhausted all of her FMLA leave in July and sought ADA leave as a "gap-filler" in August.[6]  (2015 ADA Paperwork).  Thereafter, Popeck accumulated "26 full day absences" between July and September—even though neither her FMLA nor ADA paperwork said anything about full day absences being necessary.[7]  (Ford Dep. 186:3-4).

---

[5] Parker testified that Popeck's ADA leave "was a bridge. . . .  Whether [she had] a disability or not, I can't say.  You know, that would be up to her doctor."  (Parker Dep. 164:10-13; Ford Dep. 116:4-12).

[6] Dr. Rhoads again indicated on Popeck's 2015 paperwork that she did not have a condition that substantially limited a major life activity.  (2015 ADA Paperwork 2, DN 116-17).

[7] On at least one of the occasions when Popeck missed time from work during this period, she made cash withdrawals at a nearby casino when she was scheduled to work.  (Defs.' Mot. Leave Serve Revised & Narrowed Subpoenas Ex. J, at 5-6, DN 75-11).

In 2015, Popeck began to experience financial problems, partially from Rawlings Co.'s practice of prorating her pay to reflect partial and full day absences, even on days when her leave was designated as ADA rather than FMLA leave.  (*See* Ford Dep. 132:4-10).   Popeck approached Mr. Rawlings to ask "if [she] could take an advance against [her] own commissions, because [she] needed some extra money towards rent or bills . . . ."[8]  (Popeck Dep. 297:9-13). Mr. Rawlings told Popeck he was unsure whether such an advance was possible, but that he would find out.  (Popeck Dep. 296:3-10).  He then contacted Joan O'Brien ("O'Brien"), Vice President of Human Resources, to inquire why Popeck was missing so much work.  (O'Brien Dep. 232:10-14, Aug. 25, 2016, DN 109-11).   Ford informed O'Brien that she believed that Popeck was on medical leave, so they retrieved Popeck's medical paperwork to confirm that impression.[9]  (Ford Dep. 185:15-20, 185:24-25).  When Ford reviewed Popeck's paperwork, she noticed that "the doctor had said no, [Popeck's IBS does] not . . . substantially limit one of life's major activities," and that, in any event, the doctor had not recommended that Popeck take full days off from work.  (Ford Dep. 186:1-6).

Upon learning that Popeck's medical paperwork did not establish that she had a disability—much less justify her taking full day absences—Ford took corrective action.[10]   She

---

[8] Popeck testified that she told Mr. Rawlings that she was low on money because Rawlings Co. was deducting her pay while she was on leave, but Mr. Rawlings testified that Popeck did not tell him that her pay was being deducted, but simply told him that "she wasn't working."  (*Compare* Popeck Dep. 297:9-13, *with* Rawlings Dep. 114:11-17, 136:2-13).  Mr. Rawlings also testified that Popeck asked him for an $8,000.00 loan rather than an advance.  (Rawlings Dep. 135:3-11).

[9] Popeck's paperwork was in a binder in Parker's office; Parker was the only Rawlings Co. employee to review Popeck's FMLA and ADA paperwork prior to permitting her to take intermittent leave.  (Parker Dep. 51:2-20; Ford Dep. 185:1-12).

[10] Meanwhile, Popeck's tardiness and absenteeism continued.  Payroll records confirm that she missed 14 half days of work (out of a total of 22 work days) in the month of October, but the record is unclear whether these absences were related to Popeck's IBS.  (*See* Payroll Records 1, DN 116-22).  In addition, according to Ford, Popeck continued to take excessive smoking breaks and long lunches.  (Ford Dep. 181:4-8).

issued Popeck a written warning notifying her that her absenteeism rate between July and September had reached 59% and informing her that she "may not miss any more [*full days* of] work until [she had] a positive accrual balance [of vacation or sick time] or once again [became] eligible and approved for FMLA leave." (Second Written Warning 1, DN 116-26). Ford then advised Popeck that Rawlings Co. needed additional information about her medical issues so that it could evaluate whether Popeck should receive an accommodation of intermittent leave under the ADA. (Requests to Dr. Rhoads 1, DN 116-27). Ford faxed Dr. Rhoads and asked her to confirm that a 59% rate of absenteeism was acceptable given Popeck's condition and whether "it will be necessary for [Popeck] to continue to be absent at this rate." (Requests to Dr. Rhoads 5). Dr. Rhoads responded that she expected Popeck's absenteeism to decrease after her medications were regulated. (Dr. Rhoads Letter 1, DN 116-28). Ford then sent Dr. Rhoads a follow-up letter asking for a time-frame in which the company could expect Popeck's absenteeism to decrease and for additional information regarding how late Popeck could be expected to arrive to work and how early she might leave. (Requests to Dr. Rhoads 5). Dr. Rhoads never provided a clear answer to Ford's questions, but Dr. Rhoads' office later confirmed that Dr. Rhoads would not have approved Popeck for full-day absences. (Ford Dep. 184:11-19; Doll Dep. 29:13-20, Dec. 15, 2016, DN 116-18).

In light of the information from Dr. Rhoads, Rawlings Co. revoked Popeck's "gap-filler" ADA accommodation during a meeting held on November 10, 2015. (Ford Dep. 181:4-6). Ford informed Popeck that "being [at work] from 8:00[am] to 5:00[pm] Monday through Friday was an essential function of the job" and that she could not miss any more full or half days of work until she accrued vacation time or was approved for FMLA leave. (Popeck Dep. 314:18-342:9).

Ford also notified Popeck that she would be subject to termination if she missed any more work.[11]  (Popeck Dep. 342:25-343:3).

Popeck felt like she was being treated unfairly and complained to Mr. Rawlings that Ford was singling her out for mistreatment due to her disability.  (Popeck Aff. ¶ 74).  Popeck told Audit Division Director Thomas Ricketts ("Ricketts") that Chapman was mistreating her due to her disability as evidenced by the fact that Chapman refused to process one of her invoices.  (Popeck Aff. ¶¶ 83-87).  Finally, Popeck threatened to file a charge against Rawlings Co. with the Equal Employment Opportunity Commission ("EEOC").  (Popeck Aff. ¶ 88).

Following the November 10 warning, Popeck's performance showed no signs of improvement.  On November 19, Ford sent Popeck an email admonishing her for taking lengthy lunch breaks and "several [smoking] breaks close to 30 minutes"—as well as for reporting to work nearly two hours late the day before.  (Final Written Warning 1, DN 116-33).  Ford told Popeck: "This is your final warning . . . ."  (Final Written Warning 1).  On December 8, Popeck arrived nearly two hours late for work.[12]  (Popeck Dep. 181:25-182:1).  As a result, Rawlings Co. terminated her employment, citing tardiness and excessive breaks as the reasons for her discharge.  (Ford Dep. 181:21-182:9).

Popeck then applied for unemployment benefits with the Kentucky Department of Unemployment Insurance ("KDUI").  In her application, Popeck noted that she was terminated because—despite having submitted all paperwork necessary to prove entitlement to an accommodation under the ADA—she was denied an accommodation.  (Unemployment

---

[11] As a follow-up to the meeting, Chapman emailed Popeck to notify her that she had taken a 40 minute smoke break on November 10 and to remind her not to take excessive breaks.  (Popeck Dep. 343:4-23; *see also* Nov. 11th Email 1, DN 116-32).
[12] Popeck claims for the first time in an affidavit attached to her response to Rawlings Co.'s motion that she was late due to her IBS.  (Popeck Aff. ¶ 88).

Paperwork 2, DN 116-34).  Ford submitted a response to Popeck's unemployment application on behalf of Rawlings Co. noting that Popeck "never submitted paperwork establishing a disability."  (Unemployment Resp. 7, DN 116-35).

Popeck then initiated this action against Rawlings Co. and Ford.  In particular, Popeck alleges that Defendants violated:  (1) the ADA, 42 U.S.C. §§ 12101-12213, and its state-law counterpart, the Kentucky Civil Rights Act ("KCRA"), KRS Chapter 344; (2) the FMLA, 29 U.S.C. §§ 2601-2654; (3) KRS 341.990(6)(1); and (4) the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and its state-law counterpart, the Kentucky Wage and Hour Act ("KWHA"), KRS 337.275-.405.

## II.  JURISDICTION

This Court has subject-matter jurisdiction of this matter based upon federal question jurisdiction.  *See* 28 U.S.C. § 1331.  The Court also has supplemental jurisdiction over Popeck's state law claims.  *See id.* § 1367(a).

## III.  STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine issue of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). Rather, the non-moving party must present specific facts proving that a genuine factual issue exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

### A.   Defendants' Motions for Summary Judgment

In their motion, Defendants seek dismissal of all of Popeck's claims. Each claim will be addressed below.

#### 1.   *Counts I & IV – ADA/ KCRA Discrimination*

"The ADA prohibits an employer from discriminating against 'a qualified individual with a disability because of the disability' in the terms and conditions of employment."[13] *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir. 1998) (quoting 42 U.S.C. § 12112). "Disability discrimination claimants can proceed under the separate legal theories of disparate treatment[,] failure to accommodate[,]" and failure to engage the employee in an interactive process. *Webb v. Humana Inc.*, 819 F. Supp. 2d 641, 645 (W.D. Ky. 2011); *Kleiber v. Honda of Am. Mfg., Inc.*,

---

[13] The KCRA "was modeled after [the ADA] [], and [Kentucky] courts have interpreted the [KCRA] [] consistently therewith." *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003) (citations omitted). Thus, the Court will address Popeck's ADA/KCRA accommodation claims together.

420 F. Supp. 2d 809, 825 (S.D. Ohio 2006).   While these theories have some overlapping elements, they are distinct, and the Court will analyze them separately.

### a.      Failure to Accommodate/Revocation of Accommodation

To survive summary judgment on a failure to accommodate claim, a plaintiff must establish that:  (1) she is disabled within the meaning of the ADA, (2) she is qualified for the position with or without a reasonable accommodation, (3) her employer knew or had reason to know of her disability, (4) she requested a reasonable accommodation, and (5) her employer failed to accommodate her.[14]   *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004) (citation omitted).   An employer may rebut an employee's prima facie case by showing that her proposed accommodation (if implemented) would eliminate an essential function of her job.   *EEOC v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (explaining that an accommodation that removes an essential function of the position "is *per se* unreasonable" (citations omitted)).

Only the first, second, and fourth elements of Popeck's claim are at issue here and, as explained below, the second and fourth elements ultimately turn on the same inquiry.  (*See* Def. Rawlings' Mot. Summ. J. 25-37).   Accordingly, the Court will analyze the following questions: (1) whether Popeck was disabled within the meaning of the ADA, and (2) whether regular and predictable attendance is an essential function of working as an auditor at Rawlings Co.

---

[14] The parties disagree over the nature of Popeck's "accommodation" claim.  Popeck claims that she seeks to hold Defendants liable for *revoking* her accommodation without any justification, while Defendants have primarily defended against her accommodation claim as if it were a run-of-the-mill *failure* to accommodate claim.  (*Compare* Def. Rawlings' Mot. Summ. J. 24-25, *with* Pl.'s Resp. Rawlings' Mot. Summ. J. 41-48, DN 127).   Regardless, the fact remains that Popeck must prove entitlement to an accommodation before she may argue that Defendants unreasonably revoked it.  *See, e.g.*, *Isbell v. John Crane, Inc.*, 30 F. Supp. 3d 725, 734-36 (N.D. Ill. 2014) (holding employer liable for unreasonably revoking a reasonable accommodation that employer had previously provided to a disabled employee without consequence).

### i. Disability

Under the ADA, a "disability" is: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."[15]  42 U.S.C. § 12102(1)(A)-(C).  For the purposes of this definition, "major life activities" include—"but are not limited to"—"eating, sleeping, . . . working" and "the operation of . . . digestive [and] bowel" functions.  *Id.* § 12102(2)(A)-(B).  While the ADA "must be construed in favor of broad coverage," it is "not a general protection for medically afflicted persons."  *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 703 (6th Cir. 2008) (citation omitted); *Perry v. Am. Red Cross Blood Servs.*, No. 3-13-1146, 2015 WL 1401058, at *2 (M.D. Tenn. Mar. 26, 2015).  "[N]ot every impairment, illness or injury will constitute a disability."  *Perry*, 2015 WL 1401058, at *2.  The parties agree that Popeck's IBS constitutes an "impairment."  The remaining inquiry is whether that impairment substantially limits a major life activity.

Popeck claims that her IBS substantially limits her ability to work, as well as her digestive and bowel functions.[16]  (Pl.'s Mot. Partial Summ. J. Re. Disability 11-13).  She has

---

[15] Popeck has primarily alleged and argued that she is disabled under 42 U.S.C. § 12101(1)(A). *See, e.g.*, Pl.'s Mot. Partial Summ. J. Re. Disability 11-13, DN 111).  At times, however, she has attempted to assert that Defendants regarded her as disabled—even though she did not raise such a claim in the Second Amended Complaint.  (*See, e.g.*, Pl.'s Mot. Partial Summ. J. Regarding Disability 12-13).  Given that "claims based on a 'regarded as' theory raise issues distinct from those raised in claims based on an actual impairment theory," the Court will reject Popeck's attempt to raise a regarded as claim at the summary judgment stage and will only address whether she has a disability pursuant to the actual impairment theory.  *See Dyer v. Wiregrass Hospice, L.L.C.*, 532 F. Supp. 2d 933, 937 (M.D. Tenn. 2008) (citations omitted).

[16] Popeck also argues that Defendants are estopped from denying that her IBS constitutes a disability because they accommodated her.  (Pl.'s Mot. Partial Summ. J. Re. Disability 14-18). This argument fails.  An employer's decision to accommodate an employee does not amount to a concession that the employee is disabled.  *See, e.g.*, *Kleiber* 420 F. Supp. 2d at 822 ("Good deeds ought not be punished, and an employer who goes beyond the demands of the law to help a

submitted an affidavit indicating the extent to which IBS impacts her life in support of her position.  (*See* Popeck Second Aff. ¶¶ 14-17).  Among other things, one of Popeck's affidavits indicates that she is "required to occupy the restroom about 500% more, on average, than [she] used to," and that she sometimes "cannot leave [her] house for about three to four hours due to severe diarrhea."  (Popeck Second Aff. ¶¶ 14-15).  In addition, Popeck argues that Dr. Rhoads' conclusion that her IBS *does not* substantially limit a major life activity is irrelevant because no amount of paperwork is "necessary to justify a disability . . . ."  (Pl.'s Resp. Rawlings' Mot. Summ. J. 48 (citing EEOC Compliance Manual § 802.156)).

Defendants counter that Popeck's IBS is not a disability because Dr. Rhoads indicated on both sets of Popeck's ADA paperwork that her IBS does not substantially limit a major life activity.  (Def. Rawlings' Mot. Summ. J. 25-27).  Defendants further represent that sister courts faced with similar fact patterns—i.e., situations where:  (1) the employee's doctor indicates that the employee's impairment does not limit her life activities, and (2) the employee submits nothing more than a self-serving affidavit to prove her disability—have concluded that the employee was not disabled within the meaning of the ADA.  (Def. Rawlings' Mot. Summ. J. 26).

Though a close question, the record contains a dispute of fact regarding the extent of Popeck's physical impairment; consequently, Defendants are not entitled to summary judgment as to Popeck's accommodation claim on the ground that she is not disabled.  While Dr. Rhoads opined twice in submissions to Rawlings Co. that Popeck's IBS did **not** substantially limit any of her life activities, he did diagnosis IBS and Popeck's description of the symptoms of that disease appear to be at odds with Dr. Rhoads' stated opinion of no impairment.  (*See* 2015 ADA

---

disabled employee incurs no legal obligation to continue doing so."  (internal quotation marks omitted) (quoting *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1257 n.3 (11th Cir. 2001))).

Paperwork 2; 2014 ADA Paperwork 2; Popeck Second Aff. ¶¶ 14-17).  As a result, a reasonable jury could find in favor of Popeck on this issue.

Defendants point out that a sister court has concluded that an employee did not have a disability when his physician indicated in medical paperwork that his impairment did not limit any major life activities.[17]  *See Sanders v. Bemis Co., Inc.*, No. 3:16-CV-00014-GFVT, 2017 WL 405920, at *4-5 (E.D. Ky. Jan. 30, 2017).   In that case, however, the court premised its conclusion on more than just the employee's doctor's representations; indeed, other record evidence—including the plaintiff's own testimony—suggested that his impairment was not a disability.  *Id*. at *5.  Popeck's case is therefore distinguished because her testimony contradicts Dr. Rhoads' findings.  (*See* Popeck Second Aff. ¶¶ 14-17).  Further, the fact that Popeck's affidavit is the only evidence establishing her disability does not necessarily mean that she has failed meet her burden.  While courts have remarked that an employee's "self-serving assertions concerning her conditions' impact on various 'major life activities'" are insufficient to create a question of material fact for trial, they have only done so when discussing affidavits that failed to contain "examples [or] details" regarding how the employee's impairment impacted her life. *See, e.g.*, *Hensler v. City of O'Fallon*, No. 09-CV-268-DRH-PMF, 2012 WL 293401, at *8 (S.D.

_____

[17] In a similar vein, Defendants also cite to *Neely v. Benchmark Family Services.*, 640 F. App'x 429, 435 (6th Cir. 2016), and *White v. City of Gatlinburg*, No. 3:14-CV-00505, 2016 WL 3093899, at *1 (E.D. Tenn. June 1, 2016), for the proposition that Popeck must prove her disability with medical evidence.  (Defs.' Combined Resp. Pl.'s Mots. Summ. J. 2, 17, DN 125 [hereinafter Defs.' Resp.]).  In *Neely*, however, the plaintiff attempted to prove he was disabled via "self-described symptoms to his physicians, without corroborating medical evidence *or any diagnosis*"; this, the Sixth Circuit reasoned, was "insufficient to establish a substantial limitation on a major life activity."  *Neely*, 640 F. App'x at 435.  Similarly, the court in *White* concluded that the plaintiffs were not disabled because they had not been diagnosed with an impairment and had—"with the exception of their own statements"—produced no evidence on the issue.  *See White*, 2016 WL 3093899, at *1.  Popeck's case is at least slightly different from *Neely* and *White* in that, at the very least, she has been diagnosed with a condition that *could* constitute a disability.

Ill. Jan. 31, 2012); *see also Jenkins v. Nat'l Bd. of Med. Exam'rs*, No. 08-5371, 2009 WL 331638, at *3 (6th Cir. Feb. 11, 2009) ("In the ADA Amendments Act, Congress made clear that it intends for the ADA to give broad protection to persons with disabilities and that the Supreme Court's holding in [*Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002),] is at odds with Congress's intent.  Congress stated in the findings of the Act that various Supreme Court holdings 'have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect' with the result that "lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities.'"  (citation omitted)). Popeck's affidavit provides such examples.  (*See* Popeck Second Aff. ¶¶ 1-17).

That said, neither the paperwork from Dr. Rhoads nor the fact that Popeck has only submitted an affidavit to evidence her disability are fatal to her claim.  Because a reasonable jury could discount Dr. Rhoads' ADA paperwork and credit Popeck's description of her symptoms, Defendants are not entitled to summary judgment as to Popeck's accommodation claim on the ground that she is not disabled.

### ii.    Essential Functions

The second and fourth elements—whether Popeck was qualified for her position and whether she suggested a reasonable accommodation—turn on whether regular and predictable attendance is an essential function of working as an auditor at Rawlings Co.  Popeck requested as an accommodation a work schedule so flexible that she could essentially come and go as she pleased.  If regular and predictable attendance *is* an essential function of working as an auditor at Rawlings Co., then:  (1) Popeck—even with her proposed accommodation—would be unable to perform that function, precluding her from establishing that she is a qualified individual with a

disability; and (2) Popeck's proposed accommodation, if implemented, would eliminate an essential function of her position and be "*per se* unreasonable."[18]  *See Ford*, 782 F.3d at 761 (citations omitted); *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 392 (6th Cir. 2017) (explaining that an employee is "not qualified" for her position if she "fail[s] to perform [an] essential function" of her job, with or without an accommodation (citations omitted)).

When determining whether a function is essential to a particular job, EEOC regulations direct courts to consider the following factors:

(i)     The employer's judgment as to which functions are essential;
(ii)    Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii)   The amount of time spent on the job performing the function;
(iv)    The consequences of not requiring the incumbent to perform the function;
(v)     The terms of a collective bargaining agreement;
(vi)    The work experience of past incumbents in the job; and/or
(vii)   The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3)(i)-(vii); *see also* 42 U.S.C. § 12111(8).

In *EEOC v. Ford Motor Co.*, the Sixth Circuit analyzed these factors, the ADA's text, and informal EEOC guidance, and concluded that each supported the proposition that "[r]egular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs," "especially those involving teamwork and a high level of interaction . . . ." *Ford*, 782 F.3d at 761-63.  Similar to the case at bar, *Ford* dealt with a plaintiff who suffered from IBS and had a difficult time working on a set schedule.  *Id.* at 759.  As a result, the plaintiff's employer (Ford Motor Company), attempted to accommodate her by allowing her to work on an alternative schedule and telecommute as needed.  *Id.* at 759.  Even with these accommodations, however, the plaintiff could not maintain a predictable work schedule, and her performance suffered as a

---

[18] Defendants bear the burden of proving that regular and predictable attendance is an essential function of working at Rawlings Co.  *Hedrick*, 355 F.3d at 452 (6th Cir. 2004) (citation omitted).

result. *Id.* After trying other accommodations, the plaintiff asked to telecommute up to four days a week. *Id.* Ford determined the request unreasonable, refused to implement it, and eventually terminated the plaintiff's employment for poor performance. *Id.* at 760. The plaintiff then sued Ford for failing to accommodate her disability. *Id.* The district court granted summary judgment in favor of Ford on the ground that the plaintiff's proposed accommodation (allowing her to come to work sporadically) was unreasonable given that regular and predictable attendance was an essential function of her job. *See id.* The Sixth Circuit, sitting en banc, affirmed. *Id.*

Aside from the ADA's language and regulatory factors, the Sixth Circuit also noted that common sense and volumes of authority from other circuits supported this proposition:

> A sometimes-forgotten guide likewise supports the general rule: common sense. *Waggoner v. Olin Corp.*, 169 F.3d 481, 482–84 (7th Cir.1999). Non-lawyers would readily understand that regular on-site attendance is required for interactive jobs. Perhaps they would view it as "the basic, most fundamental" "activity" of their job. Webster's Third New International Dictionary 777, 920 (1986) (defining "essential" and "function"). But equipped with a 1400–or–so page record, standards of review, burdens of proof, and a seven-factor balancing test, the answer may seem more difficult. Better to follow the commonsense notion that non-judges (and, to be fair to judges, our sister circuits) hold: Regular, in-person attendance is an essential function—and a prerequisite to essential functions—of most jobs, especially the interactive ones. That's the same rule that case law from around the country, the statute's language, its regulations, and the EEOC's guidance all point toward. And it's the controlling one here.

*Id.* at 762-63.

The indisputable evidence in this case establishes that regular and predictable on-site attendance is an essential function of working as an auditor at Rawlings Co. The job description for Popeck's position states that auditors work "full time" and that an auditor's essential duties are "[r]eview[ing]/audit[ing] healthcare claims . . . ." (Job Description 1, DN 116-6). Only an auditor who is *at work* can complete this task, as auditors are not permitted to access their work

computer desktops from home given that their work involves "handl[ing] a large volume of confidential and HIPAA protected personal information . . . ." (Barrens Aff. ¶ 4, DN 116-2). Similarly, Rawlings Co.'s Employee Handbook states:  (1) "[o]ur normal work week consists of 40 hours per week.  Our standard office hours are 8:00 a.m. to 5:00 p.m., Monday through Friday," and (2) "[p]art of performing your job well means being where you are supposed to be when you are supposed to be there."  (Rawlings' Employee Handbook 22, DN 116-3).  Further, effective collaboration—which "typically [involves] person to person contact"—is crucial at Rawlings Co., as collaboration is the means by which the company improves the way it does business.  (Barrens Dep. 248:8-9); *see also Ford*, 782 F.3d at 762 (noting that jobs involving teamwork typically require regular and predictable on-site attendance).   "[R]egular and predictable schedule . . . is important for managers to be able to manage their people effectively, [and] for clients to have their . . . expectation[s] met . . . ."[19]  (Barrens Dep. 241:3-6).  This is exactly what Popeck told her subordinates when she counseled them before taking leave:  "punctual arrival and reliable presence [are] key factors in providing excellent service . . . ." (Team Member Emails 1-2).  Popeck's performance in 2015—a year in which she missed many days of work—underscores the proposition that regular and predictable attendance is essential at Rawlings Co.:  when Popeck worked sporadic hours on shortened shifts, her work product suffered.  (Defs.' Resp. 24; 2015 Performance Chart 1).  Under these circumstances, the record reflects that Popeck's work at Rawlings Co. fell within the mainstream where regular attendance was an essential job function.

---

[19]  In other words, an auditor's "punctual arrival and reliable presence are key factors in providing . . . [the] excellent service [Rawlings Co.'s] clients expect." (Barrens Dep. 254:21-25).

In an effort to create a dispute of fact on this issue, Popeck raises four arguments, none of which are availing. First, s claims that Rawlings Co.'s job description for auditors does not *specifically* state that office hours are from 8:00 a.m. until 5:00 p.m. (Pl.'s Mem. Supp. Mot. Partial Summ. J. Re. Essential Job Functions 3-4, DN 113-1). To the contrary, the employee handbook states that "standard office hours are 8:00 a.m. to 5:00 p.m., Monday through Friday." (Rawlings' Employee Handbook 22). Second, she argues that Rawlings Co. allowed certain employees to arrive to work late when their commute was regularly delayed due to construction on their route. (Pl.'s Mem. Supp. Mot. Partial Summ. J. Re. Essential Job Functions 4, 9; Ford Dep. 278:2-6). But those employees still came to work *regularly and predictably*; they did not simply "come in whenever they [felt] like it." (Ford Dep. 197:12-13). Third, Popeck complains that employees in Rawlings Co.'s IT department have been permitted to access their work computer desktops remotely and work from home. (Pl.'s Mem. Supp. Mot. Partial Summ. J. Re. Essential Job Functions 5; Hull Dep., 42:15-25, July 28, 2017, DN 109-12). Auditors, however, are *not* permitted to work remotely. (Barrens Aff. ¶ 4). Finally, Popeck claims that "[t]here were no production-based consequences to letting Plaintiff start [work] later . . . ." (Pl.'s Mem. Supp. Mot. Partial Summ. J. Re. Essential Job Functions 9). Substantial record evidence (*e.g.*, Plaintiff's 2015 Performance Chart 1-2) contradicts that assertion, and, in any event, she did not simply "start [work] later"—she left early (or did not show up at all), working only on a sporadic basis. (Ford Dep. 186:3-4). Under these circumstances, Popeck's contention that regular attendance at work was not essential is rejected.

In sum, "[t]he [ADA] requires employers to reasonably accommodate their disabled employees; it does not endow all disabled persons with a job—or job schedule—of their choosing." *Ford*, 782 F.3d at 757. Popeck asked Rawlings Co. to accommodate her IBS with a

work schedule so flexible that she could come and go as she pleased, irrespective of any impact such a schedule may have had on her work performance.  Given that Rawlings Co. requires its auditors to adhere to a policy of regular and predictable on-site attendance, Popeck—even with this accommodation—could not perform the essential functions of her job and was therefore not qualified for the position.  *Williams*, 847 F.3d at 392.  Likewise, her proposed accommodation which essentially negated required attendance was unreasonable.  *See Ford*, 782 F.3d at 761 (citations omitted).  Accordingly, Defendants are entitled to summary judgment on Popeck's accommodation claim.

### b.  Interactive Process

Popeck next claims that "Defendants did not engage in the 'interactive process' necessary to assess the availability of a reasonable accommodation, including the availability of an alternative accommodation . . . ."  (Second Am. Compl. ¶ 169).  Generally, "[a]n employer is required 'to initiate an informal, interactive process' when necessary to determine how an employee's disability limits her ability to work and to identify appropriate reasonable accommodations."  *Williams*, 847 F.3d at 395 (quoting 29 C.F.R. § 1630.2(o)(3)).  To survive summary judgment on an interactive process claim, a plaintiff must show that:  (1) she is qualified for the position, (2) the employer failed "to participate [in the interactive process in] good faith," and (3) "a reasonable accommodation would have been possible" had the employer participated in the process.  *See Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 619 (N.D. Ohio 2014) (citations omitted); *see also Williams* 847 F.3d at 395.

Popeck has failed to prove first two elements of her *prima facie* interactive process claim.  As noted at length above, Popeck is not qualified for the position of auditor because she could not perform the essential function of regularly and predictably coming to work, even with her

proposed accommodation in place.  *See Williams*, 847 F.3d at 392.  In addition, despite attaching dozens of exhibits to her six motions for partial summary judgment and responsive briefs, Popeck has presented no evidence demonstrating Defendants' bad faith.[20]

Popeck has not proven that a reasonable accommodation would have been possible but for Defendants' bad faith failure to engage her in the interactive process.  She claims in her responsive brief that the following accommodations were possible:  (1) telecommuting, (2) working a later shift in the subrogation department, and (3) allowing her to have a "later starting time."  (Pl.'s Resp. Rawlings' Mot. Summ. J. 47-48).  Her arguments are unavailing.  As already explained, telecommuting was not a possibility for Popeck (or any other auditor), as auditors are required to work on-site due to the sensitive nature of the data they review.  (Barrens Aff. ¶ 4).  Working a later shift does not solve the problem, either.  In order to work full time, Popeck would be required to *stay* later if she *arrived* later.  According to Dr. Rhoads, Popeck's medical condition impacts her early in the morning and *late in the afternoon*, so pushing back her arrival time would do nothing to combat her afternoon symptoms.  (*See, e.g.*, 2014 ADA Paperwork 2).  As a result, Popeck would be coming in later *and* leaving early—i.e., working less.  Such an accommodation was not possible.  *See Ford*, 782 F.3d at 761-63

Popeck has failed to present evidence supporting the essential elements of her interactive process claim.  Consequently, Defendants are entitled to summary judgment on this point.

---

[20] To the contrary, Defendants appear to have engaged Popeck in the interactive process in good faith, as Ford corresponded with Dr. Rhoads about the extent and severity of Popeck's medical condition so as to determine whether the company could continue to accommodate.  *See, e.g.*, *Kovac*, 998 F. Supp. 2d at 622 (noting that employer engaged in interactive process in good faith when it sought to understand how it might best accommodate employee).  Further, Rawling Co.'s recommendation of allowing Popeck intermittent leave long past expiration of her FMLA leave reflects commendable efforts at flexibility by Rawlings Co., certainly far more than was legally required.

### c.     Disparate Treatment

Popeck claims that Defendants treated her differently than her non-disabled coworkers because they prorated her pay to reflect partial day absences *but did not* prorate the pay of her coworkers who missed work to, for example, attend doctors' appointments.   (Second Am. Compl. ¶¶ 172-74, 205-13).   To survive summary judgment on a disparate treatment claim, the plaintiff must prove that:  (1) she is disabled; (2) she is qualified for the position; (3) she suffered from an adverse employment decision; (4) the employer knew or had reason to know of her disability; and (5) "similarly situated non-protected employees were treated more favorably." *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007) (internal quotation marks omitted) (citations omitted).

Popeck has failed to prove a prima facie disparate treatment claim.  As discussed above, she is not qualified for her position.  Popeck has also failed to identify any similarly-situated, non-disabled employees whose pay was not prorated to reflect partial day absences while not on ADA or FMLA leave.   (Pl.'s Reply Supp. Sixth Mot. Partial Summ. J. 4-7, DN 137). Defendants are entitled to summary judgment on this claim.[21]

---

[21] The Court also notes that Ford is entitled to summary judgment with respect to Popeck's ADA/KCRA disability discrimination claims because, as an individual, she cannot be held liable on those claims.  *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 808 n.1 (6th Cir. 1999). In addition, the Court recognizes that the parties dispute whether the act of prorating Popeck's pay constitutes an adverse employment action in light of Sixth Circuit precedent holding that deductions from pay which only have a "negligible impact" on the employee's income are not sufficiently adverse.  *See Plautz v. Potter*, 156 F. App'x 812, 817-18 (6th Cir. 2005) (citation omitted).  Given that Popeck has failed to meet two elements of her claim, the Court will not address this issue.

## 2. *Count II – FMLA Interference*[22]

The FMLA enables a covered employee to take up to twelve weeks of leave per year for various purposes, including to obtain treatment for "serious health condition[s] that make[] the employee unable to perform the functions of [her] position . . . ." 29 U.S.C. § 2612(a)(1)(C)-(D). Once the employee's leave expires, she must be restored to her prior position or to a position with equal pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1).

Both the text of the FMLA and Sixth Circuit precedent indicate that an employee has a cause of action against her employer if it interferes with the rights created by the FMLA and its regulations. 29 U.S.C. § 2615(a)(1); *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003); *see also Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007) (citation omitted). To prevail on a claim of FMLA interference, the employee must establish that: (1) she is an eligible employee, (2) the defendant is an employer, (3) she "was entitled to leave under the FMLA," (4) she "gave the employer notice of [her] intention to take leave," and (5) "the employer denied the employee FMLA benefits to which [she] was entitled." *Wysong*, 503 F.3d at 447 (citing 29 U.S.C. §§ 2611(2)-(3), 2612(a)(1), (e)(1); *Cavin v. Honda Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003)).

Popeck argues that Defendants denied her FMLA benefits to which she was entitled on three separate occasions.[23] First, she claims that Defendants forced her to use her FMLA leave as soon as it was available rather than designating her leave as "ADA leave" and allowing her to preserve her FMLA allotment. (Second Am. Compl. ¶ 192). Second, she asserts that

---

[22] Ford incorporated Rawlings Co.'s arguments regarding Popeck's FMLA claims into her separate motion for summary judgment. (*See* Def. Ford's Mem. Law Supp. Mot. Summ. J. 12, DN 115-1 [hereinafter Ford's Mot. Summ. J.]). Thus, the Court will jointly address Ford and Rawling Co.'s potential liability through the lens of Rawlings Co.'s contentions.

[23] The parties only appear to dispute the fifth element of Popeck's prima facie case.

Defendants improperly designated her leave as FMLA rather than ADA even though—in light of certain FLSA regulations—an ADA designation would have afforded her greater benefits. (Second Am. Compl. ¶ 191).  And third, she alleges that Defendants failed to restore her to the position of ATM once her leave expired.  (Second Am. Compl.  ¶ 186).

### a.      Involuntary FMLA – Theory 1

As an initial matter, the Court notes that Popeck's first interference claim rests on the faulty premise that she is entitled to the protections of the ADA.  Given that she was not qualified for her position, however, Popeck's first interference theory boils down to a claim that Defendants should not have "forced" her to take FMLA leave—a variety of leave that she applied for twice—and should have instead allowed her work on her own schedule for an indefinite amount of time (with no threat of discipline or termination) so that she could use her FMLA leave for some other purpose at some point in the future.  This contention fails as a matter of law.

Though the Sixth Circuit has explained that "[a]n employee may have" an FMLA interference claim "when [her] employer forces [her] to take FMLA leave when [she] does not have a 'serious health condition' that precludes her from working," "the employee's claim ripens only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past."  *Wysong*, 503 F.3d at 449 (citations omitted).  Popeck has not presented evidence indicating that her IBS was not a "serious health condition" or that she attempted to take FMLA leave at another date only to find that her allotment had expired.  Since Popeck has not established that she was entitled to any other kind of leave—certainly not under the ADA—Rawlings Co.'s designation of Popeck's

intermittent leave under the FMLA is not actionable.   Defendants are entitled to summary judgment on this claim.

### b.      Theory 2 – Better Benefits

Popeck's second FMLA interference claim is complex.   She claims that Defendants violated 29 C.F.R. § 825.702—which states that, as between the FMLA and ADA, "[a]n employer must . . . provide leave under whichever statutory provision provides . . . greater rights to [the] employee[]"—when they designated her leave as FMLA rather than ADA because, under FLSA regulations, an employer *may* prorate an employee's pay to reflect partial day absences when the employee is on FMLA, but *may not* otherwise do so.   29 C.F.R. § 825.702(a); *see generally id*. § 541.602 (delineating the circumstances in which employers are prohibited from making deductions to an employee's salary).   The implication, then, is that Defendants interfered with Popeck's FMLA rights when they wrongly prorated her pay to reflect partial day absences during pay periods in which she was on ADA leave—i.e., the ADA offers better protections than the FMLA.   This claim is predicated on Popeck's entitlement to both FMLA and ADA's protections.   Without available protection under the ADA, as discussed above, Popeck has no claim.

Even assuming that Popeck were entitled an ADA accommodation, this theory of FMLA interference would still fail.   The regulation at issue requires employers to provide employees with the best rights possible *as between* the ADA, FMLA, and other anti-discrimination statutes. *See* 29 C.F.R. § 825.702(a).   In fact, the regulation is titled:   "Interaction with Federal and State *anti-discrimination* laws," and the opening sentence states that "[n]othing in the FMLA modifies or affects any Federal or State law *prohibiting discrimination* on the basis of race, religion, color, national origin, sex, age, or disability . . . ."   *Id.* (emphasis added).   Thus, by its plain language,

this regulation does not interact with the FLSA (which contains labor rather than discrimination laws) and its regulations.  Consequently, 29 C.F.R. § 825.702(a) does not require employers to consider the impact of the FLSA's regulatory scheme when determining whether the ADA or FMLA affords an employee greater rights.[24]  In light of the foregoing, Defendants are entitled to summary judgment on this theory of FMLA interference.

### c.      Theory 3 – Refusal to Restore

Finally, Popeck argues that Defendants interfered with her rights under the FMLA when they refused to restore her to the position of ATM once her leave expired.  (Second Am. Compl. ¶¶ 186-88).  While the FMLA provides that an employee who has taken FMLA leave must "be restored by the employer to the position of employment held by the employee when the leave commenced," this right is not absolute.  29 U.S.C. §§ 2612(a)(1)(A), 2614(a)(1)(A); *Pharakhone v. Nissan N. Am., Inc.*, 324 F.3d 405, 407 (6th Cir. 2003).  Rather, "whether an employer violates the FMLA turns on why the employee was not reinstated."  *Pharakhone*, 324 F.3d at 408 (internal quotation marks omitted) (citation omitted).  "If the employee cannot show that . . . [her] taking of FMLA leave was a 'negative factor' in the employer's decision'" not to reinstate her, she "cannot show a violation of the FMLA."  *Id.* (citations omitted).  "An employer need not reinstate an employee who would have lost his job even if he had not taken FMLA leave."  *Id*. at 407 (citations omitted).

The undisputed facts of this case show that Popeck's FMLA leave was not a factor in Young's decision to demote her, and that she would have been demoted even if she had not taken leave.  Popeck has not produced any evidence suggesting that Young demoted or otherwise

---

[24] This conclusion is underscored by Popeck's failure to identify case law, regulations, or informal guidance supporting her position.

treated her differently due to her taking FMLA leave.[25]  Though Popeck has testified that Young disciplined her for wearing sandals and ripped jeans—and for taking a long lunch with a couple of new Rawlings Co. employees—she has not proven any connection between those instances and her leave.  (Popeck Dep. 188:16-191:25).  In addition, Popeck has testified that Young demoted her for taking excessive smoking breaks and for failing to exhibit leadership qualities.  (Popeck Dep. 216:24-217:13).  She did not deny that her smoking breaks were excessive, and she has not since proven that her use of FMLA leave was a factor, much less a negative factor, in Young's decision to demote her.  (Ford Dep. 105:24-106:8).  Accordingly, Defendants would have demoted Popeck even if she had not taken FMLA leave; Defendants are therefore entitled to summary judgment on this claim.

### 3.    *Counts II & IV – Retaliation*

To survive summary judgment on a claim of retaliation under the FMLA, ADA/KCRA, or KWHA, a plaintiff must demonstrate:  (1) she engaged in a protected activity, (2) her employer knew of that activity, (3) the employer thereafter took an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse action.[26]  *See, e.g.*, *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (FMLA); *Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 F. App'x 336, 340 (6th Cir. 2001) (ADA).  "If the plaintiff

---

[25] Popeck did not respond to Defendants' arguments with respect to this claim; instead, she simply noted that she had raised a "refusal to restore" claim.  (*See* Pl.'s Resp. Rawlings' Mot. Summ. J. 61).

[26] Though Kentucky courts have not acknowledged a claim for retaliation under the KWHA, a recent federal decision interprets KRS 377.990 (which prohibits employers from retaliating against employee for complaining to her employer about unpaid wages) as creating a right of action.  *See Williams v. King Bee Delivery, LLC*, 199 F. Supp. 3d 1175, 1182 (E.D. Ky. 2016).  Given that the standard applicable to ADA and FMLA retaliation claims mirrors the standard for FLSA retaliation claims, the Court will apply that standard to Popeck's KWHA claim as well.  *See Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 529 (6th Cir. 2011) (noting that FLSA retaliation claims use the same standard as ADA retaliation claims).

establishes a *prima facie* case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff . . .bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997).

The parties dispute only the first and fourth elements of Popeck's retaliation claims. Accordingly, a few points on those elements are in order. First, to engage in protected activity, an employee must clearly challenge an employment practice that she believes is unlawful. *See Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (noting that "a 'vague charge of discrimination'" is not a protected activity (citation omitted)). Second, establishing causation between a protected activity and adverse employment action requires the employee to "produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citations omitted). "[E]vidence that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.* (citation omitted). Temporal proximity, however, rarely constitutes *prima facie* evidence of causation and is *never* sufficient to show pretext; "the employee must [usually] couple temporal proximity with other evidence of retaliatory conduct . . . ." *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (citation omitted). In analyzing temporal proximity, courts in the Sixth Circuit look to the amount of time between the [employee's] first protected activity and the adverse employment action. *Hall v. Ohio Bell Tel. Co.*, 529 F. App'x 434, 441 (6th Cir. 2013). Finally, "[t]he burden of establishing a *prima facie* case in a retaliation action is not onerous," but is a burden nonetheless. *Nguyen*, 229 F.3d at 563 (citation omitted).

a.      **FMLA – Demotion & Termination**[27]

i.      **Prima Facie Case**

Defendants do not dispute their awareness of the fact that Popeck sought leave under the FMLA; rather, Rawlings Co. argues that no causal connection exists between Popeck's first stint of FMLA leave and her demotion and/or termination.  (Def. Rawlings' Mot. Summ. J. 48-50). Popeck counters that she has submitted evidence of causation sufficient to present a *prima facie* case of FMLA retaliation.  (Pl.'s Resp. Rawlings' Mot. Summ. J. 56-57, 61).

As an initial matter, Popeck's case does not present a scenario where temporal proximity alone satisfies the causation element of her *prima facie* case.  Popeck obtained FMLA leave in December 2013 but was not demoted until August 2014, over eight months later.  (Young Dep. 252:10-20; Ford Dep. 102:3, 103:15-16, 104:3-4).   Rawlings Co. did not terminate her employment until two years after she first sought leave.  (Popeck Dep. 181:25-182:1).  The Sixth Circuit has reasoned that a time period of four months between a protected activity and adverse employment action is too long to establish an inference of causation.  *See Blosser v. AK Steel Corp.*, 520 F. App'x 359, 363 (6th Cir. 2013).

In light of that, Popeck asserts that temporal proximity—coupled with the fact that Young subjected her to heightened scrutiny shortly before her demotion—shows that Rawlings Co. demoted her in retaliation for obtaining FMLA leave.[28]  (Pl.'s Resp. Rawlings' Mot. Summ. J. 56-57, 61).   Specifically, she argues that Young's act of "spying" on her while she took

---

[27] Ford incorporated Rawlings Co.'s arguments as to Popeck's FMLA retaliation claim into her separate motion for summary judgment.  (Ford's Mot. Summ. J. 12).  Accordingly, the Court will jointly address Ford and Rawlings Co.'s liability in light of Rawlings Co.'s arguments.

[28] Popeck offers no evidence to support her claim that Defendants terminated her because she took FMLA leave; Defendants are therefore entitled to summary judgment on Popeck's termination-based FMLA retaliation claim.

excessive smoke breaks constitutes heightened scrutiny, prompted by her decision to seek FMLA leave.  (Pl.'s Resp. Rawlings' Mot. Summ. J. 56-57).

Defendants contend that even if Young subjected Popeck to heightened scrutiny he did so because of her team's poor performance, not because she took FMLA leave, and Popeck has failed to present any evidence to the contrary.  (Def. Rawlings' Reply Supp. Mot. Summ. J. 18-19, DN 139 [hereinafter Rawlings' Reply]).  Defendants also established that Young expressed concern about Popeck's leadership qualities prior to her applying for FMLA leave, thereby negating any suggestion that he began scrutinizing her work *after* she took leave.  (Rawlings' Reply 19-20; Popeck Dep. 128:23-130:6).  As a sister court has noted, "[e]vidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation."  *Lattimore v. Wild Flavors, Inc.*, No. CIV.A. 2009-023 WOB, 2012 WL 208078, at *17 (E.D. Ky. Jan. 23, 2012) (citation omitted).  On this basis, Popeck failed to meet her burden.

### ii.    Legitimate, Non-discriminatory Reason for Adverse Action

If Popeck had proven a *prima facie* case of FMLA retaliation, the burden would shift to Defendants to set forth a legitimate, non-discriminatory reason for demoting her.  *Penny*, 128 F.3d at 417.  Defendants claim that Rawlings Co. demoted Popeck for a number of reasons, all of which relate to her poor work performance rather than her taking FMLA leave.   First, Defendants assert that Young demoted her because she failed to curb her team's absenteeism, tardiness, and tendency to take excessive breaks.  (Team Member Emails 1-8).   Second, Defendants point out that Popeck's excessive smoking breaks violated company policy and that, when confronted about her behavior during her demotion meeting, Popeck did not deny that she had been taking excessive breaks or suggest that the breaks she took were related to her IBS.

(*See* Popeck Dep. 216:24-217:13; Ford Dep. 105:24-106:8).  No genuine disputes of fact exist as

to the truth of these reasons,[29] and both demonstrate that Defendants had a legitimate reason for

demoting Popeck.  *See Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 560 (6th Cir. 2009)

(concluding that a violation of company policy was a legitimate reason to terminate an

employee); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) (noting that

poor work performance justified administration of adverse employment action).

### iii.     Pretext

Popeck must now establish that Defendants' reasons for demoting her constitute pretext

for discrimination.  *Penny*, 128 F.3d at 417.  In an attempt to do so, Popeck argues that

Defendants' corporate representative testified that Popeck was demoted due to "excessive

absences and time away from work" rather than smoke breaks.  (*See* Pl.'s Mem. Supp. Mot.

Partial Summ. J. Re. Smoking Breaks 12, DN 112-1 (citing Barrens Dep. 13:6-8)).  She also

claims that Mr. Rawlings—who did not play a role in Young's decision to demote her—has

testified that he did not know that Popeck smoked.  (Pl.'s Mem. Supp. Mot. Partial Summ. J. Re.

Smoking Breaks 12).  Finally, she claims that when she first began working at Rawlings Co., she

was permitted to take multiple breaks per day as long as she completed her work.  (Popeck Aff. ¶

18).

These arguments are unavailing and fail to create an issue of fact.  Contrary to Popeck's

position, the fact that Rawlings Co.'s corporate representative testified that it was *her*

*understanding* that Popeck was demoted due to "excessive absences and time away from work"

does not mean that Young terminated her because she took FMLA leave.  Rather, that statement

is entirely consistent with the undisputed fact that Young demoted Popeck due to her *excessive*

---

[29] Popeck has submitted no evidence showing that she did in fact curb her team's misbehavior or
that she did not take excessive smoking breaks during her stint as ATM.

*breaks*, which are the same thing as *time away from work*.  (*See* Popeck Dep. 216:24-217:13; Ford Dep. 105:24-106:8).  Additionally, it is irrelevant that Mr. Rawlings did not know that Popeck took excessive smoking breaks since Ford and Young made the decision to demote Popeck.  (Young Dep. 252:10-20; Ford Dep. 102:3, 103:15-16).  Finally, that Popeck's ATM permitted her to take multiple smoke breaks per day as long as she completed her work is immaterial.  (Popeck Aff. ¶ 18).  Young did not supervise Popeck when she worked as an auditor, so he had no reason to monitor her smoking habits at that time.  (Popeck Dep. 58:8-23 (testifying that ATMs manage)).  Perhaps Young *would not* have criticized Popeck's excessive breaks if she "got all of [her] work finished and done to [his] satisfaction."  (Popeck Aff. ¶ 18).  But she did not.  It is significant to note in this regard that Young's initial conversation with Popeck was motivated by the fact that her team had missed over 60% of their shifts!  (Team Member Emails 7-8).  Given this dismal performance record, her failure to meet the expectations Rawlings Co. sets for its managers justified the demotion.

No disputes of fact exist as to whether Defendants' stated reasons for demoting Popeck are pretext for discrimination.  Defendants are entitled to summary judgment on this claim.

### b.   ADA/KCRA – Termination

Popeck claims that she engaged in three protected activities under the ADA, and that Defendants terminated her as a result.  (Pl.'s Resp. Rawlings' Mot. Summ. J. 61).  First she claims that she complained to Mr. Rawlings that Ford was mistreating her and "asked if [she] could have a different Human Resources worker handle [her] medical issues."  (Popeck Aff. ¶ 74).  Second, she notes that she complained to Ricketts that Chapman was treating her differently as a result of her ADA accommodation, as Chapman refused to process invoices that she had completed, thereby thwarting her efforts to achieve her performance goals.  (Popeck Aff. ¶¶ 83-

84).  Third, she argues that her attorney contacted Defendants and threatened to file an EEOC charge against them.  (Popeck Aff. ¶ 88).  Further, Popeck seems to contend that Young's "heightened scrutiny" and temporal proximity demonstrate a causal connection between these events and her discharge.  (Pl.'s Resp. Rawlings' Mot. Summ. J. 61).  Finally, Popeck contends that Mr. Rawlings admitted that he terminated her because she threatened to file an EEOC charge against the company.  (Pl.'s Resp. Rawlings' Mot. Summ. J. 59).

Defendants counter that two of Popeck's "complaints" are not protected activities and that she has not established a causal connection between those activities and her termination.  (Def. Rawlings' Mot. Summ. J. 56-59; Rawlings' Reply 22-23).  Specifically, Defendants note that Popeck raised her first and second protected activities for the first time in an affidavit attached to her response to Defendants' summary judgment motions and that these activities "appear to have been fabricated for the purposes of avoiding summary judgment."[30]  (Rawlings' Reply 23).  Defendants then argue that, in any event, Popeck has failed to produce evidence establishing a causal connection between those activities and her termination.  (Rawlings' Reply 23-24).  Finally, Defendants contend Popeck is wrong to suggest that Mr. Rawlings admitted that he terminated her because of that activity.  (Rawlings' Reply 22).

Defendants' position is persuasive.  Even assuming that Popeck did not fabricate her first and second complaints, the former does not constitute a protected activity because Popeck's testimony does not indicate that she told Mr. Rawlings that Ford was mistreating her *because of her disability*.  *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 592 (6th Cir. 2007) (finding that employee did not engage in protected activity when he failed to tell his employer that he believed he was being discriminated against due to his age).  While the second complaint appears to clear

---

[30] To underscore their argument, Defendants note that Popeck did not discuss either of those complaints during her deposition.  (Rawlings' Reply 23).

that hurdle, Popeck has failed to present evidence establishing a connection between that activity and her termination. (Popeck Aff. ¶¶ 83-84). Further, Mr. Rawlings did not "admit" that he ultimately approved the decision to terminate her *because* she threatened to file an EEOC charge against the company. Mr. Rawlings was aware that Popeck was likely to sue Rawlings Co., but his general knowledge of Popeck's impending suit does not establish that he fired her *because* of it. (*See* Rawlings Dep. 174:3-9); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1314 (6th Cir. 1989) ("[T]he mere fact that an adverse employment decision occurs after a charge of discrimination is not . . . sufficient to support a finding that the adverse employment decision was in retaliation to the discrimination claim." (citation omitted)). Finally, to the extent Popeck relies on temporal proximity to create an inference of causation between any of her alleged activities and termination,[31] that inference is significantly undercut by the fact that Popeck voiced her complaints at least one month after Ford warned her—*for the second time*—about her tardiness and absenteeism.[32] *See, e.g.*, *Lattimore*, 2012 WL 208078, at *17 ("Evidence of an employer's concerns about an employee's performance before the employee's protected activity undercuts a finding of causation." (citation omitted)). In this regard, Popeck's performance deficiencies existed for the entirety of 2015. (2015 Performance Chart 1-2). Further, it is noteworthy that Popeck was admonished for taking a forty-minute smoke break *after* she was warned on November 10, 2015, and *before* she complained of differential treatment.

---

[31] She appears to have engaged in all of her alleged "protected activities" sometime within the last two months of her employment at Rawlings Co. (Popeck Aff. ¶¶ 74-75, 83-84).

[32] Ford issued the second written warning on September 30, 2015, and each protected activity occurred sometime in November 2015. (*See* Popeck Aff. ¶¶ 74-75, 83-84; Second Written Warning 1).

Having carefully reviewed the record and arguments of the parties, the Court finds that Popeck has failed to create a dispute of fact as to whether Defendants demoted Popeck due to her complaints.  Defendants terminated Popeck because she continued to arrive to work late and take excessive breaks after being warned that doing so would result in her termination.  (Ford Dep. 181:21-182:9; Final Written Warning).  Defendants therefore had a legitimate justification for terminating Popeck, and she has failed to show that this reason was pretext for discrimination.  *See Santana v. U.S. Tsubaki, Inc.*, 932 F. Supp. 189, 191 (N.D. Ohio 1995) (holding that employer was justified for terminating employee for arriving to work late after receiving warnings regarding his tardiness).  Defendants are entitled to summary judgment on this claim.[33]

### c.    KWHA – Termination[34]

Finally, Popeck asserts that Defendants terminated her because she informed Mr. Rawlings that her pay was being "docked because of [her] IBS and the FMLA/ADA status surrounding it" when she approached him for a loan.  (Popeck Aff. ¶ 63).  She claims that this conversation constitutes a protected activity under the KWHA, and that "[i]t is up to the jury to decide whether [this conversation] toppled the first domino" that ultimately resulted in her discharge.  (Pl.'s Resp. Rawlings' Mot. Summ. J. 58-59).

This claim suffers from the same infirmities as her other retaliation claims.  At the outset, the correspondence does not appear to constitute a protected activity under the KWHA.  The relevant provision therein states:

---

[33] Ford incorporated Rawlings Co.'s arguments regarding Popeck's claim of KCRA retaliation into her separate motion, so the Court's analysis dismisses this claim as against both Ford and Rawlings Co.  (Ford's Mot. Summ. J. 12).  The Court also notes that that Ford is entitled to summary judgment on Popeck's claim for ADA retaliation because Ford was not Popeck's employer and therefore cannot be held liable for such a claim.  *See Hiler v. Brown*, 177 F.3d 542, 545-47 (6th Cir. 1999).

[34] Ford expressly incorporated Rawlings Co.'s arguments as to Popeck's KWHA retaliation claim into her separate motion.  (Ford's Mot. Summ. J. 10).

> Any employer who discharges or in any other manner discriminates against any employee because the employee has made any complaint to his or her employer, to the commissioner, or to the commissioner's authorized representative *that he or she has not been paid wages in accordance with KRS 337.275 and 337.285 or regulations issued thereunder* . . . shall be deemed in violation of KRS 337.275 to 337.325, KRS 337.345, and KRS 337.385 to 337.405 . . . .

KRS 337.990(9) (emphasis added).  Contrary to her arguments, Popeck did *not* tell Mr. Rawlings that Rawlings Co.'s practice of prorating her pay to reflect partial day absences during pay periods where she was not on FMLA leave *violated* the KWHA—she merely told him that she "needed some extra money towards rent or bills, because [she] had been out on" FMLA leave. (Popeck Dep. 297:9-13).  This does not qualify as a protected activity.[35]  *See, e.g.*, *Riffe v. Wal-Mart Stores, Inc.*, No. 1:11 CV 266, 2012 WL 204164, at *7 (N.D. Ohio Jan. 24, 2012) (concluding that an employee's complaint that she was "not happy" that she had to answer phone calls from home without being paid overpaid was too vague to constitute a protected activity under the FLSA); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011) ("To fall within the scope of the antiretaliation provision, a complaint must be sufficiently clear and detailed for a reasonable employer to understand it . . . as an assertion of rights protected by the [FLSA] . . . .").[36]  Even if it did, Popeck has produced no evidence

---

[35] Popeck's affidavit—which casts her conversation with Mr. Rawlings differently so that *it appears* to allege a violation of the KWHA (*see* Popeck Aff. ¶¶ 63-64)—does not change the outcome of the analysis.  "Although the affidavit represents [Popeck's] sworn testimony, it does not . . . preclude summary judgment" because "[a] party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts earlier deposition testimony."  *See Sanders v. Bemis Co., Inc.*, No. 3:16-CV-00014-GFVT, 2017 WL 405920, at *5 (E.D. Ky. Jan. 30, 2017) (internal quotation marks omitted) (quoting *Penny*, 128 F.3d at 415).

[36] The Court recognizes that *Riffe* and *Kasten* are cases interpreting the FLSA's anti-retaliation provision rather than the KWHA's.  Kentucky courts, however, interpret the KWHA consistent with the FLSA when the two sets of provisions are similar.  *Starr v. Louisville Graphite, Inc.*, No. 2014-CA-000620-MR, 2016 WL 1612940, at *3 (Ky. App. Apr. 22, 2016).  The relevant FLSA provision states that "it shall be unlawful for any person . . . to discharge or in any other manner discrimination against any employee because she employee has filed a complaint."  29

demonstrating a causal connection between it and her termination, especially in light of her poor attendance record.  Defendants are entitled to summary judgment.

### 4.      *Count V – Wage Law Violation Under KWHA & FLSA*[37]

In Count V of the Second Amended Complaint, Popeck alleges that Defendants violated the FLSA when they prorated her pay to reflect partial day absences during pay periods where she missed work but was not on FMLA leave.[38]  (Second Am. Compl. ¶¶ 214-21).  Rawlings Co. appears to concede the impropriety of the partial day deductions, but nonetheless moves for summary judgment on this claim.[39]  (Def. Rawlings' Mot. Summ. J. 60-61; Rawlings' Reply 27).

Rawlings Co. has admitted that it deducted Popeck's pay to reflect partial day absences for leave designated as arising under the ADA, and, as a result, Rawlings Co. has violated 29 C.F.R. § 541.602(a).  (*See* Ford Dep. 133:6-134:17).  That regulation states that a "salary basis" employee—like Popeck—must be paid "a predetermined amount" that "is *not subject to reduction* because of variations in the quality of quantity of the work performed."  29 C.F.R. § 541.602(a) (emphasis added).  Correspondingly, such employees "must receive the full salary for

U.S.C. § 215(a)(3).   These provisions are therefore similar and should be interpreted consistently.

[37] Count V alleges violations of the FLSA and KWHA, but the parties' briefs focused exclusively on whether Defendants violated the FLSA.  Given that Kentucky courts interpret the KWHA consistent with the FLSA—and that both the FLSA and KWHA require employers that fail to compensate their employees consistent with those acts to pay damages in an amount equal to the withheld wages plus reasonable attorneys' fees and, in some instances, liquidated damages—the Court will analyze Count V pursuant to the FLSA and its regulations.  *Compare* 29 U.S.C. § 216(b), *with* KRS 337.385(1), (2); *see also Starr*, 2016 WL 1612940, at *3.

[38] According to Popeck, Defendants incorrectly designated her leave as FMLA rather than ADA from December 2014 until November of 2015, and that improper pay deductions occurred during those months.  (Pl.'s Resp. Rawlings' Mot. Summ. J. 62).  As already explained, however, Popeck was not qualified for her position and was not entitled to the protections of the ADA.  Thus, at most, Count V is claim that Defendants improperly prorated her pay during the pay periods where Defendants *designated* her leave as arising under the ADA:  November 2014 and July through November 8, 2015.

[39] Ford cannot be held liable for Rawlings Co.'s violation of the FLSA because Ford was not Popeck's "employer."  *See, e.g.*, 29 U.S.C. § 216(b).

any week in which the employee performs any work," *unless* a specific exception to this rule applies.  *Id.*  While the FLSA allows such deductions for "full day[]" absences "occasioned by sickness or disability" and when the "employee takes unpaid leave under the [FMLA]," no exception allows employers to deduct an employee's pay to reflect partial day absences caused by sickness or disability.  29 C.F.R. § 541.602(b)(2), (7).

The three remaining issues relate to the consequences of Rawlings Co.' violation.  The first is whether Rawlings Co. withheld wages in an amount greater than the amount that it already paid her, and the second is whether Rawlings Co. must pay Popeck liquidated damages in an amount equal to her unpaid wages.  The third issue relates to attorneys' fees.  Each issue is addressed in turn.

### a.      Extent of Liability

The record shows that Rawlings Co. sent Popeck a check for $2,082.34 on July 29, 2016.  In an accompanying letter, Rawlings Co. informed Popeck that the check "represents wages (less all applicable withholdings) plus interest for partial day periods in which [Popeck] did not work, and was not compensated for in November 2014, and July through November 2015"—the pay periods in which Rawlings Co. designated her leave as being provided under the ADA.  (Deduction Payback Letter & Check 3, DN 46).  Popeck seems to claim that the check is insufficient, asserting that the check is only a partial payment for "some of the docked . . . days." (*See* Pl.'s Resp. Def. Rawlings' Mot. Summ. J. 62).  She has not, however, submitted evidence disputing Defendants' calculations.

Under the FLSA, the "plaintiff must prove by a preponderance of evidence that . . . she 'performed work for which [she] was not properly compensated.'"  *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 602 (6th Cir. 2009), *abrogated by Campbell-Ewald Co. v. Gomez*,

38

136 S. Ct. 663 (2016), (quoting *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999)).   Even in instances where the employer has failed to keep adequate records of the employee's work schedule, she must produce an estimate of her damages.  *Id.*

Popeck has not produced *any* evidence regarding the extent to which Rawlings Co. incorrectly deducted her pay, much less evidence suggesting that she is entitled to more than $2,082.34.  Thus, Popeck has not created a dispute of fact as to whether Rawlings Co. owes her more for its violation of 29 C.F.R. § 541.602(a) than what it has already paid.

### b.    Liquidated Damages

An employer who violates the FLSA's compensation provisions is usually liable to the employee for the unpaid compensation plus an equivalent amount in liquidated damages.   29 U.S.C. § 216(b).  But "if the employer shows to the satisfaction of the court that the" employee's under-compensation "was in good faith and that [it] had reasonable grounds for believing that his act or omission was not a violation of the [FLSA] . . . the court may, in its sound discretion, award no liquidated damages . . . ."  29 U.S.C. § 260.  This burden is "substantial and requires proof that [the employer's] failure to obey the statute was *both* in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict."  *Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 840 (6th Cir. 2002) (internal quotation marks omitted) (alterations and emphasis in original) (citations omitted).

Rawlings Co. asserts that its payroll department acted in good faith and with reasonable grounds when it deducted Popeck's pay, thereby absolving it from liability for liquidated damages.   To support this argument, it first points to a Department of Labor ("DOL") administrative opinion.  (Def. Rawlings' Mot. Summ. J. 61-62).  In that opinion, the DOL analyzes the interaction between the FLSA's compensation requirements and several proposed

rehabilitation plans. *See* WH Admin. Op. No. FLSA2004-5, 2004 WL 2146924, at *1-2 (2004). The opinion provides that, while an employee is recuperating from a sickness or disability, her employer "may make a bona fide reduction in an employee's salary because of a 'reduction in the normal scheduled workweek,' so long as the reduction 'is not designed to circumvent the salary basis requirement.'" *Id.* (citation omitted). Rawlings Co. further points out that the FLSA permits an employer to make a partial day deductions to an employee's pay when the employee is on FMLA leave and notes that it only designated Popeck's leave as *something other than FMLA* so that she could remain employed. *See* 29 C.F.R. § 541.602(b)(7); (Parker Dep. 164: 10-12).

In light of the facts of this case, the Court will not require Rawlings Co. to pay Popeck liquidated damages. Had Defendants never designated Popeck's leave as arising under the ADA, she would not have a claim under 29 C.F.R. § 541.602(a) in the first place because she would have been fired. Rawlings Co. sheltered Popeck with the ADA's protections to allow her to keep her job, even though it had no obligation to do so. (Parker Dep. 164:10-13; Ford Dep. 116:4-12). Rawlings Co. acted in good faith when treating Popeck's ADA and FMLA leave the same and should not be punished for doing so, as such treatment of an employer who "goes beyond the demands of the law to help a disabled employee" creates perverse incentives. *See Kleiber*, 420 F. Supp. 2d at 822 (citation omitted). In this instance, it appears Rawlings Co. bent over backwards to help Popeck and has amply established its good faith.

### c.    Attorneys' Fees

Notwithstanding the foregoing, the fact remains that both the FLSA and the KWHA require Rawlings Co. to pay Popeck's reasonable attorneys' fees. *See* 29 U.S.C. § 216(b); *Fegley v. Higgins*, 19 F.3d 1126, 1134 (6th Cir. 1994) ("An award of attorney fees to a

prevailing plaintiff under § [216(b)] of the FLSA is mandatory . . . ." (citation omitted)); *Hunt v. N. Am. Stainless*, 482 S.W.3d 796, 799-800 (Ky. App. 2016) (affirming an award of reasonable attorneys' fees under the KWHA).   As a result, though Popeck did *not* move for summary judgment on this claim, the Court will nonetheless:  (1) enter judgment on this claim in favor of Popeck (due to Rawlings Co.' concession), and (2) order that Rawlings Co. pay Popeck's reasonable attorneys' fees related to this claim.[40]   *Celotex Corp.*, 477 U.S. at 326 ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte* . . . .").

### 5.     *Count III – Violation of KRS 341.990(6)(a)*

Next, Defendants move for summary judgment on Popeck's claim that they violated KRS 341.990(6)(a).  (Second Am. Compl. ¶¶ 197-204).  That statute provides:

> Any person who knowingly makes a false statement or representation, or who knowingly fails to disclose a material fact to prevent or reduce the payment of benefits to any worker entitled thereto, or to avoid becoming or remaining subject to this chapter, or to avoid or reduce any payment required of an employing unit under this chapter shall be guilty of a Class A misdemeanor unless the liability avoided or attempted to be avoided is one hundred dollars ($100) or more, in which case he shall be guilty of a Class D felony.

KRS 341.990(6)(a).  Popeck claims that Defendants violated this provision when Ford submitted paperwork to the KDUI which stated: "[c]ontrary to [Popeck's] statement[,] she has not submitted paperwork establishing a disability."  (Second Am. Compl. ¶ 146; Unemployment Response, DN 116-35).

---

[40] Ford cannot be held liable for Popeck's attorneys' fees—or any other aspect of her FLSA and KWHA claims—because, given that she did not employ Popeck, Ford is not subject to the FLSA's provisions.  *See Dole*, 943 F.2d at 965.

Collectively, Defendants argue that they are entitled to summary judgment on this claim for two reasons.[41]   First, Defendants assert that they did not knowingly make any false statements to the KDUI.  (Ford's Mot. Summ. J. 4-7).  Second, Defendants claim that Popeck has failed to present proof that Defendants made false statements to the KDUI so as "to prevent" Popeck from obtaining unemployment benefits.  (Ford's Reply 7-8).

Popeck claims that Defendants' statement to the KDUI that Popeck failed to "submit[] paperwork establishing a disability" is false, as the ADA paperwork that Dr. Rhoads submitted to Defendants on Popeck's behalf establishes that she had an impairment (IBS) that substantially limited her ability to work (a major life activity).  (Pl.'s Resp. Ford's Mot. Summ. J. 30).  Further, she argues that Ford testified that "generally, people who have attendance problems due to illness do get unemployment" and attempts to imply from this statement that Ford presented the false statement to the KDUI to prevent her from obtaining benefits.  (Pl.'s Resp. Ford's Mot. Summ. J. 9 (citing Ford Dep. 245:24-246:2)).

No material disputes of fact exist and Defendants are entitled to summary judgment on this claim.  The ADA paperwork Dr. Rhoads submitted to Defendants on her behalf *does not* establish that Popeck's IBS substantially limits her ability to work.   Rather, Dr. Rhoads responded:  (1) "yes" to the question whether Popeck was "currently able to perform all of the physical and mental functions of his/her position," and (2) "no" to the question whether Popeck's impairments "substantially limit [her] ability to perform any major life activities . . . ."  (*See* 2014 ADA Paperwork 2; 2015 ADA Paperwork 2).  Given those answers, Defendants did not "knowingly make[] a false statement or representation" to the KDUI.  *See* KRS 341.990(6)(a).

---

[41] Only Ford's motion for summary judgment contains arguments addressing Popeck's claim under KRS 341.990(6)(a), but Rawlings Co. expressly incorporated these arguments into its separate motion.  (*See* Def. Rawlings' Mot. Summ. J. 67).  That said, the Court will jointly address Defendants' liability with respect to this claim in the context of Ford's arguments.

Even assuming they did, Popeck has not presented any evidence indicating that Defendants made said statements "to prevent or reduce" Popeck's unemployment benefits." *See id.*  Contrary to Popeck's position, Ford's statement does not imply any attempt to prevent her from obtaining benefits; instead, the statement merely evidences Ford's knowledge about the typical outcome of unemployment claims.  Thus, Defendants are entitled to summary judgment on this claim.

### 6.    *Declaratory Judgment*

Finally, Popeck seeks a judgment declaring that Rawlings Co. forfeited its overtime exemption when it violated 29 C.F.R. § 541.602(a), which is discussed above.[42]  Defendants argue that Popeck lacks standing to sue for such a judgment and that, in any event, she is not entitled to one because Rawlings Co. is entitled to the FLSA's "window of correction" defense as set forth at 29 C.F.R. § 541.602(a).  (Def. Rawlings' Mot. Summ. J. 63-65; Rawlings' Reply 28-29).

Both of Defendants' arguments are persuasive.  The fact FLSA regulations state that that "[a]n employer who makes improper deductions from salary"—such as Rawlings Co.—"shall lose the [overtime] exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis" does not necessarily mean that Popeck is entitled to a judgment declaring as such.  *See* 29 C.F.R. § 541.603(a).  To bring suit, she must establish that she suffered an "injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  As that requirement relates to this claim, Popeck must show that she worked *more than forty hours* in a week and was not paid overtime.  *See Craig v. Bridges Bros. Trucking LLC*, 823 F.3d 382, 391

---

[42] Popeck initially sought a judgment declaring that Defendants forfeited their overtime exemption with respect to *all* of Rawlings Co.'s auditors and audit managers based on Rawlings Co.'s violation of 29 C.F.R. § 541.602(a). (*See* Second Am. Compl. ¶¶ 230-51).  In her response to Rawlings Co.'s Motion for Summary Judgment, however, she conceded that she lacked standing to litigate other employees' rights and asked the Court to enter a judgment declaring her rights.  (Pl.'s Resp. Rawlings' Mot. Summ. J. 68).

(6th Cir. 2016) (citation omitted).  Popeck has not even alleged (much less proven) that she ever worked more than forty hours in a week at Rawlings Co. and has consequently not met this burden.

Further, Defendants would be entitled to summary judgment as to this claim even if Popeck had standing to bring it because no genuine dispute of fact exists as to whether Defendants are entitled to the FLSA's "window of protection" defense.  That defense provides:

> If an employer has a clearly communicated policy that prohibits the improper pay deductions . . . and includes a complaint mechanism, reimburses employees for any improper deductions and makes a good faith commitment to comply in the future, such employer *will not lose the exemption* unless the employer willfully violates the policy by continuing to make improper deductions after receiving employee complaints.

29 C.F.R. § 541.603(d) (emphasis added).  Rawlings Co. has a "clearly communicated policy" prohibiting improper deductions.  Its employee handbook specifically states:  "Your salary will not be reduced for a partial day absence even if you do not have eligible sick or vacation time." (*See* Rawlings' Employee Handbook 26).  Rawlings Co. also utilizes a "complaint mechanism" designed to uncover improper deductions, which provides:  "If you believe your wages have been subject to any improper deductions, or your pay does not accurately reflect all hours worked, you should report your concerns to your Supervisor immediately, who will report the discrepancy to the Human Resources Department."   (Rawlings' Employee Handbook 27). Moreover, Rawlings Co. has paid Popeck an amount equal to the improper deductions she endured.  (*See* Deduction Payback Letter & Check 3).  Rawlings Co. has introduced evidence that it made a good faith effort to make deductions consistent with its handbook and the FLSA, as evidenced by its implementation of "procedural safeguards to prevent partial day deductions

for exempt employees related to unpaid leave as an ADA accommodation . . . ."  (Barrens Aff. ¶ 8).

Because Defendants are entitled to the window of correction defense, Popeck has no viable claim for a declaratory judgment.  Defendants are therefore entitled to summary judgment on this claim.

### B.   Plaintiff's Motions for Partial Summary Judgment

In light of the Court's determination that it will dismiss Popeck's claims, it is unnecessary for the Court to consider the merits of her dispositive motions.  Accordingly, those motions will be denied as moot.

### C.   Plaintiff's Objection to Magistrate Judge's Order

Popeck has objected to the Magistrate Judge's Order dated June 21, 2017, involving the scope of discovery.  Because the Court is dismissing Popeck's claims in this action, the Court will overrule her objection as moot.

### D.   Parties' Motions to Exceed Page Limitations

The parties have requested permission to exceed the page limitations of LR 7.1.  Because those requests are reasonable, the Court will grant those motions.

### V.   CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.   Defendants' Motions for Summary Judgment (DN 115, 116) are **GRANTED IN PART** and **DENIED IN PART**.  Defendants are entitled to summary judgment on all of Plaintiff's claims except for Count V.  While Rawlings Company LLC has already paid Plaintiff back pay on that claim, Plaintiff is the prevailing party on that claim because Rawlings Company LLC violated the Fair Labor Standards Act and the Kentucky Wage and Hour Act.  Accordingly,

within ten (10) days of the entry of this Memorandum Opinion and Order, Plaintiff shall submit an itemized statement outlining her reasonable attorneys' fees and costs incurred and to be paid by Rawlings Company LLC relating only to Count V.  Rawlings Company LLC shall have ten (10) days to respond with any objections.

2.      Defendants' Motions for Leave to Exceed Page Limitations (DN 114, 124, 138) and Plaintiff's Motion for Leave to Exceed Page Limitations (DN 126) are **GRANTED**.

3.      Plaintiff's Objection to Magistrate Judge's Order (DN 97) is **OVERRULED AS MOOT**.

4.      Plaintiff's Motions for Partial Summary Judgment (DN 110, 111, 112, 113, 117, 118) are **DENIED AS MOOT**.

**Greg N. Stivers, Judge**
**United States District Court**

May 3, 2018

cc:     counsel of record